**UNITED STATES DISTRICT COURT**
**DISTRICT OF WASHINGTON D.C.**

| | | |
|---|---|---|
| Standing Rock Sioux Tribe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| U.S. Army Corps Engineers; Michael | ) | |
| Connor, in his capacity as Assistant | ) | |
| Secretary; Col. Robert J. Newbauer, | ) | **Standing Rock Sioux Tribe's** |
| in his capacity as Omaha District | ) | **Complaint for Injunctive,** |
| Commander; Brig. Gen. Geoff Van Epps, | ) | **Declaratory or Other** |
| in his capacity as Northwestern Division | ) | **Equitable Relief** |
| Commander, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Comes Now, the Standing Rock Sioux Tribe, and for its Complaint alleges as follows:

<u>Introduction</u>

1.      Plaintiff Standing Rock Sioux Tribe files this suit for vacatur, and equitable, declaratory and injunctive relief to protect the Standing Rock Sioux Tribe's water supplies, cultural resources, and Treaty rights threatened by the unlawful and unreasonable actions and inactions of Defendant U.S. Army Corps of Engineers ("Corps") in failing to regulate, permit, and remove the Dakota Access Pipeline ("DAPL") operated by Energy Transfer LP, as required by law.

2.      The defendants include the Corps and its primary officials that are allowing DAPL to operate in a federally-administered flood control project in spite of violations of numerous mandatory federal statutes and regulations. The defendants' conduct in allowing the continued operation of DAPL without the required easement to cross federal land, absent a lawful environmental impact analysis under the National Environmental Policy Act ("NEPA"), without

compliant emergency spill response plans, and in violation of Treaty rights held by the Standing Rock Sioux Tribe, and by a company that has been debarred from holding any federal licenses due to established criminal conduct and, as alleged herein, is responsible for the deliberate destruction of Standing Rock Sioux Tribe cultural resources, constitutes agency action that is arbitrary, capricious, an abuse of discretion or otherwise contrary to law within the meaning of the Administrative Procedures Act ("APA"). 5 U.S.C. §706.

3.      Under the Rivers and Harbor Act of 1898, 33 U.S.C. §401 *et seq.*, the Corps of Engineers is authorized to implement engineering works in the navigable waters of the United States. In the Flood Control Act of 1944, 58 Stat. 887, the Corps was authorized to develop five massive earthen dams on the Missouri River main stem, primarily for flood control, navigation and hydropower generation.

4.      Under these and other related authorities, the Corps built and operates the Oahe Dam, much of whose reservoir is located on the Standing Rock Indian Reservation. The manner in which the Corps operates the dam and manages the land surrounding the reservoir has had and continues to have a significant effect on the Standing Rock Reservation environment.

5.      The Dakota Access Pipeline is a 1,174 mile-long hazardous liquid material pipeline with an original capacity of 574,000 barrels per day. DAPL originates in the Bakken and Three Forks oil fields near Stanley, North Dakota, and carries Bakken crude to refineries near Patoka, Illinois. It enters the Treaty land of the Oceti Sakowin Oyate ("Seven Council Fires," commonly known as the Great Sioux Nation) upon crossing the Heart River in present-day central North Dakota. 11 Stat. 749 (1851 Treaty of For Laramie). The pipeline crosses the Missouri River high consequence area less than one-half mile from, and directly upriver from, the present-day boundary of the Standing Rock Indian Reservation.

2

6.      On February 8, 2017, defendant Army Corps of Engineers granted an easement to Dakota Access, LLC, a wholly owned subsidiary of Energy Transfer LP, to operate DAPL on federally-administered land and water at the Oahe Reservoir immediately adjacent to plaintiff's Reservation. On March 25, 2020, this Court vacated the easement, due to defendants' failure to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §4231 *et seq*., and its implementing regulations. *Standing Rock v. U.S. Army Corps of Engineers*, 471 F.Supp.3d 71, 77-78 (D.D.C. 2020). On January 26, 2021, the D.C. Circuit Court of Appeals affirmed the vacating of the easement. *Standing Rock Sioux Tribe v. Army Corps of Engineers*, 985 F.3d 1032, 1054 (D.C. Cir. 2021).

7.      At present, DAPL is operating across federally-administered land and water without an easement as required by the Mineral Leasing Act of 1920, 30 U.S.C. §185(a), and without a determination of the pipeline's environmental impacts, as required by the Mineral Leasing Act, *id.* at (h), NEPA, 42 U.S.C. §4232, and the defendants' regulations. 32 CFR §651.10(i).

8.      On August 22, 2022, Energy Transfer LP pled no contest and was convicted of 23 criminal violations of the Pennsylvania Clean Streams Act.

9.      On October 22, 2023, Energy Transfer LP, obtained a special entity designation of debarment by the U.S. Environmental Protection Agency, under the Government Acquisition and Streamlining Act of 1994, 31 U.S.C. §6101 (note), and its implementing regulations. Energy Transfer LP is debarred from contracting and federal assistance for an indefinite period under the statute and regulations. Consequently, Energy Transfer LP is not eligible for the statutorily-required easement.

10.      On approximately September 3, 2016, upon information and belief, Energy

Transfer LP's contractors intentionally destroyed up to 28 burials of ancestors of the Standing Rock Sioux Tribe located near the pipeline route, by excavating and grading land containing the sites. This was done for the purpose of circumventing the review and consultation process for historic properties that is prescribed in section 106 of the National Historic Preservation Act ("NHPA"). 54 U.S.C. §306108. The pipeline operator is not eligible for the required easement because such action violated section 110(k) of the NHPA, which prohibits federal assistance to any applicant that intentionally destroys historic properties to evade the section 106 review process. 54 U.S.C. §306113.

11.    Defendant Van Epps oversees water releases from Oahe and the other Corps of Engineers' dams on the upper Missouri River. The "normal" level of Oahe Reservoir is identified by defendants in the *Missouri River Master Water Control Manual* (2018), as the top of the "multi-purpose pool," which is 1607.5 mean sea level ("msl"). Beginning in 2021, inflows into the Missouri River reservoir system declined precipitously due to low levels of snow melt from the Rocky Mountains. The elevation of Oahe Reservoir has been considerably below normal since that time, and at times has declined to 15-18 feet below normal.

