**UNITED STATES DISTRICT COURT**
**DISTRICT OF WASHINGTON, D.C.**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>     Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS ENGINEERS;<br>MICHAEL CONNOR, in his capacity as Assistant Secretary;<br>COL. ROBERT J. NEWBAUER, in his Capacity as Omaha District Commander;  and<br>BRIG. GEN. GEOFF VAN EPPS, in his capacity as Northwestern Division Commander,<br><br>     Defendants. | Case No. 1:24-cv-02905 |

**MEMORANDUM IN SUPPORT OF STATE OF NORTH DAKOTA'S MOTION TO INTERVENE AS A DEFENDANT-INTERVENOR**

_____

Pursuant to Federal Rule of Civil Procedure 24 and D.D.C. Local Rule 7(j), the State of North Dakota ("North Dakota" or "State") submits this memorandum in support of its motion to intervene as a Defendant-Intervenor.  North Dakota respectfully requests that the Court grant its motion for leave to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2), or alternatively grant permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).[1]  North Dakota seeks to participate in this matter to protect significant sovereign, environmental, and economic interests that are threatened by Plaintiff's Complaint, which again seeks to shut down the Dakota Access Pipeline ("DAPL").

---

[1] In accordance with Local Rule 7(m), undersigned counsel has conferred with Counsel for Plaintiff and Counsel for Defendants.  Plaintiff takes no position North Dakota's Motion until it can review the Motion, and will communicate its position to the Court in a timely filed Response. Defendants do not oppose North Dakota's request for permissive intervention.

Plaintiff's Complaint in the instant action was filed on October 14, 2024. Defendants have not yet filed an Answer, no briefing schedule has been set, and granting this motion will not delay or impede the progress of this litigation.

## INTRODUCTION

Plaintiff, the Standing Rock Sioux Tribe, seeks immediate and permanent injunctive relief against Defendants, the U.S. Army Corps of Engineers and various Corps officials (collectively, the "Corps" or "Federal Defendants"), to shut down DAPL—a pipeline that went through a years-long public permitting and approval process in North Dakota and which impacts billions of dollars in State revenue. This case is a continuation of Plaintiff's prior efforts to shut down DAPL, which has been operating safely in North Dakota for nearly eight years. In 2016, Plaintiff brought similar claims against the Corps in this District in Case No. 16-cv-1534, wherein this Court eventually vacated an easement granted by the Corps to Dakota Access, LLC ("Dakota Access") and required the Corps to conduct an Environmental Impact Statement ("EIS"), but declined to enjoin operation of DAPL pending the Corps' completion of an EIS. *See Standing Rock Sioux Tribe, et al. v. U.S. Army Corps of Engineers, et al.,* 540 F.Supp.3d 45 (D.D.C. 2021).

The Corps is in the process of developing the EIS ordered by this Court. And North Dakota has been actively participating in the Corps' EIS development process as a Cooperating Agency. The relief requested by Plaintiff in this action would upend that court-ordered EIS process, substantially impact North Dakota's economy, and undermine the State's sovereign interests in the regulation of oil and gas activity within the State. North Dakota therefore has significant and legally cognizable interests (sovereign, environmental, and economic) in the continued and safe operation of DAPL, and those interests are not likely to be adequately represented by any other

party to this proceeding, including the Federal Defendants.  For those reasons, North Dakota's

Motion to Intervene as a Defendant-Intervenor should be granted.

## SUMMARY OF THE DAPL SAGA

1.    DAPL is an approximately 1,100-mile-long crude oil pipeline, operated by Dakota

Access, that begins near Stanley, North Dakota and ends near Patoka, Illinois.  *See* Exhibit 1 (North

Dakota's Comments on the Corps Draft Environmental Impact Statement for the Dakota Access

Pipeline (Dec. 13, 2023) ("ND Draft EIS Comments")) at 3, n.1.  Approximately 1.73 miles of that

1,100-mile pipeline go underneath the Missouri River, and that is the portion at issue here.  That

section of the pipeline was tunneled at a depth of 95 to 126 feet below the bed of the Missouri

River and required a permit from the Corps under Section 14 of the Rivers and Harbors Act of

1899 ("408 Permit").  It also required the Corps to issue an easement for the crossing under the

Mineral Leasing Act.  *Id.* at 30.

