**UNITED STATES DISTRICT COURT**
**DISTRICT OF WASHINGTON, D.C.**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>    Plaintiff,<br><br>v.<br><br>U.S. ARMY CORPS ENGINEERS;<br>MICHAEL CONNOR, in his capacity as Assistant Secretary;<br>COL. ROBERT J. NEWBAUER, in his Capacity as Omaha District Commander;  and<br>BRIG. GEN. GEOFF VAN EPPS, in his capacity as Northwestern Division Commander,<br><br>    Defendants. | Case No. 1:24-cv-02905 |

**DECLARATION OF SUSAN SISK**
**NORTH DAKOTA OFFICE OF MANAGEMENT AND BUDGET**
**IN SUPPORT OF MOTION TO INTERVENE**

I, Susan Sisk, state and declare as follows:

1.   My name is Susan Sisk. I am over 21 years of age and am fully competent and duly authorized to make this Declaration. The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2.   I am the Director of the North Dakota Office of Management and Budget (OMB). Before my appointment as Director, I most recently served as vice president and director of finance for the Bismarck-based engineering firm KLJ from 2015 to 2021.  Prior to that, I served as chief financial officer and controller for CHI St. Alexius Health in Bismarck for eight years and as director of finance for the North Dakota Supreme Court from 2001 to 2007.  I also served as a tax accountant for a Bismarck, North Dakota accounting firm for nearly six years and as supervisor of fiscal management for the state Retirement & Investment Office from 1990 to 1995.  I earned an

1

undergraduate degree in accounting from Minot State University and a master of business administration degree from Troy University in Montgomery, Alabama. I am a past president of the North Dakota Healthcare Financial Management Association and member of the North Dakota Society of CPAs.

3. OMB's mission is to provide innovated leadership and support to state government through five divisions: Fiscal Management, Human Resource Management, Central Services, Facility Management and Risk Management.

4. I am familiar with the Complaint in this matter filed by the Standing Rock Sioux Tribe against the U.S. Army Corps of Engineers (Corps) in Case No. 1:24-cv-02905 (D.D.C), which seeks an immediate and permanent injunction against the continued operation of the Dakota Access Pipeline (DAPL) at the crossing of the Missouri River at Lake Oahe, which would effectively end the operation of DAPL, and transportation of crude oil through DAPL, in North Dakota.

5. This declaration describes the extensive, immediate, unnecessary, and irreparable harm that will befall North Dakota and its citizens who did not assume any economic risk when the U.S. Army Corps of Engineers (Corps) approved the Dakota Access Pipeline (DAPL).

6. North Dakota is a small state in terms of both population (47th out of 50 states, 2023 population estimates, U.S. Census Bureau) and economic output (45th out of 50 states, calendar year 2023 - Gross Domestic Product by State, Bureau of Economic Analysis), but ranks third out of the fifty states in terms of oil production (1.183 million barrels per day, calendar year 2023, U.S. Energy Information Administration). As a result, North Dakota is extremely dependent upon revenues from taxes on the extraction and production of oil and natural gas to fund government operations and essential services to state citizens. For the Mandan, Hidatsa, and Arikara Nations

(Three Affiliated Tribes), DAPL transports about 60% of their oil production, the receipts of which comprise a substantial amount of their annual budget.

7. Specifically, over ten percent of the State's general fund revenues are derived directly from oil and gas taxes and nearly sixty percent of the total of all tax and fee revenue received by the state comes from oil and gas extraction and production (based October 2023 general fund forecast and on assumptions outlined in #8 below). The 2023-25 biennium legislative forecast (March 2023) assumes general fund revenues, excluding oil and gas taxes, of approximately $4.0 billion. Total oil and gas tax revenues during that same time are expected to total $5.9 billion based on the assumptions outlined below. These revenues support programs from which all State residents benefit including education, healthcare, water resource management, law enforcement, roadways, libraries, veterans' services, public housing, parks and recreation, and other public services.

