# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Standing Rock Sioux Tribe,             )
                                                )
                Plaintiff,             )
                                                  )
v.                                     )
                                              )     Case No. 1:24-cv-02905-JEB
                                              )
U.S. Army Corps Engineers, et al.,    )
                                              )
                Defendants,        )
                                              )
State of North Dakota, et al.,       )
                                              )
                Defendant-Intervenors    )
_____)

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Comes Now Plaintiff, Standing Rock Sioux Tribe, by and through undersigned counsel, and submits this Memorandum in Support of Motion for Partial Summary Judgment.

## Introduction

Federal Defendants continue to allow the Dakota Access Pipeline ("DAPL") to operate in a federally-administered flood control project in spite of violations of numerous mandatory federal statutes and regulations. Federal Defendants' conduct in allowing the continued operation of DAPL without the required easement to cross federal land, absent a lawful environmental impact analysis under the National Environmental Policy Act ("NEPA"), without compliant emergency spill response plans required by the Clean Water Act ("CWA"), and by a company that has been debarred from holding a federal easement due to established criminal conduct constitutes agency action "unlawfully withheld" within the meaning of the Administrative Procedures Act ("APA"). 5 U.S.C. §706(1). Each of these violations of law represent a discrete, mandatory legal duty upon

1

Federal Defendants to which the agency has failed to adhere. As a result, this Court should grant this Motion for Partial Summary Judgment, issue a Declaratory Order that Federal Defendants are in violation of the APA, Mineral Leasing Act, CWA, and Federal Defendants' regulations, and, in accordance with APA § 706(1), issue an Order to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Further, as it deems necessary, this Court should order the parties to present argument and evidence on what other relief, including injunctive relief, is appropriate for the legal violations identified herein.

### **Background**

Under the Rivers and Harbor Act of 1898, 33 U.S.C. §401 *et seq*., the Corps of Engineers is authorized to implement engineering works in the navigable waters of the United States. In the Flood Control Act of 1944, 58 Stat. 887, the Corps was authorized to develop five massive earthen dams on the Missouri River main stem, primarily for flood control, navigation and hydropower generation. *See ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 499 (1988). In the Oahe Act of September 2, 1958, 72 Stat, 1762, the Corps acquired 56,000 acres of Missouri River bottomlands from plaintiff Standing Rock Sioux Tribe, for the site of Lake Oahe. The manner in which the Corps operates the dam and manages the land surrounding the reservoir has had and continues to have a significant effect on the Standing Rock Reservation environment. *See Water Problems on the Standing Rock Indian Reservation, Hearing Before the S. Comm. on Indian Affairs*, 108th Cong., 1-4 (2004).

The Dakota Access Pipeline is a 1,174 mile-long hazardous liquid material pipeline with an original capacity of 574,000 barrels per day. DAPL originates in the Bakken and Three Forks oil fields near Stanley, North Dakota, and carries Bakken crude to refineries near Patoka, Illinois. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng's*, 205 F. Supp. 2d 4, 7 (D.D.C. 2016)

(*Standing Rock I*). It enters the Treaty land of the Oceti Sakowin Oyate ("Seven Council Fires," commonly known as the Great Sioux Nation) upon crossing the Heart River in present-day central North Dakota. 11 Stat. 749 (Treaty of Fort Laramie of 1851). The pipeline crosses the Missouri River at Lake Oahe, less than one-half mile from, and directly upriver from, the present-day boundary of the Standing Rock Indian Reservation. *Standing Rock I*, 205 F. Supp. 3d at 7.

On February 8, 2017, defendant Army Corps of Engineers granted an easement to Dakota Access, LLC, a wholly owned subsidiary of Energy Transfer LP ("Energy Transfer LP"), to operate DAPL on federally-administered land and water at the Missouri River crossing on Lake Oahe. U.S. Army Corps of Engineers, *Dakota Access Pipeline Lake Oahe Crossing Project Draft Environmental Impact Statement* 1-1 (2023) (hereinafter "Draft EIS") https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=428178. The pipeline crosses the Missouri River less than one-half mile from, and directly upriver from, the present-day boundary of the Standing Rock Indian Reservation. immediately adjacent to plaintiff's Reservation. *Standing Rock I*, 205 F. Supp. 3d at 7. On February 19, 2020, the North Dakota Public Service Commission approved the construction of a new pump station for DAPL and an increase in the flow rate from 574,000 barrels per day to 1.1 million barrels per day. Draft EIS at p. 1-10.

On March 25, 2020, this Court vacated the easement, due to Federal Defendants' failure to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347, and its implementing regulations. *Standing Rock v. U.S. Army Corps of Eng's*, 471 F. Supp. 3d 71, 77-78 (D.D.C. 2020) (*Standing Rock V*). On January 26, 2021, the U.S. Court of Appeals for the D.C. Circuit affirmed the vacating of the easement. *Standing Rock Sioux Tribe v. Army Corps of Eng's*, 985 F.3d 1032, 1054 (D.C. Cir. 2021).

The D.C. Circuit made clear its expectation that the defendant Corps of Engineers would take further action with respect to discontinuing the operation of DAPL across the federal flood control project without an easement:

> It may well be – though we have no occasion to consider the matter here – that the law or the Corps' regulations oblige the Corps to vindicate its property rights by requiring the pipeline to cease operations and that the Tribes or others could seek judicial relief under the APA should the Corps fail to do so. But how and on what terms the Corps will enforce its property right is, absent a properly issued injunction, a matter for the Corps to consider in the first instance, though we would expect it to decide promptly. To do otherwise would be to issue a de facto outgrant without engaging in the NEPA analysis that the Corps concedes such an action requires.

*Id.*

Since January 26, 2021, Federal Defendants have allowed DAPL to continue to operate on federally-managed land and in a federally-operated flood control project without an easement as required by the Mineral Leasing Act, 30 U.S.C. § 185(a), and without a determination of the pipeline's environmental impacts, as required by the Mineral Leasing Act, *id.* at (h), NEPA, 42 U.S.C. § 4332, and the Federal Defendants' regulations. 32 C.F.R. §§ 651.9(b), 651.10(i).

