

| | |
|---|---|
| U.S. Department of Transportation<br>**Pipeline and Hazardous Materials Safety Administration** | 901 Locust Street, Suite 480<br>Kansas City, MO 64106 |

# NOTICE OF PROBABLE VIOLATION
# PROPOSED CIVIL PENALTY
# and
# PROPOSED COMPLIANCE ORDER

**VIA ELECTRONIC MAIL TO:** matthew.ramsey@energytransfer.com , Gregory.Mcilwain@energytransfer.com , Eric.Amundsen@energytransfer.com and todd.nardozzi@energytransfer.com

July 22, 2021

Matt Ramsey
Chief Operating Officer
Energy Transfer LP
DAPL-ETCO Operation Management, LLC
8111 Westchester
Dallas, TX 75225
214-981-0733

**CPF 3-2021-049-NOPV**

Dear Mr. Ramsey:

From April 29, 2019 through August 30, 2019, a representative of the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), pursuant to Chapter 601 of 49 United States Code (U.S.C.) inspected procedures, facilities and records of your Dakota Access Pipeline (Energy Transfer) beginning at Stanley, North Dakota and continuing to the east state line of South Dakota.

**Exhibit C**
**Case No. 24-cv-02905-JEB**

As a result of the inspection, it is alleged that you have committed probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations (CFR). The items inspected and the probable violations are:

1. **§ 195.264  Impoundment, protection against entry, normal/emergency venting or pressure/vacuum relief for aboveground breakout tanks.**
   **(a) . . . .**
   **(b) After October 2, 2000, compliance with paragraph (a) of this section requires the following for the aboveground breakout tanks specified:**
   **(1) For tanks built to API Spec 12F, API Std 620, and others (such as API Std 650 (or its predecessor Standard 12C)), the installation of impoundment must be in accordance with the following sections of NFPA-30 (incorporated by reference, see § 195.3);**
   **(i) Impoundment around a breakout tank must be installed in accordance with section 22.11.2;**

   Energy Transfer failed to meet the requirements of NFPA-30 section 22.11.2 applicable to breakout tanks located at six pipeline facilities. Valves used for drainage of storm water were not accessible from outside of the dike as required by NFPA 30. NFPA 30 section 22.11.2.7.1 requires that "control of drainage shall be accessible under fire conditions from outside the dike." Locations that did not meet this requirement were as follows: Epping Terminal; Johnson's Corner Terminal; Ramberg Terminal; Stanley Terminal; Trenton Terminal; and Watford City.

2. **§ 195.401  General requirements.**
   **(a) . . . .**
   **(b) An operator must make repairs on its pipeline system according to the following requirements:**
   **(1)** *Non Integrity management repairs*. **Whenever an operator discovers any condition that could adversely affect the safe operation of its pipeline system, it must correct the condition within a reasonable time. However, if the condition is of such a nature that it presents an immediate hazard to persons or property, the operator may not operate the affected part of the system until it has corrected the unsafe condition.**

   Energy Transfer failed to correct a condition that could adversely affect the safe operation of its pipeline within a reasonable time on its relief valves that utilize a nitrogen supply for correct operation. These type of relief valves use a nitrogen supply appurtenance bottle to maintain the proper relief set point.

   At a field inspection of Johnsons Corner pump station, and during a subsequent review of records including the alarms generated in the operator's local station control system and SCADA system records, it was determined that multiple alarms occurred since

commissioning of the pipeline indicating changes in relief valve's nitrogen pressure (which effects the valve relief pressure set point).

PHMSA asked questions about what was causing these alarms to occur. The operator responded that the nitrogen pressure is inherently subject to change because of local climate conditions that often cause wide fluctuation in temperatures. These climate conditions are elements such as a rapid heating or cooling of ambient air temperature and effects of direct exposure to sunlight. When the nitrogen supply for overpressure protection (relief) valves is located in an area that is exposed to such climate conditions, and are not shielded/insulated or otherwise designed to compensate for the variances in climate conditions, changes in the ambient air temperature are known to have an additive impact on the operation of overpressure protection related controls.

A records request for a log of alarms associated with the nitrogen supply outside of defined limits resulted in a list of 9541 alarms occurring at multiple locations (Johnson's Corner, Watford City, Trenton, Ramburg, Stanley, and Epping) since the commissioning of the pipeline (approximately June of 2017). The data provided by Energy Transfer listed alarms from June 1, 2017 to December 13, 2019.