12.    Energy Transfer LP has developed the *Facility Response Plan Dakota Access Pipeline North Response Zone, Sequence No. 3056* (March 2023) and the *Geographic Response Plan, Missouri River/Lake Oahe, Emmons County, North Dakota* (March 2018) provided to the plaintiff only in redacted format. Upon plaintiff's information and belief, the redacted plan fails to include a realistic calculation of a worst-case discharge of hazardous liquid from DAPL. The Oahe Reservoir water levels routinely decline below the "muti-purpose pool" due at least in part to on-going water releases at Oahe Dam. At low elevations, there is limited or no access to Oahe Reservoir via boat ramp in the spill response zone. The boat ramps are identified in the *Facility*

*Response Plan* as the primary means for deploying spill mitigation equipment. The plan provides no detail and contains no realistic process to remediate a spill during the routine low water conditions at Oahe Reservoir, or winter ice-cover conditions.

13. Section 311(j) of the Clean Water Act and its implementing regulations require the operator of DAPL to develop and implement a Facility Response Plan to properly calculate a worst-case discharge and establish a plan remediate the release of a worst case discharge "to the maximum extent practicable." 33 U.S.C. §1321(j)(5). The DAPL plan fails to do so.

14. Notwithstanding the lack of an easement to operate the pipeline across federally-managed land; the operator's lack of eligibility to obtain an easement; and the violations of law in the operation of the pipeline, defendants have in the past and on an ongoing basis, failed to meet mandatory duties under federal law in permitting DAPL to continue to operate.

## Parties

15. Plaintiff Standing Rock Sioux Tribe is a sovereign Tribal Nation and is recognized as such by the Secretary of the Interior. <u>See</u> 88 Fed. Reg. 2114 (January 12, 2023). The Tribe resides on the Standing Rock Indian Reservation in present-day North Dakota and South Dakota. The primary address of the Tribal government is Box D Fort Yates, North Dakota 58538.

16. Defendant U.S. Army Corps of Engineers ("Corps") is a branch of the U.S. Department of the Army.

17. Defendant Michael Connor is the Assistant Secretary of the Army for Civil Works, the civilian authority that supervises the Army Corps of Engineers. Defendant Connor's address is 108 Army Pentagon Washington D.C.

18. Defendant Brig. Gen. Geoff Van Epps is the commander of the Corps of Engineers' Northwestern Division. In this capacity, defendant Van Epps supervises the operation of Oahe and

the other dams on the Missouri River main stem. Additionally, Van Epps supervises defendant Robert J. Newbauer. Defendant Van Epps' address is 1201 NE Lloyd Boulevard Suite 400 Portland, Oregon 97232.

19.     Defendant Col. Robert J. Newbauer is the Commander and District Engineer of the Corps' Omaha District Office. In this capacity, defendant Newbauer is responsible for regulatory compliance in the operation of the Oahe Dam and Reservoir, including approval of an easement for the Dakota Access Pipeline Missouri River crossing immediately adjacent to the Standing Rock Indian Reservation. Defendant Newbauer's address is 1616 Capitol Avenue Omaha, Nebraska 68102-9000.

## Jurisdiction and Venue

20.     This Court possesses jurisdiction over this dispute under 28 U.S.C. §1331 (federal question), 28 U.S.C. §1346(a)(2) (United States as defendant), 28 U.S.C. §1361 (action in the nature of mandamus), 28 U.S.C. §1363 (civil action by Indian Tribe), 28 U.S.C. §2201 (declaratory relief), and 28 U.S.C. §2202 (injunctive relief).

21.     Venue is properly before the District of D.C. pursuant to 28 U.S.C. § 1391. Defendants are located within this District and a substantial part of the actions and inactions that give rise to this Complaint occurred, and continue to occur, in this District.

## General Allegations

22.     Plaintiff Standing Rock Sioux Tribe resides on its 2.3 million acre Reservation, beginning on the Missouri River in the central Dakotas, and spreading westward for over 100 miles across the northern Great Plains. Some of the most prominent events in American history took place at Standing Rock, whose great leader, Sitting Bull, made his home near Rock Creek community along the Grand River.

23.     Standing Rock is part of a larger Native Nation, the *Oceti Sakowin Oyate* (Lakota for "Seven Council Fires"), commonly referred to as the Great Sioux Nation. The seven bands of Sioux share a common geography, language and culture, but there are three distinct language dialects – Lakota, Dakota and Nakota.

24.     The Tribe's ancestors entered into two major Treaties with the United States. In the 1851 Fort Laramie Treaty, the United States recognized a wide swath of the northern plains as Sioux Country, beginning on the Missouri River to the Platte River, west to the Big Horn mountains, and north to the Heart River in present-day North Dakota. 11 Stat. 749.The Sioux granted the United States permission for western emigrants to traverse Sioux Country on the Oregon Trail. Beginning in approximately 1864, trespassers began traveling northward through the Powder River basin to explore for gold in the northern Rocky Mountains. This impacted important buffalo hunting grounds for the Lakota. It led to the Powder River War of 1866-1867, in which Sioux warriors led by Red Cloud shut down the Bozeman Trail, while forces under Sitting Bull defended the northern hunting grounds near Kildeer Mountain.

25.     Sioux victories in the Powder River War prompted the United States to sue for peace, resulting in the Fort Laramie Treaty of 1868. The 1868 Treaty established the Great Sioux Reservation, beginning on the east bank of the Missouri River, and comprising all land within the boundaries of present-day South Dakota west of the Missouri. 15 Stat. 635. The Sioux agreed to establish permanent settlements at the Reservation, but, under Article 11, the lands identified as Sioux territory in the 1851 Treaty that are outside of the Great Sioux Reservation remained in Sioux ownership and were designated as "unceded territory" with hunting, fishing and gathering rights preserved. *Id.* at 639.  (Exhibit A – map of Sioux Nation Treaty Lands).

26.     A military incursion onto the Great Sioux Reservation in 1873 discovered gold,

leading to the Black Hills gold rush. After the historic victory at the Battle of Little Big Horn in 1875, Sioux military resistance began to subside. Congressional acts in 1877 and 1889 forcibly acquired Sioux Reservation lands, removing the Black Hills from the Reservation and then establishing new boundaries for seven smaller Sioux Reservations, including Standing Rock. The Supreme Court ruled that the taking of Sioux Nation treaty lands under the Act of 1877 violated the Fifth Amendment of the U.S. constitution, and famously stated, "(a) more ripe and rank case of dishonorable dealings will never, in all probability, be found in our nation's history." *United States v. Sioux Nation of Indians*, 448 U.S. 371, 387 (1980).

27.     Half a century later, Congress enacted the Flood Control Act of 1944, 58 Stat. 887, which authorized the Corps of Engineers to develop five massive earthen dams on the upper Missouri River. The Corps sited the dams to maximize the impacts on the Sioux Reservations and minimize adverse impacts to non-Tribal communities in the Dakotas. One of the largest of the projects, Oahe, resulted in the taking of 56,000 acres of wooded, fertile riparian lands at Standing Rock, and caused the forced relocation by the Corps of Engineers of four Standing Rock Tribal communities, including Cannon Ball.