2.    The Corps evaluated this proposed crossing under the National Environmental

Policy Act ("NEPA") and issued an Environmental Assessment ("EA") on July 25, 2016.  *Id.*  On

the same date, the Corps granted Dakota Access a 408 Permit for crossing underneath the Missouri

River.  Later, on February 8, 2017, the Corps also granted Dakota Access an easement for crossing

underneath the river.  *Id.*

3.    While the Corps issued a 408 Permit and an easement for the approximate mile-

and-a-half of pipeline which crossed under the Missouri River, it was the North Dakota Public

Service Commission ("ND PSC") that, after a lengthy and public process, authorized the siting

and construction of the other 358 miles of DAPL that stretch across a significant part of North

Dakota.  *See* Exhibit 2 (Declaration of Commissioner Julie Fedorchak) at ¶¶ 6-16.

4.      In July of 2016, a group of plaintiffs led by the Standing Rock Sioux Tribe brought suit against the Corps' decision to grant Dakota Access the 408 Permit. *See Standing Rock Sioux Tribe, et al. v. U.S. Army Corps of Engineers, et al.,* No. 1:16-cv-1534 (D.D.C.), Dkt. No. 1 (complaint) (Jul. 27, 2016). Later, that lawsuit was expanded to include a challenge to the Corps' February 2017 decision to grant Dakota Access an easement for the Missouri River crossing. *See Sioux Tribe, et al. v. U.S. Army Corps of Engineers, et al.,* 255 F.Supp.3d 101, 120 (D.D.C. 2017).

5.      North Dakota initially participated in that litigation as an amicus while the Corps defended its easement and 408 Permit decisions. *See Standing Rock Sioux Tribe, et al.,* No. 1:16-cv-1534 (D.D.C.), Dkt. Nos. 503 (Apr. 29, 2020), 537 (June 8, 2020), 572 (Nov. 20, 2020).

6.      The litigation took many twists and turns, eventually culminating in this Court's decision vacating the Corps' easement for the Missouri River crossing (but not the 408 Permit) and requiring the Corps to conduct an EIS for the easement. *Standing Rock Sioux Tribe, et al. v. U.S. Army Corps of Engineers, et al.,* 471 F.Supp.3d 71, 88 (D.D.C. 2020).

7.      However, DAPL had by that time been constructed, and operations utilizing the pipeline had been underway since 2017. *Id.* at 77. Consequently, the Court rejected the plaintiffs' repeated efforts to enjoin operation of DAPL pending the completion of an EIS for the required easement. *See Standing Rock Sioux Tribe, et al.,* 540 F.Supp.3d at 65-66 (D.D.C. 2021).

8.      Towards the end of that litigation, after a change in presidential administrations, the Corps made statements to this Court indicating that it was abandoning its defense of the easement, prompting North Dakota to seek intervention as a Defendant-Intervenor. *See Standing Rock Sioux Tribe, et al.,* No. 1:16-cv-1534 (D.D.C.), Dkt. No. 592-1 (Apr. 19, 2021). The Court denied North Dakota's intervention without prejudice at that time, given the Court's concurrent Order declaring that it would not shut down operation of DAPL pending the Corps' completion of

the ordered EIS; however, the Court noted that North Dakota could renew its motion to intervene at a subsequent juncture if warranted. *Id.* at Dkt. No. 607 and May 27, 2021 Minute Order. The Court then terminated that litigation pending the Corps' completion of an EIS, and directed that the plaintiffs could file a separate action (and relate it back to the original action) if they wished to challenge the forthcoming EIS. *Id.* at June 22, 2021 Minute Order.

9.     Following this Court's decision, North Dakota sought and obtained Cooperating Agency status for the Corps' development of the DAPL EIS.[2]  Under NEPA, a Cooperating Agency is an entity that provides input to support a NEPA analysis because it has legal jurisdiction or because it has special expertise with respect to the environmental issues associated with a project. 40 C.F.R. § 1501.8.  Cooperating Agencies participate in the NEPA process for a federal action at the earliest practicable time, including the scoping process. *Id.*

10.     The Corps issued of a Draft EIS on September 8, 2023, and North Dakota submitted extensive comments on that Draft EIS reflecting the specialized knowledge and expertise of numerous state agencies—including the Governor's Office; the North Dakota Public Service Commission; the North Dakota Agriculture Commission; the State Historical Society; the North Dakota Office of Management and Budget; the North Dakota Department of Trust Lands; the North Dakota Superintendent of Public Instruction; the North Dakota Mill & Elevator Association; the North Dakota Industrial Commission; the Bank of North Dakota; the North Dakota Retirement and Investment Office; and the Upper Great Plains Transportation Institute. *See generally* Exhibit 1 (ND Draft EIS Comments).