8. North Dakota accounted for approximately 9.1% of the crude oil produced in the U.S during calendar year 2023. However, there is limited in-state capacity for refining. Consequently, continued oil production in North Dakota is dependent upon reasonable methods of transporting crude oil produced in the state to out of state refining facilities. The most efficient and cost-effective method of transporting crude oil is through existing pipeline infrastructure. The Dakota Access Pipeline transports approximately 50% of the crude oil produced in North Dakota. Any reduction in pipeline capacity will increase the cost of transporting North Dakota crude oil to refining facilities.

9. The basis of taxation upon which North Dakota oil severance taxes are levied is defined as "the price paid for the oil under an arm's-length contract between the producer and the purchaser, less, when applicable, transportation costs associated with moving the oil from the point

of production to the point of sale under the contract." NDCC 57-51-02.3. Consequently, any increase in the transportation cost of crude oil lowers the basis of the North Dakota tax and correspondingly lowers the amount of tax collected.

10. Due to North Dakota's geographic location with significant distance to crude oil refining facilities, a certain level of "discount" from the West Texas Intermediate crude oil benchmark price is expected to allow for the transportation cost that is deducted before the North Dakota tax is calculated. For the twelve-month period prior to the operation of DAPL (June 2016 through May 2017), the transportation discount averaged $7.15 per barrel. For the twelve-month period after DAPL opening (June 2017 through May 2018), the transportation discount averaged $4.75 per barrel, a reduction of $2.40, or 34%.

11. Based on the actual positive impact of DAPL operations to lower oil transportation costs, it is apparent a corresponding negative impact on tax revenue would result from any action that would close DAPL. Current projections for the State of North Dakota assumes oil production will average 1.2 million barrels per day through June 30, 2025, the end of the current two-year budget period.

12. The closure of DAPL would reduce state revenues for the first twelve months by approximately $900 million assuming a 50% decrease in oil production for three months then gradually ramping up from DAPL to rail, until production is back to 1.2 million barrels per day over twelve months, and an increase in transportation costs of $2.40 per barrel. This also assumes an average projected North Dakota price of $66.50 (Energy Information Administration (EIA) outlook less North Dakota transportation costs.

13. After the first year, estimated decreases in revenue due to the increased transportation costs is conservatively estimated to be $2.40/barrel which is $105.1 million per year

4

until DAPL is up and running again. Using these assumptions over a ten-year period the estimated reduction to revenue for the State of North Dakota is $1.8 billion, which equates to about 11% of the current biennium on-going appropriation. This would be a substantial negative financial hit to the State of North Dakota and would adversely impact virtually every industry and citizen.

14. Shutting down DAPL at a time when crude oil production is recovering from the pandemic and is projected to grow will worsen the harm that North Dakota and its citizens have already endured because of the COVID-19 pandemic and the initial, short-term collapse in crude oil demand. It would also cause extensive disruption in the drilling, completion, production, and transportation sectors resulting in permanent job losses. *See* Declaration of Nathan Anderson.

15. These estimates are conservative as oil prices are likely to go higher considering recent world events, and they assume that rail can be ramped up to handle the additional capacity over a 12-month period. At the time DAPL opened in 2017, rail capacity in North Dakota had grown to accommodate the increase in production. It would likely take several months or more for rail capacity to be restored, which could significantly increase the transportation discount during that period.

16. Another factor that could further decrease tax revenues if DAPL is closed relates to oil production contracts in North Dakota. Much of the crude oil that is transported through DAPL is subject to binding contracts committing that production to being transported through DAPL and no other means of transportation. *See* Declaration of Nathan Anderson. If this occurs, the loss of tax revenue to the State could be much higher.

17. As a State with a part-time citizen legislature that meets on a biennial basis, there are few viable options available to deal with a sudden, drastic change in the State's revenue. A long-term, ongoing reduction in state revenues from oil and gas taxes would result in the need to

significantly reduce State services or significantly increase taxes on citizens.

18.     In my view, any DAPL shutdown would greatly negatively impact the economy of North Dakota.  It would cause North Dakota to lose billions in extraction tax revenues and would result in the loss of thousands of North Dakota jobs.  It would unnecessarily and irreparably harm North Dakota and its residents.

19.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 6, 2024.

*Susan Sisk*
_____
SUSAN SISK