## **Standard of Review**

Under the Administrative Procedure Act ("APA"), a party may seek judicial review of either a "final agency action," 5 U.S.C. § 704, or for an agency's "failure to act," *see* 5 U.S.C. § 551(13); *Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004); *Air Line Pilots Ass'n v. Civil Aeronautics Bd.*, 750 F.2d 81, 85 (D.C. Cir. 1984). When the challenged agency action is a failure to act, the APA instructs the court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

Importantly, this provision applies where the defendant agency has <u>either</u> "unlawfully withheld" <u>or</u> "unreasonably delayed" agency action. *Id.*  For purposes of Plaintiff Standing Rock

Sioux Tribe's submission to this Court for Partial Summary Judgment, the Tribe contends that Federal Defendants have "unlawfully withheld" agency action. This provision generally applies when an agency fails to take an action required by law.

A § 706(1) claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *SUWA*, 542 U.S. at 63–64. "The limitation to *discrete* agency action precludes ... broad programmatic attack[s,]" *id.* at 64 (emphasis added), while "[t]he limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[,]"*id.* at 65; *see also*, *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017). Because § 706(1) is limited "to *required* agency action," the Court cannot direct "even discrete agency action that is not demanded by law." *Id*. In other words, Plaintiffs must show that the agency is subject to a "legal duty" that is "ministerial or nondiscretionary" and amounts to "a specific, unequivocal command." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018). Notably, the "law" that generates a mandatory duty need not be a statute—it can also be an "agency regulations that have the force of law." *SUWA*, 542 U.S. at 64; *accord SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 119 (D.D.C. 2015).

Courts routinely find that when a statutory or regulatory mandate includes the word "shall," that it imposes the type of mandatory duty for which relief under APA § 706(1) is appropriate. *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *Pierce v. Underwood*, 487 U.S. 552, 569–70 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); *Barrentine v. Arkansas–Best Freight Sys., Inc.* 450 U.S. 728, 739 n. 15 (1981) (same under Fair

Labor Standards Act); *United States v. Myers*, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f) ] indicates mandatory intent."), cert. denied, 520 U.S. 1270 (1997); *see also* Black's Law Dictionary 1233 (5th ed. 1979) ("As used in statutes ... [shall] is generally imperative or mandatory.").

Thus, APA § 706(1) claims rightly provide the avenue for a plaintiff to effectively challenge a scenario in which "agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001); *see also, In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (explaining that "the primary purpose of the writ [of mandamus] in circumstances" in which a plaintiff files a § 706(1) claim "is to ensure than an agency does not thwart our jurisdiction by withholding a reviewable decision"); *Zinke*, 260 F. Supp. 3d at 20.

In *SUWA*, the U.S. Supreme Court acknowledged that "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act, now codified at 28 U.S.C. § 1651(a)." *SUWA*, 542 U.S. at 63. The Court noted that "[t]he mandamus remedy was normally limited to enforcement of "a specific, unequivocal command,'" and "'the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatever.'" *Id.* (quoting *ICC v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932) and *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888)).

Pursuant to 28 U.S.C. § 1361, federal district courts "have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "A court may grant mandamus relief 'only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there

is no other adequate remedy available to plaintiff.'" *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

The Court of Appeals has similarly acknowledged that a Writ of Mandamus and APA § 706(1) both provide an appropriate vehicle for relief where the federal court is "faced with the agency's failure . . . to respond to our own remand . . . [and] [i]n so doing, the agency has effectively nullified our determination . . . ." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 856 (D.C. Cir. 2008). As distinct from a Writ of Mandamus, however, APA § 706(1) does not provide for the same equitable latitude in crafting a remedy for a found violation.

As the Fourth Circuit recently held, "if a party has successfully demonstrated an unlawfully withheld agency action under § 706(1), the court must enter an appropriate order and secure the agency's compliance with the law. If the agency's legal obligation falls within the scope of § 706(1), such an order must issue regardless of equitable or policy considerations." *South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018). Courts in this district have similarly recognized that:

> Under Section 706(1), the APA provides relief for agency action unlawfully withheld by instructing courts to "compel" the action in question. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). The imperative nature of the provision not only empowers, but requires, courts to issue orders mandating agency action when it is unlawfully withheld. *See Inv. Co. Inst. v. Fed Deposit Ins. Corp.*, 728 F.2d 518, 522 (D.C. Cir. 1984); *see also Solenex LLC v. Jewell*, 156 F. Supp. 3d 83, 84 (D.D.C. 2015).

*Am. Forest Res. Council v. Nedd*, No. CV 15-01419 (RJL), 2021 WL 6692032, at *2 (D.D.C. Nov. 19, 2021), rev'd and remanded on other grounds sub nom. *Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023).

Finally, the Declaratory Judgment Act allows courts to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). In order "[t]o

invoke the Declaratory Judgment Act, a plaintiff must demonstrate that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *United Gov't Sec. Officers of Am. v. Chertoff* (*UGSOA*), 587 F. Supp. 2d 209, 222 (D.D.C. 2008) (quoting *Atlas Air, Inc. v. Air Line Pilots Ass'n, Int'l*, 69 F. Supp. 2d 155, 162 (D.D.C. 1999)).

As to the mechanism for presenting the issues to the Court for review, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); *see also Depomed v. United States Dep't of Health and Human Servs.*, 66 F. Supp. 3d 217, 227 (D.D.C. 2014). However, while "a challenge to final agency action judicial review is ordinarily limited to the administrative record at the time of the agency's decision, *Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C.Cir.2007)," that is not the case in a challenge to an agency's failure to act. *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 100–01 (D.D.C. 2013).

In cases alleging an unlawfully withheld actions under 5 U.S.C. § 706(1), there is no final agency action to "demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir.2000). "Said another way, if an agency fails to act, there is no 'administrative record' for a federal court to review." *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)); *see also Cobell v. Babbitt*, 91 F. Supp. 2d 1, 38 (D.D.C. 1999) ("Extrinsic evidence is appropriate for consideration when the processes utilized and factors considered by the decisionmaker require further explanation for

effective review." (internal quotation marks omitted)). As a result, "any motion for summary judgment may rely on affidavits or declarations as well as on the documentation in [the agency's] files related to the alleged inaction," which are not necessarily part of the administrative record. *Pool*, 942 F. Supp. 2d at 101 citing *SUWA*, 542 U.S. at 61–65; *Nat'l Ctr. on Homelessness and Poverty*, 842 F. Supp. 2d at 130.