Relief valves are used on this pipeline to relieve overpressure conditions and these relief valves operated by nitrogen are part of the surge overpressure protection for the pipeline. After PHMSA brought this to the operator's attention, PHMSA asked for the alarm summary information as well as design details and standards for the equipment used. In response to this request for information, the operator also provided necessary actions to correct the condition. In summary, from June 1, 2017 to December 13, 2019, Energy Transfer failed to correct a condition that could adversely affect the safe operation of its pipeline by allowing the relief valve setpoints to fluctuate without taking corrective action.

3. **§ 195.402   Procedural manual for operations, maintenance, and emergencies. (a) *General*.  Each operator shall prepare and follow for each pipeline system a manual of written procedures for conducting normal operations and maintenance activities and handling abnormal operations and emergencies.  This manual shall be reviewed at intervals not exceeding 15 months, but at least once each calendar year, and appropriate changes made as necessary to insure that the manual is effective.  This manual shall be prepared before initial operations of a pipeline system commence, and appropriate parts shall be kept at locations where operations and maintenance activities are conducted.**

Energy Transfer failed to prepare and follow its Operations and Maintenance Manual (O&M manual), dated May 1, 2018, as required by § 195.402(a).  At the time of the inspection, Energy Transfer's Pipeline Integrity Management Plan, ENGR-PR-0015 (IM plan), was reviewed by PHMSA.  The IM plan referenced sections from the O&M

manual that were no longer contained in the O&M manual.  Specifically, Energy Transfer's IM plan referenced the following procedures:

• PR-11-0039 Management of Change (MOC)

• PR-11-0036 ILI Assessment Evaluation Response Corrosion Growth Rate & Reassessment

• PR-11-0037 Activating and Deactivating Pipeline

 • PR-11-0032 Pipeline Assessment Method Selection

• PR-11-0004 Pressure testing of Pipeline

• PR-11-0006 Pipeline Repair Procedures

• PR-11-0028 Change in MOP, MAOP, COL of a Pipeline System

Even though the IM plan referenced these procedures, they were not part of the O&M manual reviewed at the time of the inspection (effective date May 1, 2018).  During the inspection, the operator verbally confirmed that these missing procedures were still being used, even though they were removed from the O&M Manual.  Energy Transfer was not using the current O&M procedures for the IM plan.  As late as June 8, 2019, documentation provided to PHMSA indicated that PR-11-0039 was still being used for Management of Change.  The IM plan was not updated until after PHMSA brought these missing files to the operator's attention.  On June 13, 2019, the IM Plan was updated and references to the missing procedures were removed.

Energy Transfer failed to follow procedures in the current O&M manual by using procedures that had been removed from the O&M and remained referenced in the IM Plan until June 13, 2019.

4. **§ 195.406   Maximum operating pressure.**
   **(a) . . . .**
   **(b)  No operator may permit the pressure in a pipeline during surges or other variations from normal operations to exceed 110 percent of the operating pressure limit established under paragraph (a) of this section.  Each operator must provide adequate controls and protective equipment to control the pressure within this limit.**

   Energy Transfer failed to set its protective equipment at its Johnson's Corner pump station in accordance with its surge study to control the pressure from exceeding 110 percent of the it Maximum Operating Pressure (MOP).

On page 5 of the "Final Report: DAPL/ETCOP Shale Oil Pipeline Surge Analysis" (dated June 2, 2017)", it recommends that a shutdown on high discharge pressure for the Johnson's Corner pump station be set at 1335 psi in order to prevent the pipeline pressure from exceeding 110 percent of MOP downstream of the station.

During the PHMSA inspection it was identified in Energy Transfer's "Management of change document 15069" dated June 8, 2019, that the discharge pressure at Johnson's Corner had been set at 1355 PSI and was subsequently corrected by June 8, 2019.

5. **§ 195.428   Overpressure safety devices and overfill protection systems.**
**(a)   Except as provided in paragraph (b) of this section, each operator shall, at intervals not exceeding 15 months, but at least once each calendar year, or in the case of pipelines used to carry highly volatile liquids, at intervals not to exceed 7 1⁄2 months, but at least twice each calendar year, inspect and test each pressure limiting device, relief valve, pressure regulator, or other item of pressure control equipment to determine that it is functioning properly, is in good mechanical condition, and is adequate from the standpoint of capacity and reliability of operation for the service in which it is used.**

Energy Transfer failed to inspect and test the overpressure safety relief valve at the Redfield station during the calendar year 2018.  This relief valve was reported to be inspected and tested during commissioning in 2017, and was not inspected and tested again until January 28, 2019.