28.     On September 2, 1958, Congress enacted Public Law 85-915 (58 Stat.1762), providing for *de minimis* payment for Standing Rock Reservation lands taken by the Corps of Engineers for the site of Oahe Reservoir. The Act required the Corps to perform certain mitigation, such as relocation of cemeteries and infrastructure, but the Corps failed to carry out its duties under the statute. Consequently, there are thousands of cultural resources and human remains deposited in the banks of Oahe Reservoir, including at and around the site where DAPL crosses the Missouri River at Oahe Reservoir. *See* U.S. Army Corps of Engineers, *Final Environmental Impact Statement, Missouri River Master Water Control Manual Review and Update* (2004).

29.     On approximately October 22, 2014, Energy Transfer LP filed an application for an easement and permit for the Dakota Access Pipeline to cross the federally-administered flood control project at Oahe Reservoir.

30.     The Dakota Access Pipeline is a 30-inch diameter high capacity hazardous liquid pipeline, designed to transport Bakken crude oil from the western North Dakota oil fields to Midwest and Gulf Coast refineries. Most of the refined crude is then exported to Europe and other overseas markets.

31.     The pipeline crosses the Missouri River at the mouth of the Cannon Ball River on Oahe Reservoir, less than one-half mile upstream from the Standing Rock Indian Reservation, and its Cannon Ball community. The river crossing was effectuated by a horizontal directional drill to approximately 90 feet beneath the bed of Oahe Reservoir.

32.     On July 25, 2016, the defendant Army Corps of Engineers issued an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the DAPL crossing at Oahe Reservoir.

33.     The Missouri River is the Tribe's drinking water source, as well as important aquatic and riverine habitat for the subsistence hunting and fishing lifestyle on plaintiff's Reservation. Any release of oil into the Missouri River will directly and adversely affect public health and welfare on the Standing Rock Reservation and the culture and way of life of the Standing Rock Sioux Tribe.

34.     The waters of the Missouri River and all waters flowing freely in nature hold spiritual or religious significance for plaintiff. The Lakota and Dakota refer to water as the "first medicine." There is a cultural emphasis on the fact that we are nurtured in the womb in water. The Lakota term associated with Indigenous opposition to DAPL, "mni wiconi" means "water *of*

life," (the water that nurtures us in the womb) or "water *is* life," (the shared medium that connects all living beings) depending on the context of the usage. Water also plays a central role in the Lakota and Dakota creation story, and in Lakota and Dakota cosmology.

35.    Water is also a very important aspect of the most significant religious ceremonies of the Lakota and Dakota – the *inipi* or sweat lodge ceremony, in which water is poured on heated rocks for purification; and the Sun Dance ceremony, in which prayer and self-sacrifice for the greater good involves fasting from both food and water for four days, and offerings of flesh at a sacred tree placed at the center of the Sun Dance circle.

36.    With respect to the Missouri River, the Lakota and Dakota call it "Mni Sose," meaning murky or dark waters. This references the turbidity which  provides fertile soils along the water's edge and is considered life-giving.

37.    On July 26, 2016, plaintiff filed an action in this Court for injunctive relief to enjoin construction of the pipeline segment at the Missouri River's Lake Oahe crossing on the Reservation boundary. *Standing Rock Sioux Tribe v Army Corps of Engineers*, 1:16-cv-01534-JEB.

38.    From approximately August 30-September 2, 2016 an internationally-recognized expert in the identification of traditional cultural properties from the Standing Rock Sioux Tribe, Tim Mentz, Sr., conducted a reconnaissance-level survey near the pipeline route on private property, upon which he was invited. Mentz found "one of the most significant archaeological finds in North Dakota in many years … (including a burial ground) associated with an elite warrior society." He predicted that these sites "would be destroyed by construction of the pipeline."

39.    On September 2, 2016, the Tribe filed a motion for a temporary restraining order to protect these sites, which included a declaration by Mentz describing his findings. (Exhibit B).

The documents were served on the Corps of Engineers and Energy Transfer LP that day.

40.     Upon information and belief, the following day, September 3, 2016, Energy Transfer LP's contractors relocated their heavy equipment approximately 20 miles to the property surveyed by Mentz, and graded and dug eight to ten feet into the soil along the pipeline route, digging up and destroying the burials and stone features associated with the graves.

41.     The intentional destruction of Native American burials and traditional cultural properties renders an applicant for a federal permit, including the requested easement to cross Oahe Reservoir currently under consideration by the defendants, ineligible for such permit.

42.     Article 1 of the 1868 Fort Laramie Treaty contains the "bad man clause," which codifies the commitment by the United States to punish those who commit any wrong upon the person or property of the Indians and keep such wrongdoers out of plaintiff's Treaty lands, including the unceded land identified in Article 11 of the Treaty, and over which DAPL crosses.

43.     On September 9, 2016, the Court denied the Tribe's request for a preliminary injunction to enjoin construction of the pipeline beneath the Missouri River, *Standing Rock Sioux Tribe v. Army Corps of Engineers*, 205 F.Supp.3d 4, 7 (D.D.C. 2016) (*Standing Rock I*). The horizontal directional drill for the bore hole underneath the Missouri River commenced soon afterward.

44.     Upon information and belief, during the horizontal directional drill process there was at least one incident involving the release of approximately 1.4 million gallons of drilling mud or other effluent released into the environment. (Exhibit C – Exponent, E*nergy Transfer LP; Energy Transfer Operating LP; and Dakota Access LLC v. Greenpeace International; Cody Hall and Krystal Two Bulls* (2024)).

45.     The defendants have ignored or refused plaintiff's repeated requests for information

and documentation relating to the drilling and pipeline installation process, and its environmental effects, including the release of drilling mud during construction of the pipeline segment at the Missouri River crossing.

46. On September 9, 2016, defendant Army Corps of Engineers, in coordination with agency officials at the U.S. Department of the Interior and U.S. Department of Justice, announced that the three agencies would jointly prepare a report on improved practices for consultation with Tribal Nations on infrastructure projects, acknowledging plaintiff's stated concerns that defendant failed to properly consult, as required by federal law, on Energy Transfer LP's application for DAPL.

47. On December 4, 2016, defendant Connor's predecessor, Jo-Ellen Darcy, announced that the consideration of an easement for DAPL would be delayed pending completion of an environmental impact statement.

48. On January 24, 2017, President Donald Trump issued a memorandum instructing defendant Army Corps of Engineers to expedite the approval of DAPL. 82 Fed. Reg. 8,661 (Jan. 30, 2017).