11.     As of this time, the Corps has not yet issued a Final EIS.

---

[2] *See* Dakota Access Pipeline Lake Oahe Crossing Project Draft Environmental Impact Statement (Vol. 1, Sept. 2023) at 1, ES-4 (available at https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/24050).

12.     Plaintiff filed the instant case on October 14, 2024, again seeking to enjoin the continued operation of DAPL pending the Corps' issuance of a Final EIS for the easement required for DAPL's Missouri River crossing.

**NORTH DAKOTA'S INTERESTS IN THIS ACTION**

13.     North Dakota's interests in this litigation are substantial and encompass its sovereign, environmental, and economic interests.

I.      **North Dakota's Role in Permitting DAPL's Route Across the State**.

14.     North Dakota approved DAPL's route through the State.  If Plaintiff prevails in enjoining or otherwise prohibiting DAPL's Missouri River crossing at its current location, the State will have expended substantial resources in vain and likely be required to expend significant further resources evaluating other potential routes across the State.

15.     The ND PSC is the State entity responsible for the siting of energy transmission facilities, like DAPL, under the North Dakota Siting Act (codified at N.D.C.C. Ch. 49-22 and 49-22.1).  *See* Exhibit 2 at ¶ 4.  ND PSC's role under the North Dakota Siting Act is to ensure that the location, construction, and operation of transmission facilities "will produce minimal adverse effects on the environment and upon the welfare of the citizens of" North Dakota.  *Id*.; N.D.C.C. § 49-22-02.  No energy transmission facility, such as DAPL, can be located, constructed, and operated in North Dakota without a certificate of site compatibility or a route permit issued by the ND PSC based on an extensive public review process.  *Id*.

16.     The ND PSC was the primary permitting authority for DAPL's construction in North Dakota.  ND PSC's permitting process for DAPL spanned more than eighteen months and included extensive evaluations of numerous alternative routes across the State, as well as an evaluation of alternative transportation technologies.  *See id.* at ¶¶ 6-16.

17.     ND PSC's siting review for DAPL was comprehensive.  It began on December 22, 2014, when Dakota Access filed applications requesting a certificate of corridor compatibility and a route permit for hundreds of miles of 12-, 20-, 24-, and 30-inch diameter crude oil pipeline across the State, along with associated facilities.  *Id.* at ¶ 7.  The ND PSC deemed Dakota Access's applications for a certificate of corridor compatibility and a route permit complete on March 25, 2015—conditioned upon receipt of additional environmental reports—and issued a Notice of Filings and Notice of Hearings.  *Id*. at ¶¶ 7-9.  After three lengthy and well-attended public hearings and extensive public and expert comment, including comments from numerous State and federal agencies and intervening parties, the ND PSC issued an Order granting Dakota Access a Certificate of Corridor Compatibility and Route Permit ("Certificate Order") on January 20, 2016.  *Id*. at ¶¶ 10-16.  The ND PSC found that the location, construction, and operation of DAPL would best minimize adverse human and environmental impacts, and that the pipeline's route was acceptable because it followed the route of existing utility lines and pipelines, thus minimizing the amount of ground that would be newly disturbed.  *Id*. at ¶ 16.

18.     Approximately two-and-half years later, on June 20, 2019, Dakota Access also filed an application with the ND PSC to optimize and upgrade DAPL (the "Optimization") by installing a new pump station for additional transportation capacity.  *Id.* at ¶ 19.  On November 13, 2019, the ND PSC held a hearing on the Optimization, in which the Standing Rock Sioux Tribe participated; that hearing lasted over 13 hours and included significant discussion of mitigation measures, safety, emergency response training, and response plans necessary to meet or exceed industry requirements.  *Id.* at ¶ 22.  On February 19, 2020, the ND PSC issued its Third Amended Certificate of Corridor Compatibility and Third Amended Route Permit approving the Optimization.  *Id.* at ¶ 24.