## <u>Argument</u>

**I.    Federal Defendants Have Unlawfully Withheld Action Pursuant to the Non-discretionary Duty Under the Mineral Leasing Act and Clean Water Act to Require a Compliant Facility Response Plan.**

The MLA prescribes non-discretionary requirements to protect public health, safety and the environment from the operation of a hazardous liquid pipeline on federally-managed land. *See Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) (BLM pipeline easement vacated for failing to comply with agency regulations and NEPA). Under subsection (h)(2) of the statute:

> The Secretary or agency head, prior to granting a right of way or permit pursuant to this section, for a new project which may have a significant effect on the environment, *shall require the applicant* to submit a plan for construction, operation and rehabilitation for such right-of-way or permit. The Secretary or agency head shall issue regulations or *impose stipulations* which shall include, but not be limited to: (A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land; (B) requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards… (C) requirements designed **t**o *prevent (i) damage to the environment* (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; *and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife and biotic resources of the area for subsistence purposes*.

30 U.S.C. § 185(h)(2) (emphasis added).

Federal Defendants have "issue(d) an outgrant without engaging in NEPA analysis that the Corps concedes an outgrant would require." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng's*, 985 F.3d at 1054. Federal Defendants have a non-discretionary duty to impose these environmental requirements in an easement, in order for DAPL to operate at the Lake Oahe crossing.

Detailed and clear provisions in facility response plans (FRPs) for hazardous liquid pipelines, including close coordination with local first responders, are integral to the protection of the environment from oil pipeline operations. *See United States of America v. Enbridge Energy, Ltd.,* 1:16-cv-00914-GJQ-ESC, ECF No. 14, Consent Decree, May 23, 2017 ($61 million civil penalty and detailed remediation requirements for July 25, 2010 spill of 20,082 barrels (843,444 gallons) of oil in Talmadge Creek and Kalamazoo River near Marshall, Michigan, causing lasting environmental degradation; shut-down took 18 hours). Adequate spill response plans are deemed to be part and parcel of the environmental reviews under NEPA due to the potential environmental impacts of flawed facility response plans. *Indigenous Envt. Network v. U.S. Dept. of State*, 369 F. Supp. 3d 1045, 1052-1053 (D. Mont. 2018) (Major pipeline project enjoined due to failure to identify remediation challenges specific to the hazardous liquid to be transported, and to properly coordinate with local first responders); *In the Matter of ExxonMobil Pipeline Company, Respondent* (Pipeline and Hazardous Materials Safety Administration ("PHMSA"), 2015 WL 780721 (Jan. 23, 2015) (inadequate plan for hazardous liquid response in flood zone).

The Oil Pollution Act of 1990, Publ. L. 101-380, 104 Stat. 484, governs facility response planning for hazardous liquid pipelines. The act is codified as section 311 of the Clean Water Act. 33 U.S.C. § 1331. The statute requires an owner or operator of a hazardous liquid pipeline to:

… prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and a substantial threat of such a discharge, of oil or a hazardous substance.

33 U.S.C. § 1331(j)(5)(A)(ii).

The statute lists other requirements for FRPs, such as consistency with the National Contingency Plan and Area Contingency Plan, the identification of oil spill contractors, training of emergency responders, etc. 33 U.S.C. § 1331 (j)(5)(D); *see also, Nat'l Wildlife Fed'n v. Sec'y, U.S. Dept. of Transp.*, 960 F.3d 872 (6th Cir. 2020) (PHMSA approval is nondiscretionary if statutory criteria fulfilled; NEPA and Endangered Species Act compliance not required); *see also* 49 C.F.R. § 194.107 (general plan requirements).

Under Executive Order 12777, 56 Fed. Reg. 54757 (Oct. 22, 1991), the Department of Transportation reviews and approves FRPs for onshore pipelines, the Environmental Protection Agency performs these functions for onshore non-transportation facilities (e.g. refineries) and the Coast Guard does so for offshore facilities. Agencies with approval authority for individual pipeline projects, such as the Federal Defendants in the present case, are required to ensure the sufficiency of response plans as well. *Indigenous Envt. Network*, 369 F. Supp. 3d at 1053.

The Facility Response Plan and its corollary Geographic Response Plan for the Lake Oahe crossing (northern response zone) fails to demonstrate sufficient protection of the environment as required under 30 U.S.C. § 185(h)(2) because:

(1)     there is no realistic estimate of the worst case discharge into Lake Oahe, as required by 49 C.F.R. § 194.105(b)(1);

(2)     the plans fail to account for the widely variable reservoir and climatic conditions below the DAPL Lake Oahe crossing, as necessary to clean up the worst case discharge "to the maximum extent practicable;"

(3)     the plans fail to provide for collaboration with the first responders – the Standing Rock Sioux Tribe;

(4)    The plans fail to address oil spill remediation during ice cover.