During the inspection the operator verbally agreed that the Redfield station relief valve was not inspected and tested in the calendar year 2018.

6. **§ 195.440   Public awareness.**
**(a)  . . . .**
**(c)  The operator must follow the general program recommendations, including baseline and supplemental requirements of API RP 1162, unless the operator provides justification in its program or procedural manual as to why compliance with all or certain provisions of the recommended practice is not practicable and not necessary for safety.**

Energy Transfer failed to follow the supplemental requirements of API RP 1162, and did not provide justification in its public awareness program or procedural manual as to why compliance with all or certain provisions of the recommended practice was not practicable or necessary for safety.  Specifically, Energy Transfer failed to follow sections 6.1 Considerations For Supplemental Enhancements for the Baseline Program, 6.2 Considerations of Relevant Factors, and 6.3 Hazardous Liquid and Natural Gas Transmission Pipeline Operators.  A review of Energy Transfer's public awareness program evidenced that it did not consider consequences from a spill in areas designated as high consequence areas (HCAs) under part 195 when it determined the scope of its

stakeholder audience for it public awareness communications. Energy Transfer used a third party contractor (Paradigm) for its Stakeholder Audience Identification. Energy Transfer stated that a 660 ft. mailing buffer was used for all pipeline systems for mailing to the public, as the stakeholder audience, including crude oil lines for Dakota Access Pipeline. Energy Transfer personnel confirmed to PHMSA verbally during the inspection that the same buffer area was required for natural gas pipelines as that for crude oil pipelines. Energy Transfer could not provide documentation that illustrated how the operator had considered or implemented recommendations associated with supplemental program enhancements due to the consequences of moving crude oil, such as overland spill.

API RP 1162 section 6.1 states that "this RP recommends that an operator enhance its baseline program with supplemental program components when conditions along the pipeline suggest a more intensive effort is needed." The same section goes on to say in 6.1.3 that "Coverage Areas refer to the broadening or widening the stakeholder audience coverage area beyond those contained in the baseline for delivery of certain communications messages. This can also be considered relative to widening the buffer distance for reaching the stakeholder audience along the pipeline route."

API RP 1162 section 6.2 states that "when the operator develops its Public Awareness Program and performs subsequent periodic program evaluations, it is recommended that a step for assessing relevant factors along the pipeline route be included to consider what components of the Public Awareness Program should be enhanced. The operator should consider each of the following factors applied along the entire route of the pipeline system:

- Potential hazards
- High Consequence Areas
- Population density
- Land development activity
- Land farming activity
- Third-party damage incidents
- Environmental considerations
- Pipeline history in an area
- Specific local situations
- Regulatory requirements
- Results from previous Public Awareness Program evaluations
- Other relevant needs.

The presence of federally designated HCAs requires an operator to consider public awareness activity above the baseline level described in the RP, or to provide justification in its program or procedural manual as to why compliance with all or certain provisions of the recommended practice is not practicable and not necessary for safety.

API RP 1162 section 6.3.1 provides that, "[c]onsideration should be given to supplemental program enhancement where … [t]he potential for concern about consequences of a pipeline emergency is heightened.  Consideration should be given to widening the coverage area for:

- HVL pipelines in high population areas, extend the coverage area beyond the 1/8th mile minimum distance each side of the pipeline;
- Large diameter, high pressure, high volume pipelines where a pipeline emergency would likely affect the public outside of the specified minimum coverage area and extend the coverage area to a wider distance as deemed prudent.

Energy Transfer procedure "HLA.17 Public Awareness Plan Section 7.2.3" includes HCAs as one of the sources that may be used to identify updates to the affected public stakeholder group.

Energy Transfer verbally explained the process for providing information to the third party vendor as supplying a map to show areas to identify target audiences.  Energy Transfer has existing data that is available from liquid pipeline plume models that identify areas that may require a supplemental program enhancement for the public stakeholder audience greater than the standard 660-foot buffer.  However, Energy Transfer did not use this data to identify areas for its third-party vendor to expand the standard 660-foot mailing buffer to a larger area, and did not use this data to determine if a 660-foot buffer was sufficient for identifying the coverage area of the stakeholder audience living near the pipeline, and there is no justification in its manual as to why it did not follow the requirements of API RP 1162.