49. On February 8, 2017, the defendant issued the easement for DAPL under section 5 of the Mineral Leasing Act of 1920. 30 U.S.C. §185.

50. DAPL commenced operation on June 1, 2017. Upon plaintiff's information and belief, in the process of the horizontal directional drilling, up to 1.2 million gallons going on-line, the DAPL pipeline system released 356 gallons of crude oil into the environment.

51. Upon information and belief, since DAPL commenced operation in 2017, Energy Transfer LP and its related companies have the overall worst spill record among hazardous liquid pipeline operators in the data base of the U.S. Pipeline and Hazardous Materials Safety

Administration ("PHMSA"). An evaluation of the PHMSA database reveals that, during this period, Energy Transfer LP and its companies have experienced 66 "significant incidents," as defined in PHMSA regulations – almost one per month. From 2017 through 2023, Energy Transfer LP pipelines have spilled 48,005 barrels of oil (2,016,210 gallons) or about 600 barrels (25,200 gallons) per month. These spills caused property damage totaling almost $57 million, or $1 million in property damage per month.

52. Energy Transfer LP's hazardous liquid pipeline safety record has actually gotten worse recently. From January 2022 to August 2023, the company has had the highest number of spills in all categories maintained by PHMSA. During this period, Energy Transfer's hazardous liquid pipelines have had nine spills exceeding 1,000 barrels (42,000 gallons). The second worst violator had one such spill. See https://opsweb.phmsa.dot.gov/primis_pdm/pub_op_search.asp.

53. The DAPL crossing at Oahe Reservoir constitutes a "high consequence area" due to the existence and proximity of environmentally-sensitive receptors, critical habitat for threatened and endangered species, drinking water sources, and environmental justice communities such as plaintiff's. 40 CFR §195.450

54. The operator of a hazardous liquid pipeline in a high consequence area, such as Energy Transfer LP in its operation of DAPL at Oahe Reservoir, has a duty to implement enhanced integrity management planning requirements. *See* 40 CFR §195.452.

55. Upon plaintiff's information and belief, DAPL does not comply with the enhanced integrity management requirements for leak detection, pressurization, or the operation of the emergency flow restriction devices at the federal flood control project at Oahe Reservoir.

56. Defendants are allowing Energy Transfer LP to operate DAPL in a flood control project at Oahe Reservoir without complying with the regulatory requirement that DAPL utilize

the best available technology.

57.     On February 19, 2020, the North Dakota Public Service Commission approved the construction of a new pump station for DAPL and an increase in the flow rate from 574,000 barrels per day to 1.1 million barrels per day.

58.     On March 25, 2020, this Court entered an order granting partial summary judgment to Standing Rock and other Tribes in their challenge under NEPA to the Corps' 2016 Environmental Impact Statement and Finding of No Significant Impact. *Standing Rock v. U.S. Army Corps of Engineers*, 471 F.Supp.3d 71, 77-78 (D.D.C. 2020).

59.     On January 26, 2021, the D.C. Circuit Court of Appeals affirmed the vacating of the easement. *Standing Rock Sioux Tribe v. Army Corps of Engineers*, 985 F.3d 1032, 1054 (D.C. Cir. 2021). The D.C. Circuit made clear its expectation that the defendant Corps of Engineers would take further action with respect to discontinuing the operation of DAPL across the federal flood control project without an easement:

> It may well be – though we have no occasion to consider the matter here – that the law or the Corps' regulations oblige the Corps to vindicate its property rights by requiring the pipeline to cease operations and that the Tribes or others could seek judicial relief under the APA should the Corps fail to do so. But how and on what terms the Corps will enforce its property right is, absent a properly issued injunction, a matter for the Corps to consider in the first instance, though we would expect it to decide promptly. To do otherwise would be to issue a *de facto* outgrant without engaging in the NEPA analysis that the Corps concedes such an action requires.

*Id*.

60.     Since January 26, 2021, through administrative action and inaction defendants have allowed DAPL to continue to operate on federally-managed land and in a federally-operated flood control project without an easement as required by the Mineral Leasing Act, 30 U.S.C. §185(a), and without a determination of the pipeline's environmental impacts, as required by the Mineral Leasing Act, *id.* at (h), NEPA, 42 U.S.C. §4232, and the defendants' regulations. 32 CFR

§651.10(i).

61.     On October 25, 2021, the Pennsylvania Attorney General charged Sunoco Pipeline LP, a wholly owned subsidiary of Energy Transfer LP, with 48 criminal violations of the state's Clean Streams Act during construction of the Mariner East pipeline. The charges involved widespread ground and surface water contamination, the use of unapproved drilling fluid and the failure to report violations.

62.     On February 2, 2022, the Commonwealth filed nine additional charges against Energy Transfer LP, for causing an explosion of the Revolution pipeline, by failing to comply with erosion control and other environmental requirements.

63.     On August 5, 2022, Energy Transfer LP and Sunoco Pipeline LP pled no contest to 23 of the criminal charges filed against it in Pennsylvania. *Commonwealth of Pennsylvania v, Sunoco LP*, Case No. CP-22-CR-002685-2022A (Ct. Common Pleas 2022). The plea agreement acknowledged use of unapproved drilling fluid additives, the repeated failure to report environmental incidents, and the widespread discharge of industrial waste into the waters of Pennsylvania

64.     In order to protect the integrity of government procurement and assistance, the Government Acquisition and Streamlining Act of 1994, 31 U.S.C. §6101 (note), and its implementing regulations govern the debarment and suspension of contractors and applicants. The U.S. Environmental Protection Agency is authorized to implement the executive branch-wide debarment program for criminal violations of the Clean Water Act. 33 U.S.C. §1151 *et seq.*

65.     On October 28, 2022, the EPA sent a Notice of Proposed Debarment to Energy Transfer LP and four of its related companies. This had the effect of  immediately debarring the owner and operator of DAPL from federal contracts or assistance for the indefinite future.  (Exhibit

K).

66.     The debarment renders Energy Transfer LP ineligible for the requested easement to cross Oahe Reservoir, currently under consideration by the defendants.

67.     The Tribe's Cannon Ball community is located at the mouth of the Cannon Ball River, at the Reservation's northern boundary, just below the pipeline crossing.

68.     A release of oil from DAPL into or along the Missouri River would migrate to the Reservation. As a result, oil spill clean-up and remediation will be under the authority of the Standing Rock Tribal government and will be supervised by the Tribal Emergency Response Commission. Yet neither the defendants nor the pipeline operator have contacted the plaintiff's Department of Emergency Management, the Cannon Ball community or the Cannon Ball-Solen School District regarding emergency planning or response. Defendants have failed to require the pipeline operator to share unredacted emergency plans with the Tribe and Standing Rock Reservation communities, and the operator has never done so.