19.     In total, the ND PSC held four public hearings with an opportunity for full participation by the public. *Id.* at ¶ 25. Pursuant to the State's Administrative Practices Act, N.D.C.C. § 28-32-01, ND PSC's Certificate Order and subsequent orders were also subject to judicial review if, among other things, the Order was issued not in accordance with law, did not afford a fair hearing, was not supported by the evidence and findings, or did not sufficiently address the evidence presented by a party. No party sought judicial review of the ND PSC's Certificate Order or other orders approving DAPL's route and operations. *Id.*

II.    **Impact of Shutting Down DAPL on North Dakota**.

20.     Since beginning operations in 2017, DAPL has transported more than half a billion barrels of North Dakota oil to market.

21.     Before DAPL was placed into operation, North Dakota crude oil producers were forced to primarily rely on truck and rail transport to bring crude oil to market, and they and will be forced to return to those modes once again if DAPL is shut down.

22.     The completion of DAPL noticeably reduced both rail and road congestion in the upper Midwest. It is foreseeable that such congestion, and the associated air pollution emissions, will return if the Court were to force DAPL to cease operations. Exhibit 1 (ND Draft EIS Comments) at 20-28. Furthermore, accidents resulting in property damage, injury, or death are substantially higher from rail and road transport than from pipeline transport. *Id.* at 2-6. And as the sovereign responsible for the protection of its citizens and their environment, these are issues of significant importance and concern to the State.

23.     North Dakota also has substantial economic interests in the continued operation of DAPL. North Dakota is a small state in terms of both population and economic output, but it ranks third out of the fifty states in terms of oil production. *See* Exhibit 3 (Declaration of Office and

Management Director Susan Sisk) at ¶ 6.   North Dakota's crude oil production is projected to continue increasing through at least 2025, while U.S. private storage and Strategic Petroleum Reserve crude oil stocks are at or near 5-year and 40-year low levels.  *See* Exhibit 4 (Declaration of North Dakota Industrial Commission, Department of Mineral Resources Director Nathan Anderson) at ¶¶ 4-8.

24.    North Dakota depends upon revenues from taxes on the extraction and production of oil and natural gas to fund government operations and provide essential services to its citizens. Exhibit 3 (Sisk Decl.) at ¶ 6.  Over ten percent of the North Dakota's general fund revenues are derived directly from oil and gas taxes, and almost sixty percent of the total of all tax and fee revenue received by the State comes from oil and gas extraction and production.  *Id*. at ¶ 7.  These revenues support programs from which all State residents benefit including education, healthcare, water resource management, law enforcement, roadways, libraries, veterans' services, public housing, parks and recreation, and other public services.  *Id.*

25.    North Dakota's State revenues from oil and gas production would be heavily impacted if DAPL were forced to cease operations.  Over 50% of North Dakota's crude oil production flows through DAPL.  Exhibit 3 (Sisk Decl.) at ¶ 8.  And there is currently insufficient rail capacity in North Dakota to accommodate DAPL's full pipeline volume if DAPL were to be shut down.  Exhibit 1 (ND Draft EIS Comments) at ¶¶ 20-28.

26.    Additionally, the oil and gas tax revenue collected by the State is increased because of DAPL's comparatively low transportation costs.  Exhibit 3 (Sisk Decl.) at ¶¶ 7-9.  Oil and gas severance taxes in North Dakota are calculated under a formula that subtracts transportation costs from revenue, N.D.C.C. § 57-51-02.3, so any increase in transportation costs will cause a decrease in tax revenue payable to the State.  *Id.* at ¶ 9.  For the twelve-month period prior to the operation

of DAPL (2016), the "transportation discount" averaged $7.15 per barrel. *Id.* at ¶ 10. For the twelve-month period after DAPL began operations (June 2017 through May 2018), the transportation discount averaged only $4.75 per barrel—a reduction of 34%—savings that are attributable to less expensive transportation through DAPL. *Id.* Thus, DAPL immediately increased taxable revenues from oil and gas production by approximately $2.40 per barrel State-wide, in a State that produces more than 1 million barrels per day. *Id.*

27.    Closing DAPL will therefore result in the loss of substantial tax revenue for the State of North Dakota and its citizens. *Id.* at ¶ 11. To put that loss of tax revenue into numbers, the State estimates that an order closing DAPL would reduce State revenues for the first twelve months by approximately $900 million, assuming a 50% decrease in oil production for three months before producers are gradually able to transition more production from DAPL to rail and an increase in transportation costs of $2.40 per barrel. *Id.* at ¶ 12.