1.    **The Facility and Geographic Response Plans Lack a Realistic Estimate of the Worst Case Discharge.**

The PHMSA regulations for pipelines such as DAPL emphasize the need for a realistic calculation of the worst case discharge. This is codified by the need to base the shutdown time on "historic data" and be the "largest foreseeable discharge." 49 C.F.R. § 194.107. The regulations define the worst case discharge as "the *largest* foreseeable discharge of oil, including a discharge from fire or explosion, in adverse weather conditions." 49 C.F.R. § 194.5 (emphasis added). The regulation prescribes the requisite calculation for the worst case discharge:

> The pipeline's *maximum* release time in hours, plus the *maximum* shutdown response time in hours (based on historic discharge data or in the absence of such historic data, the operator's best estimate), multiplied by the maximum flow rate expressed in barrels per hour (based on the maximum daily capacity of the pipeline), plus the line drainage volume after shutdown of the line section(s) in the response zone expressed in barrels…

49 CFR §194.105(b)(1) (emphasis added).

The current FRP for the DAPL Lake Oahe crossing repeats the same mistakes as the 2017 FRP (ECF No. 1-7). The project continues to operate, even though in the 2023 FRP, intervenor-defendant Energy Transfer LP estimates that a leak would be detected in three minutes, that shutdown decision-making would be immediate (zero minutes), that pump shutdown time would be six minutes and closure of the emergency flow restriction devices would occur in 3.9 minutes, for a total shutdown time of 12.9 minutes. *Id.* This Court cited the critique of plaintiff's expert that the assumptions underlying the 12-minute shutdown time are overly optimistic and are unrealistic:

> Holmstrom concluded that the 12.9 (or possibly 11.9 ) minutes "from leak detection to the to the closing of the shut-off valves lacks supporting data and is not credible." This number, he pointed out, was "based on a 'best case' scenario in which all systems function precisely as intended." Such assumptions have no place in a worst case scenario, experts said, since in reality "[m]ajor spill incidents typically

occur with multiple system causes, when people, or equipment, or systems do not function exactly as they are expected to." By failing to consider such eventualities, which is the modern standard for major accident prevention, the model has not, in fact, given a worst case discharge analysis.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng's*, 44 F. Supp. 3d 1, 24 (D.D.C. 2020) ("Standing Rock V").

Yet the revised FRP uses the same figures. ECF No. 1-7. Although the FRP is redacted and calculation of the worst case discharge is not provided, Federal Defendants' 2023 draft environmental impact statement identifies a 12-minute shutdown time, by reducing the pump shutdown time from 9 minutes to 6 minutes and adding a three minute detection time and 3.9 minute valve closure time. Declaration of Donald S. Holmstrom, attached hereto as Exhibit D ("Holmstrom Decl.") at ¶¶ 26-27. The shutdown time is the exact same 12.9 minutes, but through a different calculation, which suggests non-compliance with both the calculation and the worst case discharge figure. *Id.*

In 2020, the issue addressed by this Court was whether Federal Defendants sufficiently resolved the controversy over the worst case discharge and other environmental impacts. *Standing Rock V*, 440 F. Supp. 3d at 16. "At best, the Corps' statement that the nine minutes included time for detection requires more explanation." *Id.* at 23. With respect to count IV in Plaintiff's complaint in the present case (ECF No. 1), the issue is whether Federal Defendants are violating section 311 of the Clean Water Act and its implementing regulations, which impose mandatory duties to ensure a pipeline operating on land they administer identifies and plans to clean up a worst case discharge to the maximum extent practicable. 33 U.S.C. § 1331(j)(5)(A)(ii); 49 C.F.R. §§ 194.105(b)(1), 194.107.

A proper calculation of the worst case discharge is a requirement for the operation of a pipeline, even if there is an easement. *See Indigenous Envt. Network*, 369 F. Supp. 3d at 1052-

1053 (mitigation plan required for project to proceed); *cf. State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 868 F.3d 810 (6th Cir. 1989) (denial of petition to shut down plant for inadequate emergency plan is reviewable, but NRC decision affirmed due to corrections to deficiencies). In the 2023 FRP, like the 2017 plan, the shutdown time is 12.9 minutes. There has been no effort by Federal Defendants to require improvements to 2017 FRP, and intervenor defendant Energy Transfer LP has made no such revisions. ECF No. 1-7.

The regulations require basing the shutdown time on "historic discharge data." 49 C.F.R. § 194.105(b)(1). As recognized by the D.C. Circuit:

> DAPL's own operator spilled 8,600 barrels of oil during a 12 day-long slow leak in 2016, even though the monitoring system in use there showed the exact same kind of "detectable meter imbalance" that the Corps here claims will quickly alert DAPL's operators to a slow leak.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engr's*, 985 F.3d at 1045.

By doubling down on the 12.9 minute shutdown time, the DAPL Lake Oahe FRP ignores Energy Transfer's "historic discharge data." According to Holmstrom:

> [C]learly, 3 minutes is not the maximum detection time… The Corps cannot take credit for the successful CPM/SCADA detection of a spill in 3 minutes with an Energy Transfer CPM/SCADA detection rate of 13% and no performance testing as provided in modern pipeline safety standards. With EFRDs (Emergency Flow Restriction Devices) not subject to full verification of performance (no full valve stroke testing) and a lack of backup power to close the EFRDs during a power failure., the Corps cannot take credit for the functioning of the EFRDs in their WCD calculations…   Also, without any analysis the drain down volume was lowered by 1,709 bbls (barrels) or a 20% reduction….

Holmstrom Decl. at ¶¶ 27-28.

Holmstrom concludes that the CPM/SCADA leak detection monitoring system uncovers only 13 percent of oil spills from intervenor-defendant Energy Transfer's pipelines. *Id.* As the D.C. Circuit noted, "DAPL is buried deep underground and visual identification is therefore unlikely to make up for deficiencies in the CPM system." *Standing Rock Sioux Tribe v. U.S. Army Corps of*

*Eng's*, 985 F.3d at 1045. Federal Defendants themselves have acknowledged "detection times for small releases have *historically taken anywhere from minutes to weeks to detect*." U.S. Army Corps of Engineers, *Dakota Access Pipeline Lake Oahe Crossing Project Draft Environmental Impact Statement* 3-34 (2023) *located at* https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=428178 (emphasis added). Thus, Federal Defendants admit that historic data, whose consideration is required by rule, 49 C.F.R. § 194.105(b)(1), could involve weeks, not just 12.9 minutes.

Moreover, "shutting down a large industrial process such as a 1.1 million BPD (barrels per day) pipeline would typically involve communication with if not discussion and approval of supervision. Detection time includes… (time for) human decision-making." Holmstrom Decl. at ¶ 27. The 2023 FRP ignores historic data in contravention of the regulation, prescribes no time for human decision-making, and relies upon a monitoring system proven effective for 13 percent of oil spills.