7. **§ 195.452   Pipeline integrity management in high consequence areas.**
   **(a)  . . . .**
   **(f)** *What are the elements of an integrity management program?*  **An integrity management program begins with the initial framework.  An operator must continually change the program to reflect operating experience, conclusions drawn from results of the integrity assessments, and other maintenance and surveillance data, and evaluation of consequences of a failure on the high consequence area.  An operator must include, at minimum, each of the following elements in its written integrity management program:**
   **(1)  A process for identifying which pipeline segments could affect a high consequence area;**

Energy Transfer failed to continually change its integrity management program (IM program) to reflect operating experience, and failed to evaluate the consequences of a failure on the high consequence area when it identified which pipeline segments could affect a high consequence area.  Specifically, Energy Transfer did not continually change its IM program, ENGR-PR-0015 Procedure 2.3.4, which requires that each facility must

be evaluated to determine whether or not additional release modeling is required to identify if it could affect an HCA, and also failed to change the program to reflect operating experience.

PHMSA reviewed Energy Transfer's analysis for facility evaluations within an HCA or could affect area, and asked questions of the operator representatives regarding elements that had been considered in these calculations. Through verbal and email communication PHMSA determined Energy Transfer did not consider drain down volumes associated with common station valve configurations, operations, and elevations should a failure occur outside of secondary containment such as in the manifold area of facilities, as required in its procedures. Energy Transfer also failed to change its IM program to reflect this operating experience.

Proposed Civil Penalty

Under 49 U.S.C. § 60122 and 49 CFR § 190.223, you are subject to a civil penalty not to exceed $225,134 per violation per day the violation persists, up to a maximum of $2,251,334 for a related series of violations. For violation occurring on or after January 11, 2021 and before May 3, 2021, the maximum penalty may not exceed $222,504 per violation per day the violation persists, up to a maximum of $2,225,034 for a related series of violations. For violation occurring on or after July 31, 2019 and before January 11, 2021, the maximum penalty may not exceed $218,647 per violation per day the violation persists, up to a maximum of $2,186,465 for a related series of violations. For violation occurring on or after November 27, 2018 and before July 31, 2019, the maximum penalty may not exceed $213,268 per violation per day, with a maximum penalty not to exceed $2,132,679. For violation occurring on or after November 2, 2015 and before November 27, 2018, the maximum penalty may not exceed $209,002 per violation per day, with a maximum penalty not to exceed $2,090,022.

We have reviewed the circumstances and supporting documentation involved for the above probable violations and recommend that you be preliminarily assessed a civil penalty of $93,200 as follows:

| Item number | PENALTY |
|---|---|
| 3 | $46,600 |
| 6 | $46,600 |

Warning Items

With respect to items 4 and 5 we have reviewed the circumstances and supporting documents involved in this case and have decided not to conduct additional enforcement action or penalty assessment proceedings at this time. We advise you to promptly correct these items. Failure to do so may result in additional enforcement action.

Proposed Compliance Order

With respect to items 1, 2, 6 and 7 pursuant to 49 U.S.C. § 60118, the Pipeline and Hazardous Materials Safety Administration proposes to issue a Compliance Order to DAPL-ETCO Operations Management, LLC. Please refer to the *Proposed Compliance Order*, which is enclosed and made a part of this Notice.

Response to this Notice

Enclosed as part of this Notice is a document entitled *Response Options for Pipeline Operators in Enforcement Proceedings*. Please refer to this document and note the response options. All material you submit in response to this enforcement action may be made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

Following the receipt of this Notice, you have 30 days to submit written comments, or request a hearing under 49 CFR § 190.211. If you do not respond within 30 days of receipt of this Notice, this constitutes a waiver of your right to contest the allegations in this Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in this Notice without further notice to you and to issue a Final Order. If you are responding to this Notice, we propose that you submit your correspondence to my office within 30 days from receipt of this Notice. This period may be extended by written request for good cause.

In your correspondence on this matter, please refer to **CPF 3-2021-049-NOPV** and, for each document you submit, please provide a copy in electronic format whenever possible.