69.     The plaintiff has enacted the *Standing Rock Sioux Tribe Pipeline Oil Spill Emergency Response Plan* (March 2020), to prepare and plan for oil spill remediation in Oahe Reservoir.

70.     On July 9, 2021, plaintiff provided to defendant Newbauer's predecessor a copy of the *Standing Rock Pipeline Oil Spill Emergency Response Plan* and requested further engagement on emergency planning. There was no response or follow-up by defendants.

71.     The operation of Oahe Dam by the Corps of Engineers has a significant effect on the Reservation's water supply and the aquatic and riverine habitat at Oahe Reservoir. The Corps' pattern of water releases causes reservoir levels to fluctuate dramatically. When Oahe Reservoir is at normal or flood level, it is a cold water reservoir with a very large surface area. There is ready

access to cold water recreational fishing, with on-Reservation boat docks managed by the Tribe, and off-Reservation access managed by the states of North and South Dakota.

72.     During periods of drought, the reservoir recedes into a braided river resembling the historic pre-dam Missouri. The de-watered lake bed transforms into mud flats that surround the relocated Tribal communities, such as Cannon Ball. Invasive plants and insects proliferate. Tribal water intakes have been impacted by siltation and erosion, affecting the Reservation drinking water supply and operation of the Tribal Farm enterprise. Erosion caused by fluctuating water levels extends to Tribal lands, and exposes and destroys cultural sites on the bed and banks of the Reservoir. During periods of low water, access to the reservoir by boat becomes limited or non-existent.

73.     The "normal" level of Oahe Reservoir is identified by defendants on page VII-8 of the *Missouri River Master Water Control Manual* (2018) as the top of the "multi-purpose pool," which is 1607.5 mean sea level ("msl").   https://www.nwd-mr.usace.army.mil/rcc/reports/ mmanual/MissouriMainstemMasterManual2018.pdf.   Beginning in 2021, spring inflows into the Missouri River reservoir system began declining due to drought conditions. By December 1, 2021, the elevation of Oahe Reservoir had declined to 1596.47 msl (Exhibit D).  At this elevation, the boat docks on the upper Oahe Reservoir – the oil spill response zone – are no longer usable to access the Reservoir.

74.     During periods of drought, the Corps does not generally reduce the releases of water to the lower Missouri River. Therefore, when inflows from spring runoff decline, the elevation of Oahe Reservoir drops dramatically.

75.     The elevation of Oahe Reservoir remained extremely low throughout 2022-2023. By December 1, 2022, the levels had declined to 1589.11 msl, or nearly 20 feet below normal.

(Exhibit E). By July 31, 2023, the reservoir levels remained at 1589 msl, with only slight increases in elevation in late spring 2023. (Exhibit F).

76.     Section 311(j) of the Clean Water Act mandates that defendants require Energy Transfer LP to submit and implement a rational Facility Response Plan for DAPL designed to clean up a worst case discharge of oil to the maximum extent practicable. 33 U.S.C. §1321(j)(5).

77.     Defendants possess a mandatory duty to ensure that Energy Transfer LP implements a Facility Response Plan that includes a reasonable and realistic calculation of the worst case discharge into Oahe Reservoir, and a plan that shall remediate such a discharge to the maximum extent practicable.

78.     Energy Transfer LP developed the Dakota Access Pipeline *North Response Zone Facility Response Plan and Emergency Response Action Plan* (2017), provided to the plaintiff only in redacted format. The plan was in place from 2017 until 2023 and did not comply with the statutory requirement to remediate a worst case discharge to the maximum extent practicable. For example, in the event of an oil spill in the Missouri River, the plan provided for surface collection of oil at four access and collection and control points. Many of these collection and control points relied on existing boat docks along the banks of Oahe Reservoir. One of the access points was not even a boat dock, but an irrigation intake pad on private land on Oahe's eastern shore, across the river from plaintiff's Reservation. This point does not provide feasible access to the reservoir under any conditions. (Exhibit F).

79.     None of the access points identified in the plan in place from 2017-2023 could provide access to the waters of the reservoir during most of 2022 and 2023 due to low water levels. Low water routinely prevents such access and boat movement up and down the River at the DAPL Missouri River crossing.

80. The control points are areas identified in the plan to collect and remove oil from the surface of the reservoir. During 2022 and 2023, reservoir levels were so low that the control points were above the surface of the reservoir and could not be used for removal of oil from the surface of the reservoir.

81. Fluctuations in the water elevation routinely experienced at Oahe Reservoir, including in 2022-2023, significantly alter the characteristics of the Reservoir, which recedes to a braided stream with large areas of exposed river bottom. These regularly-changing conditions, caused by defendants' water releases at Oahe Dam, impede access for the heavy equipment required for surface collection and removal of oil from the River, as contemplated in Energy Transfer LP's Facility Response Plans. They create the potential for greater oil retention, more extensive shoreline contamination and damage to fish and wildlife and to the Reservation environment at Standing Rock.

82. The 2017 Facility Response Plan (FRP) identifies the worst case discharge volume from DAPL as 12,317 barrels. That is not a realistic calculation of the worst case discharge, and is a small percentage of the actual worst case discharge that could result from an oil spill in the Missouri River.

83. The Oahe Reservoir at plaintiff's reservation routinely experiences ice cover for four months or more, most winters. The 2017 Facility Response Plan contained no realistic provisions for oil spill remediation during ice cover.

84. Energy Transfer LP has developed a *Facility Response Plan Dakota Access Pipeline North Response Zone, Sequence No. 3056* (March 2023), provided to the plaintiff only in redacted format. (Exhibit G). The 2023 plan failed to remedy the aforementioned deficiencies in the 2017 plan, including failure to provide a realistic calculation of a worst case discharge. Upon

plaintiff's information and belief, the worst case discharge identified in the 2023 plan is 16,966 barrels, and unrealistically low figure.

85.     The 2023 FRP provides no detail and contains no realistic process to remediate a spill during the current, and regularly experienced, low water conditions at Oahe Reservoir, or winter ice-cover conditions.  The plan fails to address the widely varying riverine conditions where DAPL crosses the Oahe Reservoir, caused by water level fluctuations stemming from the defendants' operation of Oahe and other upper Missouri River dams.

86.     Defendants have failed in their duty to require a statutorily-compliant Facility Response Plan for DAPL's crossing of the Missouri River at the Oahe Reservoir flood control project.

87.     In the event of a spill, the lack of a rational, compliant Facility Response Plan that properly accounts for the regular low water conditions creates the likelihood that the unplanned use of heavy equipment on the bed and banks of the Oahe Reservoir will be required in order to deploy oil spill mitigation measures. The plan fails to identify procedures to remediate an oil spill to the maximum extent practicable during periods of low water. The use of heavy equipment on the bed and banks of Oahe Reservoir during periods of low water is likely to occur in locations where significant cultural resources have been identified.