28.    Shutting down DAPL will also force a decrease in production in North Dakota due to contractual commitments. For example, 75%-90% of North Dakota's crude oil production is based on contracts with binding provisions requiring transportation using DAPL. *See* Exhibit 4, (Anderson Decl.) at ¶ 10. Consequently, if DAPL is shut down, 550,000 to 600,000 barrels of oil per day will likely remain shut-in until economically viable alternate transportation can be secured and contracts revised. *Id.* This would result in an estimated temporary loss of 8,450 to 9,300 full time jobs and a permanent loss of 1,700 to 2,200 full time jobs. *Id.*

29.    Furthermore, as noted above, shutting down DAPL will require North Dakota oil producers to shift to less efficient rail and truck shipping, alternative methods that come with increased spill and safety risks, and which are less environmentally friendly, emitting about twice the amount of air pollution. *Id.*

30.    And if most of North Dakota's oil production must again be transported by rail and truck due to a closure of DAPL, it follows that the State's railways and roadways will be subject to significant additional demand and congestion that would increase transportation costs for other goods that rely on road or railway transportation, such as agricultural products. *Id*.

31.    Shutting down DAPL would also significantly affect North Dakota's agricultural sector, which supports nearly 25% of the State's workforce. Exhibit 5 (Declaration of North Dakota Agriculture Commissioner and North Dakota Pipeline Authority Member Doug Goehring) at ¶ 13. Approximately 83% of the State's total agricultural commodity production is shipped by rail, and the State's agriculture industry relies on that efficient and cost-effective method of transportation. *Id.* at ¶¶ 20, 29. If DAPL were to be shut down, the State estimates that approximately 800 rail cars would be repurposed to transporting crude oil every day. *Id.* at ¶ 26. Forcing significant volumes of oil previously transported by pipeline to rail would result in the congestion of rail transport and significantly increase agricultural transport costs. *Id.* at ¶¶ 27-31. It would also destabilize regional agricultural supply chains, stress short-term and long-term agricultural storage capacity, and potentially strand North Dakota agricultural products. *Id.* at ¶ 30. And it would significantly increase the costs for North Dakota farmers and ranchers to haul commodities and livestock to markets, affecting already-thin profit margins and market competitiveness. *Id.* at ¶ 31.

32.    Furthermore, as also noted above, if DAPL were to be shut down due to the 1.7 miles of Missouri River crossing that are at issue in this case, North Dakota would have significant sovereign responsibilities and burdens regarding the 358 other miles of existing DAPL pipeline within the State. DAPL's current route and the Missouri River crossing at issue here results in a 10.6% reduction in mileage, a 38% increase in corridor collocation with other infrastructure, and

cumulatively less impact in nearly every other assessment factor—including less impacts on waterbodies, floodplains, agriculture, and transportation crossings. *See* Exhibit 1 (ND Draft EIS Comments) at 6. The current route of DAPL was already 100% surveyed, and it was moved 140 times to avoid impacting cultural and environmental resources. *Id.* If DAPL is ordered to be shut down by this Court due to the disputed Missouri River crossing, all of those prior State assessments and determinations would foreseeably need to be redone by the State at significant burden and expense in order to evaluate alternate routes. The State would also need to incur significant costs addressing what will be done with the pipelines and infrastructure already in place with the Missouri River's current crossing location.

## ARGUMENT

### I.    North Dakota Is Entitled to Intervene as a Matter of Right.

Under the Federal Rules, the standard for intervention as of right states in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).

"Unequivocally, the recognized requirements for intervention as of right in this Circuit are: (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by existing parties." *Parker v. John Moriarty & Assocs.*, 319 F.R.D. 18, 21 (D.D.C. 2016); *see also Smoke v. Norton*, 252 F.3d 468, 470, 346 (D.C. Cir. 2001). North Dakota satisfies each of those requirements for intervention as of right here.