Federal Defendants possess a non-discretionary duty to ensure that hazardous liquid pipelines crossing land they administer possess an easement, 30 U.S.C. § 185(a), which is supported by an environmental review under NEPA, *id.* at (h)(1), and contains which stipulations to protect water quality, *id.* at (h)(2)(B); prevent damage to the environment, *id.* at (h)(2)(C); and protects the "fish, wildlife and biotic resources of the area for subsistence purposes," *id.* at (h)(2)(D); *see* Declaration of Erroll "Doug" Crow Ghost, Attached as Exhibit A, at ¶ 4 ("subsistence hunting and fishing are very important aspects of our way of life on the Standing Rock Reservation").

Federal Defendants have and continue to fail to perform these duties by allowing DAPL to operate without a compliant Facility Response Plan. *See Indigenous Envt. Network*, 369 F. Supp.

3d at 1052-1053. Facility response plans are integral aspects of "requirements designed to control or prevent damage to the environment." 30 U.S.C. § 185(h)(2)(c)(i). The operative plan in the present case includes a worst case discharge calculation that significantly understates the amount of time it could take to detect a leak and shut down DAPL, thereby underestimating the worst case and failing to provide for its clean-up "to the maximum extent practicable." 33 U.S.C. § 1331(j)(5)(A)(ii). According to Holmstrom, the worst case discharge could be 14 times higher than projected by intervenor defendant Energy Transfer LP and accepted by the federal defendants. Holmstrom Decl. at ¶ 33.

The Facility Response Plan is a "best case" approach, not a reasonable estimate of the "the *largest* foreseeable discharge of oil," as required by rule. 49 C.F.R. § 194.5. Accordingly, plaintiffs are entitled to summary judgment on count IV in its complaint.

### 2. The FRP Fails to Account for Variable Conditions at the Lake Oahe Crossing.

Federal Defendants have a duty to provide a "reasonable assurance" that the FRP "is capable of being implemented." *Union of Concerned Scientists v. United States Nuclear Regulatory Comm'n,* 735 F.2d 1437, 1452 (D.C. Cir. 1984). Federal Defendants are unable to do so on account of their own actions – the water releases at Oahe Dam. The operation of the dams has been described as follows:

> The water releases for navigation on the lower Missouri River are the central feature of the Missouri River system operation… In the springtime, that large upstream reservoirs – South Dakota's Lake Oahe, North Dakota's Lake Sakakawea and Lake Fort Peck in Montana – receive re-charge from snow melt in the Rocky Mountains. Beginning with water releases for navigation on (April 1) of each year, the water stored in these reservoirs is drawn down by the Corps. The navigation releases cause the water levels in the reservoirs to decline precipitously during the course of the navigation season.

Peter Capossela, *Impacts of the Army Corps of Engineers' Pick-Sloan Program on the Indian Tribes of the Missouri River Basin*, 30 J. ENVTL. LAW AND LITIGATION 143, 181 (2015); *see South*

16

*Dakota v. Hazen*, 914 F.2d 147, 148-149 (8th Cir. 1990) (request for injunction against navigation releases deemed moot, because fish spawning season and navigation season had concluded).

In his Declaration, the Director of the Standing Rock Department of Water Resources, Doug Crow Ghost, explains the effect of the water releases at Oahe Dam on the hydrologic conditions at the mouth of the Cannon Ball River, immediately below the DAPL Lake Oahe crossing:

> The riverine conditions at the mouth of the Cannon Ball River are constantly changing. Free flowing water enters the reservoir above its confluence with the Cannon Ball, which has a heavy silt load. During periods of high water, the silt is deposited on the bed of the reservoir. The area resembles a freshwater lake, with teems of waterfowl in the spring and fall, and robust macroinvertebrate resources stimulating the food web for aquatic life.
>
> During periods of low water, the reservoir recedes and the river behaves as the naturally-braided Missouri River. Low water causes the river bed to change rapidly, as deposits of sediment get transported downstream, and side channels continuously form and disappear. The main channel itself becomes difficult to discern as it coalesces with side channels. The depth of the water can suddenly change from 25 feet or more to 5 feet or less, based upon overall hydrological conditions, sediment deposits, time of the year, recent rainfall patterns, etc. During low water, in this segment the water temperature increases and aquatic habitat is degraded.

Crow Ghost Decl. at ¶¶ 20-21.

At its own admission, defendant Corps of Engineers does not consider Tribal rights in managing stream flows at the upper Missouri River dams. "Indian rights regarding water management were not clarified nor considered in operational plans." John R. Ferrell, BIG DAM ERA: A LEGISLATIVE AND INSTITUTIONAL HISTORY OF THE PICK-SLOAN PROGRAM 123 (1993) published by U.S. Army Corps of Engineers, Missouri River Division, located at https://www.nwd-mr.usace.army.mil/rcc/reports/pdfs/BigDamEra.pdf. (last accessed on January 15, 2025). As explained by Crow Ghost, "Corps' officers may meet with our Tribe periodically to explain what they are doing, but our requests the mitigate the adverse impacts of its operations on

our land and water fall on deaf ears." Crow Ghost Decl. at ¶ 11. This dynamic was described by

a Western Shoshone Tribal leader:

> We made countless proposals. We got nothing of substance back, no effort on their part to even meet us part way. Instead of dialogue and a respectful exchange of ideas, we were stonewalled.

Derek C. Haskew, *Federal Consultation with Indian Tribes: The Foundation of Enlightened Policy*

*Decisions, or Another Badge of Shame?* 24 AM. INDIAN L. REV. 21, 22 (2000).