Sincerely,


Gregory A. Ochs
Director, Central Region, OPS
Pipeline and Hazardous Materials Safety Administration

Enclosures:   *Proposed Compliance Order*
              *Response Options for Pipeline Operators in Enforcement Proceedings*

cc:   Gregory Mcilwain, Senior VP Liquids Operations, Gregory.Mcilwain@energytransfer.com
      Eric Amundsen, Senior VP Gas Operations, Eric.Amundsen@energytransfer.com
      Todd Nardozzi, Director Regulatory Compliance, Todd.nardozzi@energytransfer.com

# PROPOSED COMPLIANCE ORDER

Pursuant to 49 United States Code § 60118, the Pipeline and Hazardous Materials Safety Administration (PHMSA) proposes to issue to DAPL-ETCO Operations Management, LLC a Compliance Order incorporating the following remedial requirements to ensure the compliance of DAPL-ETCO Operations Management, LLC with the pipeline safety regulations:

1. In regard to Item Number 1 of the Notice, Energy Transfer must relocate valves or their control for the drainage of stormwater outside of the diking in accordance with NFPA 30 at Epping Terminal, Johnson's Corner Terminal, Ramberg Terminal, Stanley Terminal and Trenton Terminal and Watford City Terminal. Energy Transfer shall notify the Director of the Central Region when these valves or their control have been relocated. Energy Transfer shall relocate the drainage valves within six (6) months from the issuance of a final order in this case.

2. In regard to Item Number 2 of the Notice, Energy Transfer shall review nitrogen operated surge relief valve operations for Johnson's Corner, Watford City, Trenton, Ramburg, Stanley, and Epping locations and submit for approval to the Director of the Central Region a project schedule and plan (including design modification drawings, control narratives, and all alarm setpoint values) to correct the relief valve operations. This project schedule and plan shall be submitted to the Director of the Central Region for review and approval within thirty (30) days of from the issuance of a final order in this case. Energy Transfer shall correct its nitrogen operated relief valves within six (6) months of the date of the final order.

3. In regard to Item number 6 of the Notice, Energy Transfer shall use existing data that is available from liquid pipeline plume models or other sources to identify areas that require a supplemental program enhancement for the public stakeholder audience greater than the standard 660-foot buffer, or provide justification in its manual and associated documentation as to why it did not require a buffer greater than 660-feet to meet the requirements of API RP 1162. This analysis and update to its public awareness program and procedureal manual shall be submitted to the Director of the Central Region for review and approval within thirty (30) days of issuance of a final order in this case.

4. In regard to Item Number 7 of the Notice, Energy Transfer shall develop procedures to review spill volume calculations and the potential impact to an HCA or could affect area. Energy Transfer shall evaluate drain down volumes associated with common station valve configurations, operations, and elevations should a failure occur outside of secondary containment such as in the manifold area of facilities.

    Energy Transfer shall submit these procedures to Director of the Central Region for review. Upon approval Energy Transfer shall then conduct reviews of all facilities and submit results to PHMSA.

5. It is requested that DAPL-ETCO Operations Management, LLC maintain documentation of the safety improvement costs associated with fulfilling this

Compliance Order and submit the total to Director of the Central Region.  It is requested that these costs be reported in two categories: 1) total cost associated with preparation/revision of plans, procedures, studies and analyses, and 2) total cost associated with replacements, additions and other changes to pipeline infrastructure.

# Response Options for Pipeline Operators in Enforcement Proceedings

The provisions of 49 CFR Part 190, Subpart B (§§ 190.201–190.243) govern response options to enforcement proceedings initiated by a Regional Director, Pipeline and Hazardous Materials Safety Administration (PHMSA).[1]  Specifically, § 190.208 provides your response options upon receipt of an enforcement notice.  You are advised to consult Subpart B for further information regarding your rights and responsibilities in such proceedings.