88.     The actions and inactions of the defendants place the plaintiff and its Tribal communities at undue risk of harm, including immediate and irreparable harm, from a pipeline that is operating without complying with the requirements of the laws of the United States.

89.     The federal policy of Environmental Justice is prescribed in Executive Order 12898 on *Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994) and Executive Order 14096 on *Revitalizing Our*

*Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (Apr. 26, 2023). Under this policy, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." 59 Fed. Reg. 7629.

90.     On February 2, 2023, defendants implemented *Interim Implementation Guidance on Environmental Justice*, to implement Executive Order 12898 and federal policy on environmental justice.

91.     Plaintiff is an Environmental Justice community within the meaning of Executive Order 12898 and Executive Order 14096.

92.     The actions and inactions of defendants results in severe, disproportionate and adverse risk to the environmental justice community of plaintiff Standing Rock Sioux Tribe.

93.     The actions and inactions of the defendants causes plaintiff irreparable harm.

94.     The plaintiff has no adequate remedy at law.

Count I – Violation of Mineral Leasing Act and Administrative Procedures Act

95.     Plaintiff re-alleges paragraphs 1 through 93 above.

96.     The defendants manage the federal flood control project at Oahe Reservoir, including the land surrounding the mouth of the Cannon Ball River on which DAPL is located.

97.     The Mineral Leasing Act of 1920, imposes a mandatory requirement that all oil and gas pipelines crossing federally-managed lands, such as those at administered by defendant Corps of Engineers, to obtain an easement for the construction and operation and maintenance of the pipeline. 30 U.S.C. §185(a).

98.     The Mineral Leasing Act contains a mandatory duty requiring defendants comply

21

with the National Environmental Policy Act in the granting of an easement for an oil and gas pipeline. 30 U.S.C. §185(h).

99.     On February 8, 2016, defendant Army Corps of Engineers granted an easement to Energy Transfer LP for DAPL to cross the Corps-managed land and flood control project at Oahe Reservoir.

100.     On March 25, 2020, this Court vacated the easement, due to defendants' failure to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §4231 *et seq*., and its implementing regulations. *Standing Rock v. U.S. Army Corps of Engineers*, 471, F.Supp.3d 71, 77-78 (D.D.C. 2020).

101.     On January 26, 2021, the D.C. Circuit Court of Appeals affirmed the vacating of the easement. *Standing Rock Sioux Tribe v. Army Corps of Engineers*, 985 F.3d 1032, 1054 (D.C. Cir. 2021).

102.     DAPL has been operating on federally-managed land and in a federally- managed flood control project, under defendants' authority since January 26, 2021.

103.     In implementing the requirements of the Mineral Leasing Act in situations, where, as here, Tribal communities are impacted, the defendants must comply with Executive Orders 12898 and 14096 on Environmental Justice, and the defendants' own *Interim Guidance*.

104.     The conduct, including actions and inactions, of defendants in permitting DAPL to operate on federally-managed land and in a federally-managed flood control project without an easement is arbitrary, capricious, an abuse of discretion and contrary to law.

105.     Defendants' failure to act in permitting the ongoing operation of DAPL without subjecting the such operation to the mandatory requirements of the Mineral Leasing Act described herein constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5

U.S.C. §706(1).

Count II – Violation of Defendants' Regulations for the Administration of DoD Real Estate and the Administrative Procedures Act

106.    Plaintiff re-alleges paragraphs 1 through 104 above.

107.    The defendants' regulations and federal law require an environmental impact analysis under NEPA prior to the issuance of an easement or other out-grant on lands they manage. 32 CFR §651.10(i); 42 U.S.C. §4332.

108.    The defendants have unreasonably granted Energy Transfer LP relief from the mandatory NEPA requirement and have unlawfully failed to act in permitting Energy Transfer LP to operate DAPL on land and in defendant's flood control project without final agency action under NEPA.

109.    In implementing the requirements of the defendants' Real Estate regulations in situations, where, as here, Tribal communities are impacted, the defendants must comply with Executive Orders 12898 and 14096 on Environmental Justice, and the defendants' own *Interim Guidance*.

110.    The conduct, including actions and inactions, of defendants in permitting DAPL to operate on federally- managed land and in a federally-managed flood control project without an easement and without compliance with NEPA, contravenes defendants' regulations and is arbitrary, capricious, an abuse of discretion and contrary to law.

111.    Defendants' failure to act in permitting the ongoing operation of DAPL without compliance with mandatory provisions of applicable law, including defendants' Real Estate regulations and Executive Orders as described herein, constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5 U.S.C. §706(1).

Count III – Violation of Government Acquisition and Streamlining Act of 1994 and the Administrative Procedures Act

112.     Plaintiff re-alleges paragraphs 1 through 110 above.

113.     On October 28, 2022, the EPA sent a Notice of Proposed Debarment to Energy Transfer LP and four of its related companies. This has the effect of immediately debarring the owner and operator of DAPL from federal contracts or assistance for the indefinite future, including eligibility for an easement across lands associated with the federal flood control project at Lake Oahe, which is necessary to operate DAPL.

114.     The debarment renders Energy Transfer LP ineligible for the requested easement to cross Oahe Reservoir, currently under consideration by the defendants.

115.     Mandatory federal law requirements, binding on defendants and Energy Transfer LP, require a lawful easement in place in order to lawfully operate DAPL.

116.     Defendants have not granted Energy Transfer LP a lawful easement and Energy Transfer LP is ineligible for an easement for the indefinite future.

117.     The conduct, including actions and inactions, of defendants in allowing DAPL to operate on federally-managed land and in a federally-managed flood control project without an easement and where the operator is ineligible for an easement is arbitrary, capricious, an abuse of discretion and contrary to law.

118.     Defendants' failure to act in compliance with mandatory provisions of applicable law, including the mandatory requirement that defendants' require a lawful easement to be in place for lawful operation of DAPL as described herein, constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5 U.S.C. §706(1).

Count IV – Violation of the Clean Water Act, Applicable Regulations, and the Administrative Procedures Act

119.     Plaintiff re-alleges paragraphs 1 through 117 above.

120.     Beginning in 2021, inflows into the Missouri River reservoir system began declining due to drought conditions. By December 1, 2021, reservoirs levels had declined to 1596.47 msl, a level at which the boat docks on the upper Oahe Reservoir – the oil spill response zone, are no longer usable to access the Reservoir. For crafts that are able to access the surface of the reservoir, low water prevents boat movement up and down the river at the DAPL Missouri River crossing.