### A.    North Dakota's Motion is Timely.

Timeliness is "judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Karsner v. Lothian,* 532 F.3d 876, 886 (D.C. Cir. 2008) (quoting *United States v. British Am. Tobacco Austl. Servs., Ltd.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006)).  "[W]e do not require timeliness for its own sake", but "[r]ather, the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (citation and quotation marks omitted).

North Dakota has filed this motion to intervene at the earliest stage of this case.  The Complaint was filed less than a month ago, the Defendants have not yet filed an answer, and no briefing schedule has been set.  Consequently granting North Dakota's intervention will not disrupt this litigation or prejudice any party and this motion is timely.

### B.    North Dakota Has Cognizable Interests in this Case, and Its Absence from This Case Will Impair the State's Ability to Protect Those Interests.

The D.C. Circuit determines whether a party has a legally cognizable interest by "looking to the practical consequences of denying intervention." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quotation omitted).  "Whether a proposed intervenor is 'so situated that the disposition of an action may as a practical matter impair or impede [its] ability to protect [its] interest,' Fed. R. Civ. P. 24(a), is determined by 'looking to the practical consequences of denying intervention, even where the possibility of future challenge to the regulation remains available.'" *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6-7 (D.D.C. 2008) (quoting *Fund for Animals,* 322 F.3d at 735).  "Our cases have generally found a sufficient injury in fact

where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015).

In Plaintiff's prior action seeking to enjoin the operation of DAPL, the Court acknowledged that an injunction shutting down DAPL would injure North Dakota and its citizens. As the Court previously recognized: "[I]t is clear that at least some immediate harm to the North Dakota oil industry should be expected from a DAPL shutdown, even if its effects are tempered by a decreased demand for oil." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 471 F.Supp.3d 71, 84 (D.D.C. 2020). "Losing jobs and revenue, particularly in a highly uncertain economic environment, is no small burden." *Id*. That remains as true now as it was then.

There can be no doubt that North Dakota has real and practical interests in this litigation sufficient to satisfy Rule 24(a)(2). As discussed *supra*, North Dakota depends on the operation of DAPL for hundreds of millions of dollars of tax revenue that is used to fund vital services for its citizens. Furthermore, shutting DAPL down as Plaintiff requests would cause an increase in transportation of hundreds of millions of barrels of oil per year by truck and train, with the environmental consequences attendant to those modes of transportation as well as negative repercussions for others in the State who rely upon the roads and railways for transportation, including North Dakota's agriculture sector.

Plaintiff's claims in this case also threaten North Dakota's sovereign interests to regulate land use and resource development within the State. A State may intervene in litigation between a private party and the federal government to protect its own sovereign interest in governing the land within its borders. *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008) (granting Alaska's intervention as of right). "States have a legally protected

sovereign interest in the exercise of sovereign power over individuals and entities within the relevant jurisdiction, which involves the power to create and enforce a legal code." *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (citation and internal quotations omitted). And when an action threatens to harm the sovereign interests of a State without affording the State "a full and fair opportunity an opportunity to be heard on the merits," that harm is considered irreparable. *Kansas v. United States*, 249 F. 3d 1213, 1227 (10th Cir. 2001). North Dakota has a vital sovereign interest and duty to its citizens in the safe, environmentally sound, and efficient development of its natural resources, to include its oil and gas resources.

North Dakota also has significant sovereign interests in the consequences of Plaintiff's requested relief, which is the shutdown of DAPL. As discussed *supra*, if DAPL's operations were to be enjoined based on the Missouri River crossing at issue in this case, the ND PSC would foreseeably incur significant expenses evaluating potential alternative routes, as well as addressing the infrastructure already in place based upon DAPL's current route. The North Dakota Department of Mineral Resources would also have to address significant and adverse effects that an order shutting down DAPL would be likely to have on oil and gas operations in the State.

North Dakota's ability to protect all of the interests described above would necessarily be impaired if this Court were to grant the Plaintiff its requested relief without affording the State an opportunity to be heard. *See, e.g., Crossroad Grassroots*, 788 F.3d at 320 ("An adverse judgment … would impair [North Dakota's] defense in a new proceeding because a judicial pronouncement [enjoining DAPL's continued operation] would make the 'task of reestablishing the status quo ... [more] difficult and burdensome.'") (citation omitted).