Nevertheless, the pattern of water releases established by the Corps over decades has had

a dramatic impact on the Standing Rock Reservation environment. *See Water Problems on the*

*Standing Rock Indian Reservation, Hearing Before the S. Comm. on Indian Affairs*, 108th Cong., 1-

4 (2004) (statement of Charles W. Murphy, Chairman, Standing Rock Sioux Tribe, "It's very sad

right now that we don't know if we're going to have water next week or not… they're letting too

much water downstream"). This is especially the case at the mouth of the Cannon Ball River,

which is near the tailwaters of the reservoir, the segment of the reservoir whose level begins to

recede and which is subject to the deposition of heavy sediment loads at the mouth of the Cannon

Ball River. Crow Ghost Decl. at ¶¶ 20-21. Extreme fluctuations in water elevations combined with

the deposit of high sediment loads from the Cannon Ball create highly variable conditions. *Id.*

> In this segment of the Missouri River, "[L]ow water causes the river bed to change rapidly, as deposits of sediment get transported downstream, and side channels continuously form and disappear. The main channel itself becomes difficult to discern as it coalesces with side channels… During low water, this stretch of river, where the Corps of Engineers in its wisdom permitted a high capacity hazardous liquid pipeline, never looks the same twice. There are no "typical" conditions at this segment of Oahe Reservoir. Even experienced river guides have difficulty navigating the Oahe tailwaters during periods of low water.

*Id.* at ¶¶ 21-22.

The Corps' recent elevation measurements at Lake Oahe demonstrate this. The elevation

of Lake Oahe on February 8, 2017, the day Federal Defendants issued the now-vacated easement

18

to intervenor-defendant Energy Transfer LP, the elevation of Lake Oahe was 1607.72 msl, https://www.nwdmr.usace.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_08022017. The Corps characterizes the elevation above 1607.5 msl as the "Annual Flood Control and Multiple Use Zone," the elevation at which it begins to store water for downstream flood control - flood waters. U.S. Army Corps of Engineers, *Missouri River Mainstem Reservoir System Master Water Control Manual* VII-8 (2018) located at: https://www.nwdmr.usace.army.mil/rcc/reports/mmanual/MissouriMainstemMasterManual2018. pdf. Thus, on February 8, 2017, the elevation was into that zone – the water was up.

According to Federal Defendants, drought began to diminish recharge onto the Missouri River system in 2021. By December 1, 2021, the elevation of Lake Oahe had declined to 1596.47 msl, 11 feet below the Annual Flood Control and Multiple Use Zone. U.S. Army Corps of Engineers, *Mainstem and Tributary Reservoir Bulletin*. 12-1-2021, ECF No. 1-4. Flood storage water was released downstream and Lake Oahe began a downward trend that has lasted years. The annual minimum average daily elevation of Lake Oahe in 2021 was 1596.2 and in 2022 it was 1588.9. https://www.nwd-mr-usace.army.mil/rcc/projdata/OAHE_Statistics.pdf (last accessed on January 13, 2025). The Corps' calculated that the average minimum daily elevation of Lake Oahe in 2023 was 1589.8 msl and the average annual daily elevation was 1597.8 msl. *Id.*

According to the Corps, on October 9, 2024, the elevation of Lake Oahe was 1600.48 msl. https://www.nwdmr.usace.mil/rcc/programs/data/bull_old/pdfs/MRBWM_Reservoir_09102 024.pdf. On that date, Tribal staff surveyed the mouth of the Cannon Ball River, where intervenor defendants identify control point 1. Crow Ghost Decl. at ¶¶ 24-25. None of the boat docks along Standing Rock's northern shore were usable on that day. *Id.* Crow Ghost and his staff were able to get into the water at Fort Rice, about 10 miles north of the Reservation boundary. The boat dock

area was five to six feet deep. *Id*. at ¶ 26. They had difficulty finding the main channel and ran

aground several times, so it took some time to reach control point 1. *Id.*

In the Geographic Response Plan, control point 1 appears to just inside the mouth is of the

Cannon Ball River along the norther shore. (ECF No. 1-7). The plan is to concentrate the oil with

the use of booms. Crow Ghost Decl. at ¶ 33. The plan states, "If the containment slick is thick

enough, regular suction equipment may be used at first; however, in most instances, a floating

skimmer should be used." ECF No. 1-7 at pp. 29, 34.

On October 9, 2024, control point 1 was a "football field-sized mud flat." Crow Ghost

Decl. at ¶ 27. It was not water where oil could be collected at the surface and skimmer or

vacuumed. Access to control point 1 was limited by water due to low water and silt deposits, or

land due to the soft exposed shale. *Id*. Water levels have continued to decline since October 9.

Declaration of Stephen Yellow Earrings ("Yellow Earrings Decl."), attached as Exhibit B, at ¶ 5.

On November 6, Tribal staff took photos of the segment of Oahe Reservoir below the DAPL

crossing, and at the mouth of the Cannon Ball River. *Id.*

The photos show the reservoir to be a braided river, with numerous channels and side

channels and emerging sand bars. Yellow Earrings Decl. at ¶¶ 6-7. They show the mouth of the

Cannon Ball River as de-watered mudflat with invasive weeds sprouting over extensive exposed,

de-watered mud flat that was once the bed of Oahe Reservoir. *Id*. Clearly, "[T]he Facility Response

Plan and Geographic Response Plan for the DAPL Lake Oahe crossing fail to recognize or prepare

for the challenges traversing this area and mobilizing equipment during variable climactic and

reservoir conditions." *Id.*

The FRP states in relevant part:

Improved boat ramps at Lake Oahe should be capable of allowing access even in
conditions matching the lowest known water levels at Lake Oahe. In the event that

water levels decrease to the point where improved boat ramps are inaccessible, the inaccessibility of the boat ramps will not inhibit the viability and timeliness of emergency response efforts. The OSROs identified in Appendix C maintain an inventory of such equipment capable of responding to an oil spill in low water conditions. In the extremely unlikely event that an oil spill were to occur, simultaneously with a low-water level necessary for improved boat ramps, such a situation would be addressed by the deployment of air boats and mechanical launching of conventional fast response vessels that do not require the use of improved boat ramps. Such equipment would be launched from the identified low water access points due to the nature of the boat launch (sandy beach or other areas of similar nature that can be accessed).

ECF No. 1-7 at pp. 33-34.