Be advised that all material submitted by a respondent in response to an enforcement action is subject to being made publicly available.  If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), along with the complete original document you must provide a second copy of the document with the portions you believe qualify for confidential treatment redacted and an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

I. **Procedures for Responding to a NOTICE OF PROBABLE VIOLATION:**

   Within 30 days of receipt of a Notice of Probable Violation, the respondent must respond directly to the Regional Director who issued the Notice in the following way:

   a. When the Notice contains a **PROPOSED CIVIL PENALTY\*-- you have 4 Options**

      1. You may decide NOT to contest the allegations.
         If you are not contesting any violations alleged in the Notice, pay the proposed civil penalty according to the details outlined in Paragraph IX below and advise the Regional Director of the payment in writing.  This authorizes PHMSA to issue an order making findings of violation and upon confirmation that the payment has been received PHMSA will close the case (subject to any outstanding compliance order). Payment terms are outlined below;

      2. You may decide NOT to contest the allegations, but provide an EXPLANATION relevant to the proposed penalty
         If you are not contesting any violations alleged in the Notice but wish to submit written explanations, information, or other materials you believe warrant mitigation of the civil penalty (including qualification as a small business – see Section VII in this document), you may submit such materials.  If submitting written explanations regarding the effect of the proposed civil penalty on your ability to continue in business, include accurate and reliable information of your financial condition by which the agency can consider your claim.  This authorizes PHMSA to make findings and to issue a Final Order.

---

[1] The Code of Federal Regulations can be accessed online at https://www.ecfr.gov/

        PHMSA will consider your submission in deciding whether to reduce or eliminate the penalty amount proposed in the Notice. Refer to 49 CFR §§ 190.221 – 190.225 for information concerning maximum penalties and assessment considerations upon which civil penalties are based;

3. <u>You may decide to CONTEST the allegations in writing and elect NOT to have a hearing</u>
    If you are contesting one or more of the items in the Notice but are not requesting an oral hearing, submit a written response to the allegations and/or seek elimination or mitigation of the proposed civil penalty; or

4. <u>You may decide to CONTEST the allegations and ask FOR A HEARING</u>
    Request a hearing as described in Paragraph III below to contest the allegations and/or proposed assessment of a civil penalty. Refer to § 190.211 for additional information concerning hearings.

b. <u>When the Notice contains a **PROPOSED COMPLIANCE ORDER\*-- you have 4 Options**</u>

1. <u>You may decide NOT to contest the allegations</u>
    If you are not contesting the proposed compliance order and the alleged violations associated with it, notify the Regional Director that you intend to take the actions in the proposed compliance order;

2. <u>You may decide NOT to contest the allegations, but provide an EXPLANATION relevant to the proposed compliance order</u>
    If you are not contesting any violations alleged in the Notice, but wish to submit written explanations, information, or other materials you believe warrant modification of the proposed compliance order in whole or in part, or you seek clarification of the terms of the proposed compliance order, you may submit such materials. This authorizes PHMSA to make findings and issue a compliance order;

3. <u>You may decide to CONTEST the allegations in writing and elect NOT to have a hearing</u>
    If you are contesting one or more violation alleged in the Notice or the proposed compliance order but are not requesting an oral hearing, submit written explanations, information, or other materials in answer to the allegations in the Notice and stating your reasons for objecting to the proposed compliance order items in whole or in part; or

4. <u>You may decide to CONTEST the allegations and ask FOR A HEARING</u>

        Request a hearing as described in Paragraph III below to contest the allegations and/or proposed compliance order items. Refer to § 190.211 for additional information concerning hearings.

    c.     When the Notice contains a **WARNING ITEM** --

        No written response is required. An adjudication is not conducted for warning items. A warning notifies an operator of a probable violation and advises the operator to correct it or be subject to potential enforcement action in the future.

\* Failure of the respondent to respond to the Notice under (a) or (b), as appropriate, within 30 days of receipt constitutes a waiver of the right to contest the allegations in the Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in the Notice without further notice to the respondent and to issue a Final Order.

II.     **Procedures for Responding to a NOTICE OF AMENDMENT\*--**

Within 30 days of receipt of a Notice of Amendment, the respondent shall respond to the Regional Director who issued the Notice in the following way:

    a.     If you are not contesting the Notice, notify the Regional Director of your plans to address the inadequacies identified in the Notice and/or submit copies of your amended procedures;

    b.     If you are not contesting the Notice but wish to submit written explanations, information, or other materials you believe warrant modification of the Notice of Amendment in whole or in part, or you seek clarification of the terms of the Notice of Amendment, you may submit such materials. This authorizes PHMSA to make findings and issue an Order Directing Amendment;

    c.     If you are contesting the Notice of Amendment but are not requesting an oral hearing, submit written explanations, information, or other materials in answer to the allegations in the Notice and stating your reasons for objecting to the Notice of Amendment items in whole or in part; or

    d.     Request a hearing as described below to contest the allegations in the Notice.