121.     On October 8, 2024, according to defendants, the water level of Oahe Reservoir was 1600.63 msl. (Exhibit I). At this elevation, the equipment required to remediate a worst case discharge cannot be readily deployed. Control point 1 for the collection and removal of oil from the surface of the water, as identified in the 2023 facility response plan, is a dewatered mud flat, which negates control point 1 as a viable location for the collection and removal of oil. (Exhibit J). Control point 1 is extremely difficult to even access when reservoir levels are this low.

122.     On October 8, 2024, Oahe Reservoir at the DAPL crossing is a shallow, braided river diffused with sandbars and side channels.   Navigating watercraft is extremely difficult due to low water and changing conditions and the on-going deposits of sediments.

123.     Section 311(j) of the Clean Water Act mandates that defendants require Energy Transfer LP to submit and implement a rational Facility Response Plan for DAPL designed to clean up a worst case discharge of oil to the maximum extent practicable. 33 U.S.C. §1321(j)(5).

124.     Energy Transfer LP has developed a *Dakota Access Pipeline North Response Zone Facility Response Plan and Emergency Response Action Plan* (2017) and a *Dakota Access*

*Pipeline .Facility Response Plan Dakota Access Pipeline North Response Zone, Sequence No. 3056* (March 2023), provided to the plaintiff only in redacted formats. Upon plaintiff's information and belief, the redacted plans unlawfully fail to include a realistic calculation of a worst case discharge and fail to provide a design to clean up a worst case discharge of oil to maximum extent practicable.

125.    The plans provide inadequate detail and unlawfully contain no realistic process to remediate a spill during the routine low water conditions and routine winter ice-cover conditions at Oahe Reservoir, as required by law, including 49 CFR §194.105.

126.    Defendants have failed in their mandatory duty to require a statutorily-compliant Facility Response Plan for DAPL's crossing of the Missouri River at the Oahe Reservoir flood control project.

127.    The conduct, including actions and inactions, of the defendants places the plaintiff and its Tribal communities at undue risk, including from irreparable harm, from a pipeline that is operating without complying with the requirements of the laws of the United States.

128.    In implementing the requirements of the Clean Water Act and the applicable regulations governing facility response planning, in situations, where, as here, Tribal communities are impacted, the defendants must comply with Executive Orders 12898 and 14096 on Environmental Justice, and the defendants' own *Interim Guidance*.

129.    The conduct, including actions and inactions, of defendants in allowing DAPL to operate in violation of the Clean Water Act and implementing regulations mandating a compliant facility response plan as described herein, is arbitrary, capricious, an abuse of discretion and contrary to law.

130.    Defendants' failure to act in compliance with mandatory provisions of the Clean

Water Act and implementing regulations as described herein, constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5 U.S.C. §706(1).

Count V – Violation of Section 110(k) of the National Historic Preservation Act and the Administrative Procedures Act

131.    Plaintiff re-alleges paragraphs 1 through 129 above.

132.    Under section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations, the federal land manager is responsible for identifying, evaluating and determining the effects of any of its undertakings on historic properties, including traditional cultural properties of Indian Nations such as plaintiff. 54 U.S.C. §306108. This includes direct and indirect effects in an area of potential effects. These determinations are made in consultation with Tribal and State Historic Preservation Offices.

133.    NHPA Section 110(k) mandates that federal agencies, including defendants, shall ensure that no federal permits or assistance will issue to any applicant, including Energy Transfer LP, that, with intent to avoid the requirements of NHPA Section 106, intentionally significantly adversely affected a historic property, or having the legal power to prevent it, has allowed the significant adverse event to occur, unless the agency, after consultation with the Advisory Council on Historic Preservation, determines that circumstances justify granting the federal permit or assistance despite the adverse effect created or permitted by the applicant. 54 U.S.C. §306113.

134.    From approximately August 30 to September 2, 2016, a Tribal expert in the identification of traditional cultural properties from the Standing Rock Sioux Tribe, Tim Mentz, Sr., conducted a reconnaissance-level survey near the pipeline route on private property, upon which he was invited. Mentz discovered 28 burial sites associated with a warrior society of plaintiff's Tribe.

135.    On September 2, 2016, Mentz informed this Court of his findings in a declaration.

The declaration was served on defendants and on Energy Transfer LP.

136.     Upon information and belief, on September 3, 2016, with intent to avoid the requirements of NHPA Section 106, Energy Transfer LP's contractors relocated their heavy equipment approximately 20 miles to the property surveyed by Mentz, and excavated and graded the pipeline route, digging up and destroying the burials and stone features associated with the graves.

137.     Any intentional destruction of Native American burials and traditional cultural properties by Energy Transfer LP contractors renders Energy Transfer LP ineligible for the requested easement to cross Oahe Reservoir, currently under consideration by the defendants.

138.     Under section 3 of the National Historic Preservation Act, the Advisory Council on Historic Preservation ("Advisory Council") is authorized to "advise the President and Congress on matters related to historic preservation, (and) recommend measures to coordinate activities of Federal, State and local agencies and private institutions and individuals relating to historic preservation…" 54 U.S.C. §304102(1).

139.     The Advisory Council has promulgated regulations for agencies to follow in implementing the NHPA section 106 process. 36 CFR Part 800. The regulations acknowledge Tribal rights to consultation, evaluation and the determination of impacts to properties of religious and cultural significance to Tribes, both within the present-day boundaries of Indian Reservations and throughout judicially-recognized Treaty and aboriginal boundaries. 36 CFR §800.2(c)(2)(ii)(D) ("Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal or ceded lands of Indian tribes and Native Hawaiian organizations and should consider that when complying with the procedures in this part").

140.   In Article 5 of the 1851 Fort Laramie Treaty, the United States recognized as Sioux Country a vast tract beginning on the Missouri River up to the Platte River, and west to the Big Horn mountains, and north to the Heart River in present-day North Dakota. 11 Stat. 749.

141.   In Article 11 of the 1868 Fort Laramie Treaty, the lands from the Heart River to the Cannon Ball River over which DAPL crosses are characterized as "unceded" Sioux lands. 15 Stat. 639.

142.   The "Bad Man" clause is found in Article 1 of the 1868 Fort Laramie Treaty.  This provision obligates the United States to punish those who commit any wrong upon the person or property of the members of plaintiff Standing Rock Sioux Tribe, and remove such wrongdoers from plaintiff's Treaty lands. This includes the unceded land identified in Article 11 of the Treaty, and on which Energy Transfer LP intentionally destroyed Tribal burial sites.

143.   North Dakota law prohibits the unlawful removal of dead bodies, which constitutes a Class C felony. NDCC §23-06-24.