### C.    North Dakota Has Article III Standing to Participate in These Proceedings.

Related to having cognizable interests, "where a party tries to intervene as another defendant, we have required it to demonstrate Article III standing, reasoning that otherwise 'any

organization or individual with only a philosophic identification with a defendant—or a concern with a possible unfavorable precedent—could attempt to intervene and influence the course of litigation.'" *Crossroads Grassroots*, 788 F.3d at 316 (quoting *Deutsche Bank Nat'l. Trust Co. v. FDIC*, 717 F.3d 189, 195 (D.C. Cir. 2013) (Silberman, J., concurring)).  North Dakota has Article III standing to intervene as a defendant here.

The requirements for constitutional standing are: "(1) 'the applicant must have suffered an injury in fact, defined as harm that is concrete and actual or imminent, not conjectural or hypothetical'; (2) the injury 'must be fairly traceable to the government conduct alleged'; and (3) 'it must be likely that the requested relief will redress the alleged injury.'" *Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 68 (D.D.C. 2006) (quoting *Environmental Defense v. Leavitt*, 329 F.Supp.2d 55, 64 (D.D.C. 2004)). When, as here, "a party seeks to intervene as a defendant to uphold what the government has done, it [must] establish that it will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if the government action is upheld." *Am. Horse Prot. Ass'n,* 200 F.R.D. at 156.  And States are entitled to "special solicitude in [the] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007); *see also id.* at 518-19 (recognizing that a State possesses an "'interest independent of and behind the titles of its citizens, in all the earth and air within its domain'" which affords it a "special position and interest").

North Dakota has constitutional standing for all the reasons set forth above—including the protection of its sovereign rights and of the economic and environmental benefits from DAPL's continued operation in the State.  And "since [North Dakota] has constitutional standing, it *a fortiori* has 'an interest relating to the property or transaction which is the subject of the action.'"

*Crossroads Grassroots*, 788 F.3d at 320 (quoting *Fund For Animals*, 322 F.3d at 735 (standards for constitutional standing and second factor of the test for intervention as of right are the same).

### D.    North Dakota's Interests Are Not Adequately Represented by Any Party in this Litigation.

"On the issue of lack of adequate representation by the existing parties, the movant need only 'sho[w] that representation of his interest 'may be' inadequate.'" *Parker*, 319 F.R.D. at 21 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).  The burden of demonstrating inadequacy of representation for the purposes of Rule 24(a)(2) is "'not onerous.'" *Crossroads Grassroots*, 788 F.3d at 321 (quoting *Fund for Animals*, 322 F.3d at 735). "[M]erely because parties share a general interest in the legality of a program or regulation does not mean that their particular interests coincide so that representation by the agency alone is justified." *Am. Horse Prot. Ass'n v. Veneman*, 200 F.R.D. 153, 159 (D.D.C. 2001); *see also Fund for Animals*, 322 F.3d at 735-36.  Intervention is proper even when "the federal agency and prospective intervenor undisputedly agreed that the agency's current rules and practices were lawful." *Crossroads*, 788 F.3d at 321.

The inadequacy of Plaintiff representing the State's interests is self-evident and requires little exposition: Plaintiff seeks to enjoin the continued operation of DAPL and is therefore directly adverse to the State on that position.

With regard to the Federal Defendants, North Dakota cannot be presumed to be adequately represented by the Corps, since the interests that North Dakota seeks to protect are not shared or represented by the Corps.  This is evident in at least two ways.

First, in Plaintiff's prior litigation over the DAPL easement, the Corps eventually stated (after a change in presidential administration) that it was abandoning its previous defense of the easement.  *See Standing Rock Sioux Tribe et al.*, No. 1:16-cv-01534 (D.D.C.), Dkt. No. 602

(Transcript of Teleconference (April 9, 2021)) at 5.  The Corps also indicated that although it would not discontinue the operation of DAPL at that time, its decision "is a matter of essentially the continuing of discretion between the Corps and the Department of Justice" and that the Corps could and might change positions at any time.  *Id*. at 8-10. According to the Corps, it "is essentially in a continuous process of evaluating the encroachment and what steps there are to take."  *Id*. at 10. The Corps also admitted it was under political pressure from both sides, and preferred that the Court, rather than the Corps, decide the question of DAPL's continued operation.  *Id*. at 15.[3]  Given the Corps' express statements that it may be unwilling or unable to defend DAPL's continued operation depending on how the political winds blow, North Dakota should be permitted to defend its interests early into these proceedings.  *See, e.g., Smoke*, 252 F.3d at 471 ("The Government's representation of the appellants' interests became potentially inadequate [] when it equivocated about whether it would appeal the adverse ruling of the district court.").