As described by Doug Crow Ghost, the boat ramps identified in the FRP are not usable for access to the control points during periods of low water, and it is difficult to determine their utility at any given time because river travel depends on other factors as well, such as sediment deposits. Crow Ghost Decl. at ¶ 22. "Air boats" (rafts) cannot transport the "skimmers with 20-34 barrel storage" or "1,200 feet of containment boom" identified as oil recovery equipment. ECF No. 1-7 App. A. "Mechanical launching of conventional fast response vessels" is unrealistic on soft shale surrounding the mouth of the Cannon Ball and control point, and, if attempted, could cause significant harm to the land, which contains Tribal cultural objects and artifacts. ECF No. 1-2, Declaration of Tim Mentz at ¶¶ 10-16.

The brief description in section 5.1 the FRP "Spill on Land (Includes Exposed River Bottom)" appears equally oblivious to the reality on the ground in this area. ECF 1-7 at p. 32. This section states in relevant part:

> The eco systems occurs (sic) when extreme weather conditions such as low water flows and draught (sic) exposes the river bottoms:
>
> • Position booms with a type of mooring around the exposed areas…
> • Construct earthen dams from soils that has been brought in from the surrounding landscape
> • Using natural containment such as logs or already compacted debris can aid in preventing migration.

21

*Id.*

When river bottom is exposed, the channel is difficult to find and navigate, and the movement of booms on the water becomes infeasible. The construction of earthen dams requires equipment that may not be able to operate on soft ground. "The Facility Response Plan and Geographic Response Plan for the DAPL Lake Oahe crossing fail to recognize or prepare for the challenges traversing this area and mobilizing equipment during variable climactic and reservoir conditions." Crow Ghost Decl. at ¶ 31. Plaintiff is entitled to partial summary judgment.

3.   **Federal Defendants have failed to require Intervenor-defendant Energy Transfer to Provide Information or Cooperate with Standing Rock Emergency First Responders.**

PHMSA requires coordination between pipeline operators such as intervenor-defendant Energy Transfer and local first responders. "Each pipeline operator must develop and implement a written continuing public education program that follows the guidance provided in the American Petroleum Institute's Recommended Practice 1162 (incorporated by reference)." 49 C.F.R. § 195.440(a). "API RP 1162 further requires operators to develop their emergency plans *with* appropriate emergency officials to include in such plans information about how emergency officials can access the operator's emergency response plan." PHMSA Notice, 75 Fed. Reg. 67807 (Nov. 3, 2010). The program "must specifically include provisions to educate the public (and appropriate government organizations. 49 C.F.R. § 195.440(d).

PHMSA Advisory Bulletin 10-08 further provides that:

…[P]ipeline operators are required to maintain an informed relationship with emergency responders in their jurisdiction… PHMSA reminds operators of these requirements, and in particular, the need to share the operator's emergency response plans with emergency responders.

75 Fed. Reg. 67807 (Nov. 3, 2010).

With respect to DAPL, the FRP and GRP tacitly acknowledge that much of the spill response zone is within the boundaries of the Standing Rock Reservation. ECF No. 1-7 at p. 1. Yet, "[N]either Energy Transfer LP, nor its subsidiaries or contractors have attempted to work with the Tribal Emergency Management program on oil spill response planning, even though the oil spill response zone is on the Standing Rock Reservation." Crow Ghost Decl. at ¶ 6. Notwithstanding repeated requests, the Tribe has never received unredacted copies of the FRP or GRP, or any other information required to respond to an oil spill on the Standing Rock Reservation. *Id.; see Colonias v. Dev.t Council v. Rhino Environmental Services, Inc.,* 117 P.3d 939, 945 (N.M. 2005) (as a matter of environmental justice, public participation deemed crucial aspect of planning for siting of landfill).

On July 22, 2021, PHMSA served a Notice of Probable Violation, Proposed Civil Penalty and Proposed Compliance Order on intervenor-defendant Energy Transfer LP, for numerous allegations of violations in the operation of DAPL, including violations of 49 C.F.R. § 195.440(d) (Attached hereto as Exhibit C). No remedial action has been taken with respect to public education or cooperation with plaintiff, however. Cf. *Union of Concerned Scientists,* 735 F.2d at 1452 (affirming denial of challenge to emergency plan, due to remedial action by operator).

### 4.  The FRP Fails to Identify Effective Response to Oil Recovery During Ice Cover.

This Court cited the inadequate attention in the FRP and GRP to oil spill response during periods of ice cover, especially with regards to remediation of a worst case discharge. *Standing Rock V*, 440 F. Supp. 3d at 25-26. Again, there has been no substantive update or added detail to the 2023 FRP related to emergency response during adverse conditions. Section 5.7 of the 2023 FRP identifies the strategy for containment and recovery of oil during periods of ice cover. ECF No. 1-7 at p. 38. This section provides in relevant part:

> Ice slots can be cut using chain saws, hand saws, ice augers or some form of trencher… Ice slotting is a very basic technique used to gain access to oil trapped beneath the ice. In ice slotting, a j-shaped outline is sketched into the ice at an angle to the current (and cut)… A second technique is to slot the ice and use plywood to help divert oil beneath the ice to a recovery area.

*Id*. at pp. 38-39.

Again, neither Federal Defendants nor intervenor defendant Energy Transfer LP have stepped to the plate and revised the plan to include more detailed plans, in consultation with Tribal first responders. They continue to act, more or less, as if plaintiff Standing Rock Sioux Tribe does not exist. The gravamen of plaintiff's motion is that the Court will disagree.

## II.    Federal Defendants Have Unlawfully Withheld Action as Required by the Mineral Leasing Act and the Corps of Engineers' Regulations

### 1.    The Mineral Leasing Act Prescribes Mandatory Duties

Federal Defendants manage the federal flood control project at Lake Oahe, including the land surrounding the mouth of the Cannon Ball River on which DAPL is located. *See ETSI Pipeline Project v. Missouri*, 484 U.S. at 499. The Mineral Leasing Act of 1920 imposes a mandatory requirement that all oil and gas pipelines crossing federally-managed lands, such as those at administered by defendant Corps of Engineers, to obtain an easement for the construction and operation and maintenance of the pipeline. 30 U.S.C. § 185(a). The Mineral Leasing Act also imposes a mandatory duty requiring that Federal Defendants comply with NEPA prior to granting of an easement for an oil and gas pipeline. 30 U.S.C. § 185(h)(1). DAPL has been operating on federally-managed land and in a federally- managed flood control project under Federal Defendants' authority, without the required easement, since as early as March 25, 2020 when this Court vacated the easement and certainly no later than January 26, 2021, when the D.C. Circuit upheld this Court's ruling.