\* Failure of the respondent to respond to the Notice within 30 days of receipt constitutes a waiver of the right to contest the allegations in the Notice and authorizes the Associate Administrator for Pipeline Safety to find facts as alleged in the Notice without further notice to the respondent and to issue a Final Order.

III. **Procedure for Requesting a Hearing**

A request for a hearing must be in writing and accompanied by a statement of the issues that the respondent intends to raise at the hearing. The issues may relate to the regulatory requirement or factual basis for the allegations, to the proposed compliance order, or to the proposed civil penalty amount. Refer to 49 CFR § 190.225 for assessment considerations upon which civil penalties are based. A respondent's failure to specify an issue may result in waiver of the right to raise that issue at the hearing. The respondent's request must also indicate whether or not respondent will be represented by counsel at the hearing. Failure to request a hearing in writing within 30 days of receipt of a Notice waives the right to a hearing. In addition, if the amount of the proposed civil penalty or the proposed corrective action is less than $25,000, the hearing will be held by telephone, unless the respondent submits a written request for an in-person hearing. Complete hearing procedures can be found at 49 CFR § 190.211.

IV. **Extensions of Time**

An extension of time to prepare an appropriate response to a Notice may be granted, at the agency's discretion, following submittal of a written request to the Regional Director. The request must indicate the amount of time needed and the reasons for the extension. The request must be submitted within 30 days of receipt of the Notice.

V. **Case File**

The case file is available to the respondent in all enforcement proceedings. Refer to 49 CFR § 190.209 for the contents of the case file. Documents in the case file will be provided upon request.

If the notice contains a proposed civil penalty, the respondent may additionally request a copy of the proposed civil penalty worksheet.

VI. **Freedom of Information Act**

When you submit information to PHMSA, we may make that information publicly available unless you ask that we keep the information confidential. You may ask us to give confidential treatment to information you give to the agency by taking the following steps: (1) Mark "confidential" on each page of the original document you would like to keep confidential; (2) Send us, along with the original document, a second copy of the original document with the confidential commercial information deleted; and (3) Explain why the information you are submitting is confidential commercial information.

PHMSA will treat as confidential the information that you submitted in accordance with the above paragraph, unless we notify you otherwise. If PHMSA decides to disclose the information, PHMSA will review your request to protect confidential commercial information under the criteria set forth in the Freedom of Information Act (FOIA), 5 U.S.C. 552, including following the consultation procedures set out in the Departmental FOIA regulations, 49 CFR 7.29. If PHMSA decides to disclose the information over your objections, we will notify you in writing at least five business days before the intended disclosure date.

VII. **The Rights of Small Entities to Enforcement Fairness and Policy Against Retaliation**

The Department of Transportation has a policy regarding the rights of small entities to regulatory enforcement fairness and an explicit policy against retaliation for exercising these rights.  Our objective is to ensure a fair regulatory enforcement environment.  The US Small Business Administration provides standards for small business classifications for Pipeline Transportation in the North American Industry Classification System Codes (NAICS).  If you are a small business and would like PHMSA to consider your classification as such in this enforcement action including, under appropriate circumstances, a potential penalty reduction or waiver under Section 223 of the Small Business Regulatory Enforcement Fairness Act (SBREFA), please respond with the relevant information you wish to be considered.[2]  Refer to 13 CFR Part 121 for more information about small business size eligibility provisions and standards.  Moreover, if you feel you have been treated unfairly or unprofessionally, you may contact the PHMSA Office of Chief Counsel.  You also have the right to contact the Small Business Administration's National Ombudsman at 1-888-REG-FAIR or https://www.sba.gov/ombudsman/comments regarding the fairness of the compliance and enforcement activities of this agency.

The Department of Transportation strictly forbids retaliatory acts by its employees.  As such, you should feel confident that you will not be penalized for expressing your concerns about compliance and enforcement activities.

VIII. **Small Business Regulatory Enforcement Fairness Act Information**

The Small Business and Agricultural Regulatory Enforcement Ombudsman and 10 Regional Fairness Boards were established to receive comments from small businesses about federal agency enforcement actions.  The Ombudsman will annually evaluate the enforcement activities and rate each agency's responsiveness to small business.  If you wish to comment on the enforcement actions of the Pipeline and Hazardous Materials Safety Administration, call 1-888-REG-FAIR (1-888-734-3247) or go to https://www.sba.gov/ombudsman/comments.