144.    The destruction of Tribal burials by Energy Transfer LP took place approximately one-half mile north of the present-day boundary of the Standing Rock Reservation. Upon information and belief, Energy Transfer LP violated North Dakota law governing sanctity of graves. *Id.*

145.   If these events occurred one-half mile south, the intentional destruction of the burials by Energy Transfer LP would violate Standing Rock Tribal law. Standing Rock Sioux Tribe Code of Justice, Title 32, Chap. 12.

https://www.standingrock.org/wpcontent/uploads/mdocs/Title%20XXXII%20%20(32)%20Cultural%20Resource%20Code.pdf.

146.   On August 5, 2022, Energy Transfer LP and Sunoco Pipeline LP pled no contest to

23 of the criminal charges filed against it in Pennsylvania. *Commonwealth of Pennsylvania v. Sunoco Pipeline LP*, Case No. CP-22-CR-002685-2022A (Ct. Common Pleas 2022).

147.    These violations of law render Energy Transfer LP a "bad man" within the meaning of Article 1 of the 1868 Fort Laramie Treaty.

148.    Based on the conduct alleged herein, and made known to defendants as early as September 3, 2016, defendants have a mandatory duty under NHPA section 110(k) to ensure that no federal permits or assistance will issue to Energy Transfer LP, unless the agency, after consultation with the Advisory Council on Historic Preservation, determines that circumstances justify granting the federal permit or assistance despite the adverse effect created or permitted.

149.    Upon information and belief, defendants have failed to conduct any investigation into the destruction of and adverse effect to historic properties as described herein and have failed to engage in any consultation with the Advisory Council on Historic Preservation regarding the same.

150.    Defendants failed and continue to provide assistance to Energy Transfer LP in failing to investigate Energy Transfer LP's alleged violations of NHPA section 110(k) and continue to provide assistance to Energy Transfer LP by allowing DAPL's continued operation across federal lands administered by defendants.

151.    The conduct, including actions and inactions, of defendants in allowing DAPL to operate in violation of the NHPA as described herein, is arbitrary, capricious, an abuse of discretion and contrary to law.

152.    Defendants' failure to act in compliance with mandatory provisions of the NHPA as described herein, constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5 U.S.C. §706(1).

WHEREFORE, plaintiff Standing Rock Sioux Tribe prays this Court:

1.     Enter an order declaring that defendants' actions and inactions in allowing/authorizing Energy Transfer LP to operate the Dakota Access Pipeline on federally-managed land administered by defendants violates the Mineral Leasing Act, Government Acquisition and Streamlining Act, National Environmental Policy Act, Clean Water Act, 1868 Fort Laramie Treaty, National Historic Preservation Act, their implementing regulations, and the Administrative Procedures Act.

2.     Pursuant to the Administrative Procedures Act, Set Aside and Vacate defendants' actions and decisions that allow/authorize Energy Transfer LP to continue to operate the Dakota Access Pipeline across the Oahe Reservoir flood control project.

3.     Issue an immediate and permanent injunction prohibiting defendants, their agents, servants, employees, and all other acting in concert with them, or subject to their authority or control, from allowing or authorizing Energy Transfer LP to continue to the operation of the Dakota Access Pipeline across the Oahe Reservoir flood control project; or a writ of mandamus to compel defendants to require the shut down of the Dakota Access Pipeline pending full compliance with the requirements of federal law.

4.     Issue an order granting plaintiff its costs and reasonable attorney fees incurred in bringing this action, under any applicable statutory or equitable authorities and principles.

//

//

//

//

//

5.      Issue an order granting such other and further relief as this Court deems just and proper.

DATED this <u>14th</u> day of October 2024

Peter Capossela

_____
Peter Capossela
Attorney at Law, PC
Post Office Box 10643
Eugene, Oregon 97440
(541) 505-4883
pcapossela@nu-world.com
*Pro hac vice Applicant*


Jeffrey C. Parsons
Parsons Law Office
2205 W. 136th Avenue, Suite 106-311
Broomfield, CO 80023
Phone: 720-203-2871
Email: jeff@parsonslawoffice.com
*Pro hac vice Applicant*


/s/ William S. Eubanks II
_____
Eubanks and Associates, PLLC
William S. Eubanks II
1629 K Street NW
Washington D.C. 20006
(970) 703-6060
Bill@Eubankslegal.com

Attorneys for Plaintiff


Address of Plaintiff:

Standing Rock Sioux Tribe
Box D
Fort Yates, North Dakota 58538

32

Certificate of Interested Parties

The undersigned certifies that, pursuant to LR 7.1-1, Energy Transfer LP, 8111 Westchester Drive Dallas, Texas 75225 has a direct pecuniary interest in the outcome of the case.

*Peter Capossela*

_____

Peter Capossela
Attorney at Law, PC
Post Office Box 10643
Eugene, Oregon 97440
(541) 505-4883
pcapossela@nu-world.com
*Pro hac vice Applicant*

Attorney for Plaintiff

List of Exhibits

Exhibit A       Map of Sioux Nation Lands under 1851 and 1868 Fort Laramie Treaties

Exhibit B       Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 1:16-cv-
                01534-JEB, ECF 29-1, Declaration of Tim Mentz, Sr.

Exhibit C       Exponent, *Energy Transfer LP, Energy Transfer Operating LP, and
                Dakota Access LLC v. Greenpeace International, Cody Hall and Krystal
                Two Bulls* (Technical report)

Exhibit D       U.S. Army Corps of Engineers, Missouri River Basin Water Management
                Mainstem and Tributary Reservoir Bulletin, 12-1-21

Exhibit E       U.S. Army Corps of Engineers, Missouri River Basin Water Management
                Mainstem and Tributary Reservoir Bulletin, 12-1-22

Exhibit F       U.S. Army Corps of Engineers, Missouri River Basin Water Management
                Mainstem and Tributary Reservoir Bulletin, 7-31-23

Exhibit G       Dakota Access Pipeline, *Emergency Response Action Plan North
                Response Zone* and *Facility Response Plan* (2017)

Exhibit H       Dakota Access Pipeline, *Emergency Response Action Plan North
                Response Zone* and *Facility Response Plan* (2023) and Dakota Access
                Pipeline, *Geographic Response Plan, Missouri River/Lake Oahe, Emmons
                County*, North Dakota (2018)

Exhibit I       U.S. Army Corps of Engineers, Missouri River Basin Water Management
                Mainstem and Tributary Reservoir Bulletin, 10-8-24

Exhibit J       Satellite image, Oahe Reservoir at DAPL crossing, Oct. 9, 2024

Exhibit K       EPA Debarment letter (undated)