Second, the Corps' recent Draft EIS for the DAPL easement further indicates that the Corps does not represent North Dakota's interests in the continued operation of DAPL.  In the Draft EIS, the Corps declined to select a "preferred alternative"—refusing to propose an explicit decision for public comment on the future of DAPL.  Of the five potential alternatives discussed in the Draft EIS, three (Alternatives 1, 2, and 5) contemplate the Corps not granting DAPL the requested easement.  *See* Exhibit 1 (ND Draft EIS Comments) at 3-4.  Alternative 3, on which North Dakota has commented in support, would grant Dakota Access an easement for the existing Missouri River crossing.  *Id.* at 3.  However, the Corps has thus far refused to identify its preferred alternative, significantly compromising the effectiveness of the Cooperating Agency participation and public

---

[3] It was this equivocation from the Corps that caused North Dakota to first seek intervention in Plaintiff's prior litigation over DAPL.  *See Standing Rock Sioux Tribe, et al.,* No. 1:16-cv-1534 (D.D.C.), Dkt. No. 592-1 (Apr. 19, 2021) at 2-3, 11-15.

commenting processes. Consequently, the Corps' less-then-forthcoming conduct with regard to the Draft EIS also indicates that the Corps and North Dakota's interests may not be aligned on the continued operation of DAPL. *See also, e.g., Fund For Animals*, 322 F.3d at 735 ("The Supreme Court has held that this 'requirement … is satisfied if the applicant shows that representation of his interest 'may be' inadequate.'") (quoting *Trbovich*, 404 U.S. at 538 n. 10).

In short, the Corps' prior statements to this Court indicate that it may be unwilling to defend the legality of its previous decisions, or that it may be unwilling to defend the continued operation of DAPL. Such equivocation establishes that the interests of North Dakota will not, or at least may not, be adequately represented by the Corps, and North Dakota should be permitted to intervene to defend those interests.

## II.    In The Alternative, The Court Should Grant North Dakota Permissive Intervention Pursuant to Federal Rule of Civil Procedure 24(b).

Alternatively, this Court should allow North Dakota to intervene permissively in this action under Fed. R. Civ. P. 24(b), which provides in relevant part: "On timely motion, the court may permit anyone to intervene who … has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

The D.C. Circuit requires three showings for permissive intervention: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Equal Emp. Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). A reviewing court "'shall consider whether the requested intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'" *Friends of Animals*, 452 F. Supp. 2d at 68 (quoting Fed. R. Civ. P. 24(b)). The decision to allow permissive intervention under Rule 24(b) is "inherently discretionary." *Equal Emp. Opportunity Comm'n*, 146 F.3d at 1046.

As addressed *supra,* North Dakota has significant and legally cognizable interests in this action which provide an independent ground for subject matter jurisdiction. North Dakota's Motion is also timely, as this case is still at the earliest stages and Plaintiff's complaint was filed less than a month ago. And regarding a "common question of law or fact," the questions of law and fact which Plaintiff asks the Court to address relate to the legality of DAPL's continued operation pending the Corps' decision on a Final EIS for the Missouri River crossing easement. Those are precisely the same issues that North Dakota intends to address if admitted into this matter as a Defendant-Intervenor.

## CONCLUSION

For the reasons stated above, North Dakota respectfully requests the Court grant its Motion to Intervene as a Defendant-Intervenor.

Date: November 7, 2024.

DREW H. WRIGLEY
ATTORNEY GENERAL

/s/ *Paul M. Seby*
Paul M. Seby
Special Assistant Attorney General
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

PHILIP AXT
Solicitor General
MATTHEW SAGSVEEN
Director of Natural Resources & Indian Affairs
600 E. Boulevard Ave., Dept. 125
Bismarck ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
Email: masagsve@nd.gov

*Counsel for Proposed Defendant-Intervenor*
*the State of North Dakota*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 7th day of November 2024, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Paul Seby*