Federal Defendants' failure to act in permitting the ongoing operation of DAPL without

complying with the Mineral Leasing Act and NEPA constitutes agency action that has been unlawfully withheld in violation of the Administrative Procedure Act. 5 U.S.C. § 706(1).

### 2. The Operation of DAPL Violates Corps of Engineers' Regulations

The Corps of Engineers' regulations governing the management of flood control project lands are codified at 36 C.F.R. Part 327. The regulations explicitly prohibit unauthorized structures on Corps' project lands.

> The construction, placement or existence of any structure… of any kind, under, upon, in or over the project lands or waters is prohibited unless a permit, lease, license or other appropriate written authorization has been issued by the District Commander.

36 C.F.R. § 327.20.

There are criminal sanctions for violations of the regulations, due to the public health and safety considerations at flood control projects. 36 C.F.R. § 327.25. The operation of DAPL by intervenor-defendant Energy Transfer LP is subject to criminal penalties under Federal Defendants' own regulations. *Id.*

Significantly, the plaintiff is a signatory to the Treaty of Fort Laramie of April 29, 1868, and under article 1 of the Treaty, the United States is obligated to recompense the Tribe and Tribal members for crimes committed in the Treaty territory and remove the "bad men" from the Treaty territory. 15 Stat. 635; *see Elk v. United States*, 87 Fed. Cl. 70, 72 (2009) (citing bad man clause as basis for Tucker Act jurisdiction for damage claim). Under Executive Order 13175 on *Consultation and Coordination with Indian Tribal Governments*, 65 Fed. Reg. 67250 (Nov. 9, 2000), Federal Defendants are obligated to act in accordance with Treaties: "Agencies shall… honor Treaty rights." Further, in his declaration, Standing Rock Sioux Tribe Water Resources Director Doug Crow Ghost describes how these regulations are imposed on Tribal members, even when conducting religious ceremonies along the Missouri River. Crow Ghost Decl. at ¶¶ 14-16;

*cf.* American Indian Reliigous Freedom Act of 1978, 42 U.S.C. § 1996.

Moreover, Federal Defendants' regulations at 32 C.F.R. § 651.10(i) require NEPA compliance for realty outgrants, such as an easement for an oil pipeline. Federal Defendants' regulations and federal law require the agency to prepare an environmental impact analysis under NEPA prior to the issuance of an easement or other out-grant on lands they manage. 32 C.F.R. § 651.10(i); 42 U.S.C. § 4332.

There are significant environmental justice considerations further mandating the requisite action by Federal Defendants. Under Executive Order 12898 on *Federal Actions to Address Environmental Justice in Minority Populations and Low Income Communities*:

> [E]ach Federal agency shall make achieving environmental justice part of its mission by identifying and *addressing*, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low income populations.

59 Fed. Reg. 7629 (Feb. 16, 1994) (emphasis added); see also Executive Order 14096 on *Revitalizing Our Nations' Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (Apr. 26, 2023) ("We must advance environmental justice for all by implementing and enforcing the Nation's environmental and civil rights laws , preventing pollution, addressing climate change and its effects…); *see Cmtys. Against Runway Expansion, Inc. v. Fed. Aviation Admin.*, 355 F.3d 678 (D.C. Cir. 2004) (agency environmental justice analysis under NEPA is subject to APA review under section 706(2)).

"Addressing" means acting, not failing to perform a non-discretionary duty. Moreover, section 4-4 of Executive Order 12898 requires Federal Defendants to take "practicable and appropriate (actions)… for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife." 59 Fed. Reg. 7631. This buttresses the obligation prescribed in the Mineral Leasing Act to include stipulations in the requisite easement "to protect

the interests of individuals who rely on the fish (and) wildlife…for subsistence purposes." 30 U.S.C. § 185(h)(2)(D).

Federal Defendants have unlawfully withheld action in ensuring compliance with the Mineral Leasing Act and NEPA, effectively granting Energy Transfer LP relief from these mandatory requirements, permitting Energy Transfer LP to operate DAPL on land and in defendant's flood control project without final agency action under NEPA.

The conduct of Federal Defendants in unlawfully withholding action with respect to the allowing DAPL to operate on federally-managed land and in a federally-managed flood control project without an easement and without compliance with NEPA, contravenes these discrete mandatory duties contained in Federal Defendants' regulations. Federal Defendants' failure to act in permitting the ongoing operation of DAPL without compliance with mandatory provisions of applicable law, including Federal Defendants' Real Estate regulations and Executive Orders as described herein, constitutes agency action that has been unlawfully withheld. 5 U.S.C. § 706(1).

## Conclusion

Based on the foregoing, Plaintiff Standing Rock Sioux Tribe requests that this Court grant this Motion for Partial Summary Judgment, issue a Declaratory Order that Federal Defendants are in violation of the APA, Mineral Leasing Act, CWA, and Federal Defendants' regulations, and, in accordance with APA § 706(1), issue an Order to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). Further, as it deems necessary, this Court should order the parties to present argument and evidence on what other relief, including injunctive relief, is appropriate for the legal violations identified herein.

DATED this 17th day of January 2025

<u>Jeffrey C. Parsons</u>
Jeffrey C. Parsons, *Pro hac vice*
Parsons Law Office
2205 W. 136th Avenue, Suite 106-311
Broomfield, CO 80023
720-203-2871
jeff@parsonslawoffice.com

<u>Peter Capossela</u>
Peter Capossela, *Pro hac vice*
Attorney at Law, PC
Post Office Box 10643
Eugene, Oregon 97440
(541) 505-4883
pcapossela@nu-world.com

William S. Eubanks II
D.C. Bar No. 987036
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com

*Counsel for Plaintiff*

## Certificate of Service

The undersigned hereby certifies that on the 17th day of January 2025, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

<u>Jeffrey C. Parsons</u>

28