---

[2] https://www.congress.gov/104/plaws/publ121/PLAW-104publ121.pdf

IX. **<u>Payment Instructions</u>**

*Civil Penalty Payments of Less Than $10,000*

Payment of a civil penalty of less than $10,000 proposed or assessed, under 49 CFR Part 190 Subpart B in the Pipeline Safety Regulations, can be made by certified check, money order or wire transfer. Payment by certified check or money order (containing the CPF Number for this case) should be made payable to the "Department of Transportation" and should be sent to:

> DOT/PHMSA/ESC
> 6500 S MacArthur Blvd.
> Oklahoma City, OK 73169-6918
> HQ BLDG ROOM 181 – AMK326

Wire transfer payments of less than $10,000 may be made through the Federal Reserve Communications System (Fedwire) to the account of the U.S. Treasury. Detailed instructions are provided below. Questions concerning wire transfer should be directed to the General Accounting Division at (405) 954-9309, or email at 9-AMC-AMZ-AR-PHMSA@faa.gov.

*Civil Penalty Payments of $10,000 or more*

Payment of a civil penalty of $10,000 or more proposed or assessed under Subpart B of Part 190 of the Pipeline Safety Regulations <u>must</u> be made by wire transfer (49 CFR § 89.21 (b)(3)), through the Federal Reserve Communications System (Fedwire) to the account of the U.S. Treasury. Detailed instructions are provided below. Questions concerning wire transfers should be directed to the General Accounting Division at (405) 954-9309, or email at 9-AMC-AMZ-AR-PHMSA@faa.gov.

**INSTRUCTIONS FOR ELECTRONIC FUND TRANSFERS FOR PIPELINE HAZARDOUS MATERIAL SAFETY ADMINISTRATION (PHMSA)**

| 1 BANK NAME:<br>TREAS NYC/FUNDS TRANSFER DIVISION<br>33 LIBERTY STREET; NEW YORK, NY 10045 | 6. TYPE SUBTYPE<br>(Provided by Sending Bank) |
|---|---|
| 2. ABA/BIC/SWIFT (Routing) NUMBER<br>021030004 | 7. SENDING BANK NAME<br>(Provided by Sending Bank) |
| 3. ALC/IBAN (Account) NUMBER<br>69140001 | 8. SENDING BANK REF NO.<br>(Provided by Sending Bank) |
| 4.. REASONS FOR PAYMENT<br>PHMSA Payment Case/Ticket/Fee # | 9. PRODUCT CODE<br>(Normally CTR, or Sending Bank) |
| 5. PAYMENT AMOUNT<br>Payment amount due | 10. SENDING BANK ARB NO.<br>(Provided by Sending Bank) |
| | |

**INSTRUCTIONS:** You, as sender of the wire transfer, must provide the sending bank with the information from above. The information provided is constant and remain the same for all wire transfers to the Pipeline Hazardous Material Safety Administration.

**Block #1** – RECEIVER NAME - "TREAS NYC" Ensure the sending bank enters this abbreviation; it must be used for all wire transfer to the Treasury Department.

**Block #2** - RECEIVER ABA NO. - "021030004" Ensure the sending bank enters this nine-digit identification number; it represents the routing symbol for the U.S. Treasury at the Federal Reserve Bank in New York (TREAS NYC).

**Block #3** - BENEFICIAL - AGENCY LOCATION CODE – "69140001" Ensures the sending bank enters this information. This is the Agency Location Code for
Pipeline Hazardous Materials Safety Administration (PHMSA).

**Block #4** - REASON FOR PAYMENT – "IN LIEU OF CHECK". To ensure your wire transfer is credited properly, enter the appropriated bill, case, ticket, fee, travel #, or PHMSA info relating to payment.

**Block #5** - AMOUNT - You as the sender provide the amount of the transfer. Please be sure the transfer amount is punctuated with commas and a decimal point. **EXAMPLE; $10,000.00**

**Note**: - A wire transfer must comply with the format and instructions or the Department cannot accept the wire transfer. You, as the sender, can assist this process by notifying, at the time you send the wire transfer to the General Accounting Division (405) 954-9309 or email at 9-AMC-AMZ-AR-PHMSA@faa.gov.