UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:24-cv-02905-JEB |
| ) | |
| U.S. Army Corps Engineers, ) | |
| Michael Connor, in his capacity as ) | |
| Assistant Secretary, Col. Robert J. Newbauer, ) | |
| his capacity as Omaha District Commander, ) | |
| Brig. Gen. Geoff Van Epps, in his capacity as ) | |
| Northwestern Division Commander, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF DONALD S. HOLMSTROM

### I.    Introduction

I, Donald S. Holmstrom, declare as follows:

1.    I am an attorney, incident investigator, and process safety practitioner with many decades of experience with the oil industry and U.S. government. I worked for the U.S. Chemical Safety and Hazard Investigation Board (CSB), an independent, non-regulatory scientific agency modeled after the National Transportation Safety Board for 17 years. At the CSB, I managed, led or participated in over 70 major chemical accident investigations serving as a Lead Investigator, Investigation Supervisor and head of the Recommendations Department. For nearly a decade, I directed the Western Regional Office of the CSB. I managed or led many of the largest and most significant chemical incident investigations in recent U.S. history, including the 2005 15-fatality BP Texas City explosion, the 7-fatality 2010 Tesoro

Anacortes oil refinery fire, the 11-fatality 2010 Deepwater Horizon offshore fire and explosion, and the 2012 Chevron Richmond, CA oil refinery fire that sent 15,000 members of the public to seek medical attention. During my tenure, approximately two thirds of the Board's investigative staff worked for the Western Regional Office under my direction. I have published over 17 professional papers related to my expertise. My CV is attached **(Attachment 1).**

2.      I have extensive experience drafting root-cause investigation reports for releases of hazardous materials or chemical accidents in the oil and gas or chemical industries. I led the drafting of reports and recommendation that addressed the importance of effective management systems for incident investigation, corporate safety oversight, safety culture, emergency response, risk management and effective regulatory systems. In particular, two investigations I led and managed for the CSB — the BP Texas City refinery explosion[1] and the Deepwater Horizon blowout and explosion[2] both involved a history of repeat incidents, ineffective "lessons learned" systems, flawed safety culture, and a failure of corporate leadership and oversight. These higher level deficiencies were the root cause that led to multiple safety management system (SMS) failures. The CSB reports and recommendations on these incidents and others were highly regarded[3] and resulted in new safety standards and regulatory initiatives by the American Petroleum Institute (API), Bureau of Safety and Environmental Enforcement (BSEE), EPA, OSHA and the Center for Chemical Process Safety (CCPS).[4]

---

[1]  https://www.csb.gov/bp-america-refinery-explosion/
[2]  https://www.csb.gov/macondo-blowout-and-explosion/
[3] The CSB "chemical industrial accident investigations and recommendations have been called the 'gold standard' in industrial accident prevention by Rep. George Miller (D-Calif.)." Chemical and Engineering News, Volume 86, Issue 35, September 2008  https://cen.acs.org/articles/86/i35/Bringing-Life-Deadly-Accidents.html, last accessed 1-7-25. Congressional Record-House, Volume 154, Pt. 5, April 30, 2008, p.7343. https://www.govinfo.gov/content/pkg/CRECB-2008-pt5/pdf/CRECB-2008-pt5-Pg7331-4.pdf, last accessed 1-7-25.
[4] The Center for Chemical Process Safety (CCPS) is an industry alliance within the US professional society of chemical engineers, the American Institute of Chemical Engineers (AICHE).

3.      Upon completion of the BP Texas City investigation, I had numerous meetings and presentations to Congressional representatives and government agencies including the Pipeline and Hazardous Materials Safety Administration (PHMSA). PHMSA was concerned about these same safety issues and had specific concerns about BP pipeline spills in Alaska. As a result of our interaction, CSB staff participated at PHMSA's request on the API committee that developed Recommended Practice (RP) 1173, *Pipeline Safety Management Systems* (2015). CSB staff in my office were part of the team that developed the applicable safety management standard. The promulgation of API RP 1173 brought a belated but much needed improvement to the pipeline sector's recommended practices for major chemical accident prevention. The API adoption of the pipeline safety management system risk methodology mirrored the approach taken much earlier in other oil industry sectors with catastrophic risk. These included standards developed in the early 1990s for oil refining, exploration, and production.[5] While at the US Chemical Safety Board I led the development of recommendations and reports that led to API standard revisions including those addressing safety management systems improvements.

4.      That important pipeline safety management standard API RP 1173 was developed in response to a recommendation from the NTSB out of the 2010 Enbridge Marshal, MI crude pipeline disaster. Having reviewed recent serious pipeline incidents, the NTSB concluded that safety management systems "are needed to enhance the safety of pipeline operations," citing the CSB's BP

---

[5] For the oil refining and petrochemical industry API promulgated API RP 750 *Management of Process Hazards* (1990) establishing the first API standard using the safety management system methodology for process hazards. In 1993 API published API RP 75, *Recommended Practice for the Development of a Safety and Environmental Management Program for Offshore Operations and Facilities*. For onshore exploration and production, API issued the first edition of API RP 74, Recommended Practice for Occupational Safety for Onshore Oil and Gas Production Operation in 2001. All of these standards incorporated elements of a safety management system risk methodology.

Texas City Refinery Report as support for its position.[6] API RP 1173 incorporated many of the key lessons from the CSB BP Texas City Report. These including the importance of company-specific, data-based risk assessments; corporate safety leadership and oversight; root cause investigations; safety culture; and the use of leading and lagging key safety performance indicators for performance improvement. In contrast, the minimum regulatory requirements of PHMSA are dated and have not kept up with modern pipeline standards[7] and responses to Congressional mandates and recommendations from government reports.

5.      I also have personal experience recommending to companies handling highly hazardous material when to stand down their operations to address serious issues with repeat chemical incidents and lack of effective integrity management. In investigations I led or managed, the CSB on occasion advised companies to shut down, or postpone restart operations, until serious systematic issues were addressed. At times companies were eager to restart operations before the causes of the incident had been determined or their safety systems and plants were safe to operate. While non-regulatory, the CSB had the authority to issue urgent recommendations to address these concerns. These interventions were generally successful. For example, I and the CSB Board Chair advised the CEO of an oil refinery in Salt Lake City, Utah that had a serious history of leaks, repeat incidents and mechanical integrity deficiencies to shut down operations and address the problems. The refinery ceased operations for months to upgrade their safety systems and the mechanical integrity of their piping and equipment.

---

[6] *Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release, Marshall Michigan, July 25, 2010*; National Transportation Safety Board Accident Report.

[7] For example, PHMSA has not incorporated a new API standard by reference into their regulatory scheme since 2013. 49 CFR § 195.3. API standards are typically updated on a 5-year schedule.

6.      I currently serve as a consultant to the Standing Rock Sioux Tribe and a member of the technical team advising the Tribe on technical matters relating to the risks imposed by the Dakota Access Pipeline ("DAPL"). As a member of the Tribe's technical team, I am also one of the contributors to technical documents submitted to the Army Corps of Engineers (Corps) as part of its report on the Corps' initial EIS scoping process (2017), Environmental Assessment (2018), court-ordered remand review (2019), DAPL Environmental Impact Statement (EIS) scoping process (2020) and DAPL Draft EIS (DEIS) report (2023)[8]. Those documents provide additional detail on some of the topics discussed in this report. I also advise the Tribe on matters related to oil spill response planning and assisted the Tribe in drafting their Tribal Emergency Response Committee (TERC) Lake Oahe Pipeline Oil Spill Emergency Response Plan (March 2020).

7.      To date, I have spent many hours involved in this work by reviewing documents and participating in meetings with Tribal agency heads, including the Departments of Emergency Management, Water Resources, and Environmental Regulation, the interdisciplinary technical team, and Tribal leaders. I have a high degree of familiarity with the environmental review documents prepared by the Corps and Energy Transfer LP[9] (hereinafter referred to as Energy Transfer) related to the DAPL litigation and NEPA administrative process. I served as an expert witness on behalf of the Tribe before the North Dakota Public Service Commission when it was considering a proposal to double the capacity of DAPL. I have also carefully reviewed and summarized recent data from the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) and

---

[8] *Draft Environmental Impact Statement, Dakota Access Pipeline Lake Oahe Crossing,* Army Corps of Engineers, September 8, 2023, referenced herein as the Draft EIS or DEIS.
[9] Note that Energy Transfer will refer to both Energy Transfer LP and the predecessor Energy Transfer Equity (ETE) both as parent companies of hazardous liquid pipeline subsidiaries such as Sunoco Pipeline LP, Mid-Valley Pipeline Co., Permian Express Partners LLC, West Texas Gulf Pipeline Co., etc., and Dakota Access Pipeline LLC, a non-wholly owned subsidiary of Energy Transfer LP.

other Federal and State agencies related to hazardous liquid[10] pipeline spill incidents, operator safety information, regulatory enforcement data, and leak detection.

8.      In records during the course of the DAPL dispute, Energy Transfer and the Corps try to make the case that operation of the pipeline is safe and hence DAPL's operation currently without an easement or sufficient environmental review is not a concern.  Energy Transfer claims DAPL is "one of the safest, most technologically advanced pipelines in the world."[11] The Corps states that the spill incidents of Energy Transfer's pipeline subsidiaries are "trending downwards" while acknowledging that one of their major subsidiary's "release record is one of the worst pipeline release records to date."[12]   Energy Transfer states their Computation Pipeline Monitoring (CPM) leak detection software is "robust" and will detect all spills at or below 1% of the pipelines flow rate. These statements like many made by the Corps and Energy Transfer in the course of the DAPL dispute are not supported by the record or the facts. The very issues that they cite to buttress their claim of safety, for example, Energy Transfer's safety record, the worst case discharge volume calculation, leak detection and shutdown systems, oil spill preparedness, and among others, are issues that the Tribe has been contesting since the very start of this process. In fact, some of them formed the basis of this Court's prior decisions in favor of the Tribe. But the Corps and Energy Transfer throughout the process simply repeat, or expand upon, the same contested claims that the Tribe has been debunking. In my report, I

---

[10] PHMSA defines hazardous liquids as "petroleum, petroleum products, anhydrous ammonia and ethanol." 49 CFR 195.2 Definitions. Hazardous liquid "commodity released" categories for incident reporting include crude oil, highly volatile liquid (HVL) and refined products. PHMSA regulates these hazardous liquids under a common framework as they present similar hazards.

[11] Safely Moving America's Energy Fact Sheet, Energy Transfer, December 2020, p. 1, https://www.energytransfer.com/wp-content/uploads/2020/12/DAPL-Overview-Factsheet-12-8-20.pdf last accessed 1-7-25.

[12] DEIS at 313.

will be referring to the body of documentation, expert reports affidavits, and records from the eight

years of DAPL legal and administrative proceedings to highlight important issues my review.

       9.     In my view, DAPL is an unusually unsafe pipeline, managed by a corporate entity with

an unusually troubled safety record across all its hazardous liquid pipeline subsidiaries. These safety

failures are not limited to specific equipment, a single pipeline, subsidiary or type of hazardous liquid

product but are widespread across Energy Transfer hazardous liquid operations.  For DAPL, Energy

Transfer has failed to implement, and the Corps has excluded from its review vital more rigorous

pipeline safety standards and guidelines developed in response to recent catastrophic incidents. As will

be documented herein, from 2017-2024 Energy Transfer has the worst overall hazardous liquid spill

record among companies and their relevant subsidiaries with the most spills (**Attachment 2**). Energy

Transfer also has the most enforcement cases and penalties. From 2022-2024 Energy Transfer's spill

and enforcement record has deteriorated (**Attachment 3 and 4).** In 2022, they were convicted of 23

Clean Water Act criminal violations and are currently debarred by the EPA from all federal non-

procurement and procurement contracts. As will be documented in Section V. this is evidence of higher

level corporate management system failures that impact multiple pipeline safety management systems

needed for both spill prevention and mitigation. These higher level deficiencies especially impact

corporate safety management systems that mitigate the impacts of an oil spill into the water of Lake

Oahe. These include the accurate determination of a credible maximum volume of a spill or worst case

discharge (WCD) for assessing spill risk consequences and emergency response preparedness; the

effectiveness of leak detection systems to rapidly identify a spill has occurred so that control operators

can act to isolate the release, the availability of the Lake Oahe emergency isolation valves (Emergency

Flow Restriction Devices or EFRDs) and the effective implementation of an oil spill emergency response plan for timely mitigation and remediation.

10.     It is vitally important to assess the adequacy of spill prevention safety systems to determine the risk of an oil spill. Industry safety guidelines for analyzing the adequacy of hazard controls recognize that scenarios with greater risk require higher levels of reliability for needed controls. This applies to control systems for spill response such as spill detection, EFRD closure and emergency response. **Weak pipeline spill prevention systems greatly increase the spill risk and underscore to an even greater degree the importance of effective mitigation response.** Moreover, key management safety systems discussed in this report such as risk management, safety culture, corporate leadership and accountability, incident investigation, and use of modern more rigorous pipeline safety standards and guidelines are applicable to the effective implementation of both prevention and mitigation systems. The weaknesses in those key safety management systems will impact both prevention and mitigation systems. For example, a flawed risk management approach of risk denial can result in a grossly underestimated determination of a pipeline segment WCD. An underestimation of WCD will result to both a faulty overall determination of pipeline risk and impairs the planning and preparation including sufficient responders and mitigation equipment.  My review will first address the pipeline mitigation safety systems such as determination of worst case discharge, leak detection, EFRD reliability and emergency response planning. I will then review Energy Transfer and DAPL's pipeline safety record and performance that highlight the higher corporate-level deficiencies that impact multiple SMS.

8

**II.    The Corps and Energy Transfer fail to ensure that pipeline system safety critical elements such as emergency flow restriction devices (EFRDs) and pipeline leak detection are functional, effective to high degree of reliability, and subject to performance testing and verification to prevent major incidents. This is especially important given Energy Transfer's increased spill risk from multiple corporate-level SMS deficiencies documented by their pipeline spill safety and enforcement history.**

11.    DAPL poses an imminent risk lacking back-up power and performance verification for the safety critical Emergency Flow Restriction Devices (EFRDs)[13] that minimize a spill into the Lake Oahe, an HCA; and ineffective and unverified spill leak detection. The oil industry trend has been towards a more rigorous application of standards and practices developed for identifying hazards and for quantifying the consequences of failures together with verification including third party verification. For oil and gas pipelines, refineries, and related facilities, from the wellhead to the loading terminal, instrumentation and automated controls known as Safety Instrumented Systems or SIS are designed and installed to meet the required risk reduction to ensure negative consequences of hydrocarbon releases are reduced to As Low as Reasonably Practicable or ALARP. A "safety life cycle" approach that considers assessment, design, maintenance, inspection, testing and operation of SISs with performance based requirements, has been adopted in the U.S. as ANSI/ISA 84.00.01-2004 Parts 1-3 (IEC 61511 Mod).[14]  This standard is a recognized and generally accepted good engineering practice throughout the

---

[13] Also referred to as emergency shutoff valves. PHMSA states an "Emergency flow restricting device or EFRD means a check valve or  remote control valve, 49 CFR §195.450, Definitions. PHMSA has detailed EFRD assessments and required actions for High Consequence Areas (HCAs) like Lake Oahe, 49 CFR § 195.452 Pipeline integrity management in high consequence areas.

[14] ANSI/ISA S84 (IEC 61511) Standard, Functional safety – Safety instrumented systems for the process industry sector." OSHA considers the revised **ANSI/ISA** - S84.00.01-2004 **Parts 1-3** (IEC 61511 Mod) to be recognized and generally accepted good engineering practices for Safety Instrumented Systems (SIS). These requirements are considered good practice across the oil and chemical sector that can experience major accident risk.

oil and chemical industry where major accident hazards are identified. Energy Transfer has not implemented and the Corps in its analysis of DAPLs has not applied standards like ANSI/ISA S84 that would assist in ensuring critical safety systems like EFRDs and leak detection systems are highly effective and subject to performance verification.

12.     Back-up power was required as an easement condition but has not been provided to remotely power the closing of the EFRD valves on each side of the Missouri River in the event of a primary power supply failure. Back-up power was only supplied to the communications signal but not the valve actuator. If the Energy Transfer or the Corps had performed a hazard analysis for the project area, the effects of loss of power preventing EFRD closure would have been identified quickly as key issue. Power failures are not uncommon in the harsh climate and winter environment of rural North Dakota.  If a spill occurred during a power failure, the emergency shut-off valves could not be closed remotely.  It would likely take many hours to travel to the isolated valve locations to manually shut the valves - especially in harsh winter conditions.  In addition, no analysis of the availability of the rural primary power supply to the Emergency Isolation Valve control sites has been presented or discussed. The *Independent Assessment* prepared by ETP/Sunoco suggests that there is no back-up power to remotely activate the shut-off valves.[15] Even though back-up power was required by the Corps' easement conditions and a known issue, none to date has been provided. **The Corps' Lake Oahe Easement Conditions require "Main line valves must be capable of closure at all times."[16]** "At all times" encompasses a power failure. Now over six years later the Corps' claims "backup power for

---

[15] Process Performance Improvement Consultants, LLC, *Independent Assessment of the Dakota Access Pipeline, U.S. Army Corps of Engineers, Special Easement Conditions*, pp. 13-14 (March 29, 2018).
[16]  Department of the Army Easement for Fuel Carrying Pipeline Right-of-Way Located on Lake Oahe Project Morton and Emmons Counties, North Dakota; February 8, 2017, USACE_ESMT000037. Pipeline Safety Condition 21.

remotely actuating the Lake Oahe Valves"[17] will be implemented if alternative 4 is selected. In previous reports the has Tribe detailed a number of easement conditions that had been violated or unfulfilled by the Corps. If the Corps has failed to implement issues raised by a third party Independent Assessment and its own easement conditions for over six-years, the Tribe has little confidence that reiterating this condition will lead to its implementation.  This also shows that the Corps' easement conditions are unenforced and an ineffective safety control mechanism. This is an unmitigated hazard and serious threat to greatly increase the volume of an oil release in the event of a spill into Lake Oahe.

13.     Given that it is acknowledged by the Corps that backup power to the Lake Oahe EFRDs has not been provided, additional WCD scenarios to include time to allow "manual" closure of the EFRD's are necessary to control spills into Lake Oahe.  Manual operation of the EFRD's will extend the time to isolate the pipeline from minutes to hours and will significantly increase the estimated volume of crude released. This is a serious deficiency.  WCD estimates need to be increased to align with the documented operations and maintenance carried out on the Lake Oahe HCA pipeline segment EFRD's.  The assumed time for EFRD to remotely close both the EFRD's from the control room in response to a detected leak (minutes) will need to be extended to allow for manual closure of the EFRD's (12 or more hours in winter conditions).  This will significantly increase the volume of crude oil released estimated within the Worst-Case Discharge calculation and the threat to the Tribe and Lake Oahe environment.

14.     Energy Transfer's (ET) leak detection systems and past performance are seriously flawed. From 2017-2024, using the same methodology as the PHMSA leak detection study, Energy Transfer's Computational Pipeline Monitoring (CPM) and SCADA systems together only detected

---

[17] DEIS, at p. 2-19.

pipeline releases 13% of the time. Despite requirements in pipeline safety standards, the NEPA litigation and administrative record indicates that Energy Transfer and the Corps have failed to apply industry leak detection standards, metrics for leak detection improvement and verification of proven leak detection performance. Given these serious problems the Corps cannot credit the functionality of leak detection at Lake Oahe.

15.     Energy Transfer's (ET) leak detection methodology and past performance are ineffective which will allow for an even greater spill into Lake Oahe. Preventing incidents is key to protecting people and the environment, but if a spill occurs effective leak detection is vital to mitigating the impact of a release of hazardous liquid. The DAPL leak detection system is a safety critical system requiring a high degree of availability if called upon to perform.  Energy Transfer has asserted that its computational pipeline monitoring (CPM) leak detection software is "robust" and will detect all spills at or below 1% of the pipelines flow rate.[18] However, a comprehensive PHMSA study looking at incident data found that CPM only had a successful detection rate of 20% for hazardous liquid spills.[19] Note that PHMSA's study was premised on an examination of all hazardous pipelines as reflecting actual leak detection system performance, rather than only focusing on one hazardous liquid such as crude oil.

16.     From 2017-2024 for Energy Transfer's hazardous liquid spills in the Pipeline Right-of-Way (67), CPM and SCADA were both functional in 47 incidents. Of those 47 Energy Transfer spills, only 6 were identified by either CPM Leak Detection System or SCADA.[20]  **This is a successful**

---

[18] DEIS at p. 3-9.
[19] Pipeline and Hazardous Materials Safety Administration, Final Report 12-173, Leak Detection Study, at 2-11. https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/technical-resources/pipeline/16691/leak-detection-study.pdf  last accessed 12-4-23.
[20] Pipeline Supervisory Control and Data Acquisition (SCADA) systems are software and hardware systems that monitoring and control pipeline pressure, flow, alarms, etc. that can assist in leak detection.

**detection rate of only 13% - worse that the PHMSA study detection rate of 20% for CPM alone.**

A summary of the accident identifier notification results:

- 22 spills or 47% of the time the leak was detected by members of the public.

- 7 or 15% by local operating personnel including contractors,

- 4 or 9% by "other"

- 4 or 9% by notification from party that caused the accident,

- 3 or 6% by controller,

- 3 or 6% by CPM Leak Detection System,

- 2 or 4% by CPM Leak Detection System or SCADA-Based Information (such as alarm(s), alert(s), event(s), and/or volume calculations),

- 1 or 2% by SCADA-Based Information (such as alarm(s), alert(s), event(s), and/or volume calculations),

- 1 or 2% by air patrol.

Both CPM and SCADA systems and data only identified six of the spill incidents out of 47 with a detection rate of 13%. Accidental discoveries by random members of the public (47%) were more reliable than Energy Transfer's CPM or SCADA systems.[21] Energy Transfer hazardous liquid spills are now more than three times more likely to be discovered by members of the public than their CPM/SCADA systems. Air patrols led to only one accident identification or 2% of the spills. Both the

---

[21] CPM Leak Detection System or SCADA Based Information (such as alarms, alerts…), CPM Leak Detection System, SCADA Based Information (such as alarms, alerts…).

Corps and Energy Transfer have highlighted the air patrols, said to be conducted every 10 days,[22] implying this surveillance is an effective identifier of potential spills in Lake Oahe.  The past performance of a 2% accident identifier rate for Energy Transfer contradicts this belief. The weakness of CPM and SCADA as an accident identifier is not without consequence. The 47 identified spill incidents in the ROW where CPM and SCADA were functional resulted in the release of 55,561 bbl or 2,329,362 gal to the environment from 2017-2024. Seven of these spills were over 1000 bbls or 42,000 gal and 19 were over 100 bbl or 4,200 gal. This led to property damage of $46,748,961.00.

17.    From the available evidence, Energy Transfer has failed to verify its leak detection performance as required by industry standards. API RP 1130 on Computational Pipeline Monitoring for Liquids (2007)[23] has been incorporated by reference into the PHMSA regulatory scheme. The provisions in the API RP are regulatory requirements. RP 1130 provides for testing of leak detection systems through withdrawal of the pipeline hazardous liquid. The DAPL CPM leak detection system must be evaluated under API RP 1130 with actual withdrawal testing to verify capabilities for various leak scenarios, including the controversial 1% detection limit.  There is no evidence in the DEIS of any actual CPM performance testing or results. The American Petroleum Institute developed a standard to assist operators to assess and improve leak detection performance, API RP 1175, *Pipeline Leak Detection Management* (2015). API RP 1175 explains that the standard has been promulgated in response to mandates and recommendations from Congress and the NTSB to improve identified weaknesses in pipeline leak detection.[24] The recently adopted API RP 1175 includes guidance on the selection of leak detection systems and establishing performance criteria and the use of metrics for system improvement. However, there is no evidence that the Energy Transfer has applied the RP 1175

---

[22] DEIS at 3-9
[23] *Computational Pipeline Monitoring for Liquids,* API Recommended Practice 1130, 2007, Reaffirmed April 2012.
[24] API RP 1175, Pipeline Leak Detection Program Management, p. 4 (2015).

requirements to DAPL, or the Corps has evaluated fulfillment of its provisions in the DEIS review.

Likewise, there is no indication in the record that Energy Transfer has used performance metrics to

improve its own troubled leak detection record. This is another example of the failure of Energy

Transfer to apply and the Corps to review a more modern protective safety standard that was developed

to improve identified deficiencies in industry performance or require the use of the RP's provisions with

DAPL.

18.    From as far back as 2018,[25] the Corps has ignored the Tribe's recommendations in

previous reports for existing external leak detection technologies that can provide improved protection

for Lake Oahe. For that reason, the Corps claims[26] that it will implement future improvements to leak

detection "as new technology becomes available" rings exceptionally hollow. The addition of other leak

detection technologies can augment the reliability of DAPL's leak detection capabilities. All protective

systems can fail and where the consequence of failure can be catastrophic, additional protective layers

are an important safeguard. One example is external leak detection technologies that can serve as an

additional layer of protection and a higher reliability for spill detection. The Lake Oahe site lacks

external leak detection that has advantages over SCADA and CPM and can be used in addition to

software systems.  The EPA recommended external leak detection for the Keystone XL pipeline in

sensitive environmental areas, similar to the Lake Oahe high consequence area (HCA).[27] There is no

comparable leak detection safety layer for DAPL.  The PHMSA leak detection study defines external

leak detection as a technology that senses, by some means (fiber optic, acoustic wave, hydrocarbon

sensing) that fluid is escaping from detection sensors outside of the pipeline. The PHMA leak detection

---

[25] *Impacts of an Oil Spill from the Dakota Access Pipeline on the Standing Rock Sioux Tribe*, Standing Rock Sioux Tribe, February 21, 2018, p. 43.
[26] DEIS at ES21
[27] *Keystone XL Shuns Infrared Sensors to Detect Leaks*, Bloomberg, January 18, 2013, https://www.bloomberg.com/news/articles/2013-06-17/keystone-xl-pipeline-shuns-high-tech-oil-spill-detectors, last accessed 1-8-25.

study found that most external leak detection technologies can be retrofitted to existing pipelines and have "the potential to deliver sensitivity and time to detection far ahead of any internal system."[28] The PHMSA study noted that the EPA had conducted studies verifying these findings.[29] PHMSA found significant benefits to external leak detections systems, yet the Corps has not reviewed this technology. The Tribe, however, in its 2020 Scoping Report again made the Corps well aware of the external leak technology alternative and the analysis in the PHMSA Leak Detection study. This was ignored again by the Corps and now they focus on "new technology…when it becomes available." The lack of effective leak detection, the absence of evidence that modern leak detection safety standards have been applied, and the failure to implement leak detection technologies that can provide the potential for additional protection "far ahead of any internal system" undercuts the claims by Energy Transfer and the Corps that DAPL's current leak detection systems are "robust" or "state of the art."

19. Energy Transfer's ineffective leak detection system was highlighted in the 2016 Sunoco L.P. pipeline crude oil spill. This incident led to a PHMSA regulatory enforcement tool called a Corrective Action Order (CAO) that is still open.[30] The newly in-service 2016 Sunoco L.P. Permian Express II pipeline spilled 361,000 gallons (8600 Bbls) from a pinhole leak that led to over $4 million in property damage in a high consequence area like Lake Oahe. According to ET's incident report[31] operators on August 29 initially observed "line imbalance indications." The Corps downplays these "anomalies" stating the release was not detected for 12 days "because the pressure readings never dropped below tolerable levels."[32] However, the anomalies were sufficiently compelling for employees

---

[28] PHMSA Leak Detection Study at p. 2-14.
[29] Id. at p. 4-21, 22.
[30] PHMSA Enforcement website, https://primis.phmsa.dot.gov/enforcement-data/case/420165030H last accessed 1-9-25
[31] "PHMSA Accident Report – Hazardous Liquid and Carbon Dioxide Pipeline Systems," Sunoco Pipeline L.P, 8-29-2016, last revision date 7-24-2017, p.23.
https://portal.phmsa.dot.gov/PDFGenerator/getPublicReport/ODES_HazLiquid.pdf?rptid=38531 last accessed 1-9-25.
[32] DEIS, at p. 3-12.

to investigate consistently for that 12 day period. Energy Transfer's incident narrative states the line was patrolled "numerous times," "meters were checked for accuracy" with issues identified on September 3 and 6. Tank to tank line balance calculations were performed but the results did not indicate a leak condition. On September 9 through 10 a static pressure test indicated a suspected release resulting in a pipeline shutdown 12 days after the suspected "anomalies." The Corps narrative is taken from the Energy Transfer provided incident report and minimizes the missed signals by the operator.

20.     The Corps emphasizes the CPM leak detection system was not fully functional[33], yet the Corps fails to mention that the CPM system was operating at the time of the incident. The investigation report states the SCADA system was functional and "provided information…such as alarm(s), alert(s), event(s), and/or volume calculations to assist with the detection of the accident." This was omitted by the Corps.[34] If that was true then it took Energy Transfer 12 days to evaluate the SCADA indications and sufficiently confirm them to make a shutdown decision.  The 12 days was much longer than the 17 hours it took to shut down the catastrophic Enbridge Marshall, MI pipeline that led to Congressional mandating the PHMSA Leak Detection Study. Only by chance, the Sunoco release was from a pinhole leak and the spill volume was a third the size of the Enbridge disaster. The evidence indicates the pipeline was shut down for 12 days in part due to control operator evaluation and decision making but also that prolonged period highlights the human reluctance to shut down an operating process as did the Enbridge incident. The 2016 Sunoco 8600 Bbl. crude spill was one of the largest incidents in Energy Transfer's operating history from 2012 – 2024. One lesson from Sunoco spill is that a pinhole leak over time can result in a major incident and that scenario is an important one to consider in a WCD analysis under what can be the "largest volume"[35] release. Another is the importance of responding to possible

---

[33] *Ibid.*
[34] *Ibid.*
[35] CFR 194.105(b)(1)

spill indications where Energy Transfer acknowledged the SCADA system provided by shutting down a pipeline rather than waiting for on-scene verification. However, the Corps does not address this issue and in their WCD scenario review only considers pipeline full bore releases.[36]

21.    There is other evidence that the operator's performance was an issue. The 2016 Sunoco pipeline disaster led to a significant enforcement action that included a Corrective Action Order.[37] CAOs are one of PHMSA most serious enforcement tools – one that is rarely employed.[38] CAOs require operators to take specific necessary actions to address conditions that PHMSA finds to be hazardous to people, property, or the environment. PHMSA stated in the CAO:

> After evaluating the foregoing preliminary findings of fact, I find that continued operation of the pipeline without corrective measures is or would be hazardous to life, property, or the environment. Additionally, having considered the uncertainties as to the cause of the failure; the location of the Failure; the proximity of the pipeline to populated areas, public water intake systems, or other high consequence areas; the young age of the pipeline and the history of known problems or failures on this pipeline, including during construction of the line, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment.

---

[36] DEIS, at p. 3-36,37.
[37] PHMSA Corrective Action Order to Sunoco Pipeline Co. L.P., 9-14-2016, https://primis.phmsa.dot.gov/enforcement-documents/420165030H/420165030H_Corrective%20Action%20Order_09142016.pdf last accessed at 1-9-25.
[38] PHMSA has only issues 21 Corrective Action Orders since 2017, https://primis.phmsa.dot.gov/comm/reports/enforce/CAO_opid_0.html#_TP_1_tab_1 last accessed 12-4-23.



**Figure 1. PHMSA website showing the 2016 Sunoco Pipeline Spill Corrective Action Order is still listed as open, a key fact not addressed in the Corps DEIS, last accessed 1-9-25**

22.     It is noteworthy that t**he CAO issued to Sunoco in 2016 is still listed as "open" on the PHMSA website (Figure 1**).[39] The fact that the CAO is open implies that PHMSA's evaluation of Energy Transfer's implementation of corrective action is still under review. None of these concerning facts were included in thew Corps narrative of the incident. These details are important to DAPL as leak detection and pipeline shutdown require control operator and likely supervisory decision making to evaluate issues such as potential false alarms, meter accuracy and then the ultimate decision to shut down when CPM and SCADA alarms and instrumentation indicate a spill. The EFRDs at Lake Oahe do not close automatically in response alarms or instrumentation set points. EFRD closure requires

---

[39] PHMSA Sunoco Enforcement Action Details, Case CPF 420165030H, https://primis.phmsa.dot.gov/enforcement-data/case/420165030H1 last accessed 1-9-25.

human action and decision-making, a fact not acknowledged by Energy Transfer and unaddressed by the Corps. PHMSA found that CPM accuracy is often a balance between instrument sensitivity and false or nuisance alarms.[40] API RP 1130 states that a CPM alarm:

> …could be triggered by many causes including equipment or data failure, an abnormal operating condition, or a commodity release. Since there is the potential that the alarm information identifies conditions that need attention other than a commodity release, the pipeline company procedures should require that all CPM alarms be evaluated… Simply understanding the cause of the alarm condition on a monitored pipeline may not be the end of the alarm evaluation.

23.    The 2016 Sunoco spill underscores both weaknesses of CPM leak detection and Energy Transfer's poor historic performance in particular, but also the importance of including sufficient time in the WCD calculation for the human factors of leak detection, evaluation, and the real conflicting pressures of shutdown decision-making. As the PHMSA study states "…leak detection systems are a combination of people, processes and technology. Leak detection systems are never autonomous technologies."[41] The Corps however, states that the DAPL CPM system is "robust" and only three minutes is claimed for detection time in their WCD calculation. We shall see that the Corps in effect bases WCD DAPL shutdown time on the operation of equipment and very little on this key human factor component.

## III.    The Corps grossly gnderestimates Lake Oahe DAPL Worst Case Discharge and spill risk, impairing oil spill emergency response planning and endangering responders.

24.    The Worst Case discharge (WCD) volume assessment is required by the pipeline safety PHMSA for emergency response planning but is also directly related to the risk posed by the pipeline's

---

[40] PMSA Leak Detection Study, at p. 4-8.
[41] *Id.*

continued operation. The larger the WCD the greater the consequences and higher the spill risk. WCD is a key element of the risk consequence analysis – what credibly can go wrong and what can be the result. WCD is also critical to other assessments including emergency response, cumulative impacts, harm to wildlife, toxic threats to people, damage to cultural sites and spill modeling. The Tribe raised the issue about the significantly underestimated Worst Case Discharge into the Missouri River in all of its reports, including the failure to comply with the minimum compliance of PHMSA WCD regulations.  PHMSA requires a worst case discharge calculation in its pipeline emergency response regulations. The Corps and Energy Transfer's calculation historically has been truncated and communicated in a manner that concealed key facts. The Corps continued that conduct in its recent analysis.

25.     The PHMSA formula shutdown time requires consideration of detection time, pump shutdown, valve closure, and the effects of adverse weather conditions much of which was not incorporated into the DAPL calculation, even though legally required. Detection time includes not just CPM software detection but also the human and organizational factors of evaluation and response. The PHMSA formula is depicted as WCD = [(DT + ST) x MF] + DD where DT=detection time, ST=shutdown time, and MF=maximum flow rate.  **PHMSA requires that the worst case definition be applied to each element of the calculation.** This is a necessary approach because major accidents typically occur when there are multiple SMS failures. The PHMSA regulation addressing Worst Case Discharge 49 CFR 194.105(b)(1) **requires a "maximum" worst case evaluation of each element of the WCD calculation** as follows:

(b) The worst case discharge is the largest volume, in barrels (cubic meters), of the following:

(1) The pipeline's **maximum** release time in hours, plus the **maximum** shutdown response time in hours (based on historic discharge data or in the absence of such historic data, the operator's best estimate), multiplied by the **maximum** flow rate expressed in barrels per hour (based on the **maximum** daily capacity of the pipeline), plus the **largest** line drainage volume after shutdown of the line section(s) in the response zone expressed in barrels (cubic meters) …(emphasis added).

26.    The DEIS fails to take the "maximum" time or flow rate in their analysis and leaves out required elements. They use a "best case" approach of equipment functioning rather that a worst case examining all the requirements of the regulation. In previous calculations prior to the DEIS, the Corps only based the WCD calculation on a best case pump shutdown time plus a modeled drain down volume that was not the largest. Detection time including investigation of alarms and instrumentation by the control operator, shutdown decision-making, EFRD valve closure were not considered or included in the calculation (Table 3-4). The WCD was only based upon pump shutdown time, "Given: the pump stations are designed to shut down in 9 minutes."[42] The calculation then used the 9-minute shutdown time volume of 3,750 bbl.: "Therefore **in a nine-minute period**, 416.6 x 9 = 3750 bbls"[43] (emphasis added). This volume was added to the modeled drain down volume of 8,751 bbl to arrive at a WCD of 12,501 bbl. Energy Transfer provided misleading information that their WCD calculation was based upon 12.9 minutes and stated it took 3.9 minutes it takes to shut the EFRDs, **however that additional time was not included in their calculations.**

---

[42] Dakota Access Pipeline Project, North Dakota, Lake Oahe Crossing, Spill Model Discussion Document, Number DAPL-WGM-GN000-PPL-STY-0019, Wood Group Mustang, May 2016, RAR014985.
[43] *Ibid.*

| | Detection Time Including Evaluation [44] | Shutdown Decision-making [45] | Pump Shutdown [46] Time | EFRD Closure [47] Time | Total Shutdown Time | Drain Down Volume [48] | Total WCD Volume bbl |
|---|---|---|---|---|---|---|---|
| Corps DEIS 2023 WCD Calculation [49] | 3 min. stated | None given | 6 min. | 3.9 min. [50] | 12.9 min. = 9,854 bbl [51] | 7,142 bbl [52] | 16,996 bbl |
| Corps EA 2016 WCD Calculation | None in the calculation; 1 min. stated | None given | 9 min. | 3.9 min. not used | 9 min. used = 3,750 bbl | 8,751 bbl | 12,501 bbl |

**Table 1. The Corps 2016 WCD Calculation Compared to the 2023 WCD Calculation. The explanatory footnotes apply to this Table 1 and Table 2.**

27.    Understanding the 2023 WCD volume is hampered by the fact that no calculations or methodology were provided even though required by the PHMSA WCD regulation.[53] Without explanation the Corps[54] reduces the pump shutdown time by three minutes from nine to six despite the earlier statement the pump stations were **"designed"** to shut down in nine minutes (see Table 1). The Corps then adds the same three minutes to detection time without analysis other than to state "while there are many factors that may affect the performance of an (leak detection system) LDS (such as

---

[44] **Investigation**: Includes CPM functioning and human investigation and evaluation of CPM data and alarms – see API RP 1130 CPM need to differentiate false alarms, etc. "all CPM alarms be evaluated" API 1130 at p. 20.

[45] **Shutdown decision:** Includes additional verification, addressing communication, and the presence of production pressures (pressure not to shut down a 1.1 million BPD pipeline) and supervisory consultation leading to a leak declaration and making a shutdown decision – see API RP 1130 CPM.

[46] Pump must ramp down to avoid surge. 9-minutes used per 2016 analysis as no justification for the change

[47] EFRDs must ramp down to avoid surge. Round up to 4 minutes for total WCD calculations, 12 hours travel time to close in winter conditions.

[48] Note an unmitigated WCD considers the total volume in the pipeline and does not consider modeling or estimated changes in pipeline elevation restricting draining. Energy Transfer claimed this was their approach to WCD in the PUC hearing in ND.

[49] Note this data was supplied to RPS Group by Energy Transfer, DEIS Appendix G p.13, 2.3, "Dakota Access provided RPS with conservative maximum estimates for various response timings for the different actions that would take place following a release from the pipeline (Table 2.4). "

[50] A shorter 3 minute time is with faster actuators is stated but the 3.9 min time was used.

[51] Not provided but calculated (1,100,000 BPD/24hrs./60 min.=764 bbl per minute*12.9 min. = 9,854 bbl

[52] Not provided but calculated from subtracting the shutdown time volume from the total WCD volume.

[53] 49 CFR **§ 194.105  Worst case discharge.**
 "**(a)** Each operator shall determine the  worst case discharge for each of its  response zones and provide the methodology, including calculations, used to arrive at the volume."

[54] DEIS, at p. 3-34.

human error and technical malfunctions) a FBR will almost certainly be detected in less than 3 minutes."[55] The three minute time is without explanation, data or factual support. It appears to be based on the functioning of the CPM/SCADA system rather than on control operator evaluation and shutdown decision-making. This short period of time does not allow for the requirements of API RP 1130 (incorporated by reference into PHMSA regulations) for the control operator to investigate and evaluate alarms and instrumentation and make a shutdown decision. In my experience shutting down a large industrial process such as a 1.1 million BPD pipeline would typically also involve communication with if not discussion and approval of supervision. Detection time includes the functioning of the CPM leak detection system as well as the human decision-making. While not a full bore release, Energy Transfer took 12 days to evaluate the SCADA "anomalies" in the 2016 Sunoco incident before the 8600 Bbl spill was detected – clearly 3 minutes even if credited as detection time is not the **maximum** detection time. The Corps has lowered the time it takes for the 2016 analysis to shut down the EFRD as well as the pumps in the DEIS calculation without explanation. Also, without analysis the drain down volume was lowered by 1,709 Bbls or a 20% reduction. The omissions, lack of calculation and methodology and failure to comply with PHMSA minimum compliance regulations in the 2023 WCD calculations are similar to the behavior of the Corps and Energy Transfer throughout the DAPL dispute.

28.     The Corps fails to consider the ineffective performance of leak detection and EFRD closure in the PHMSA WCD "maximum" calculation of time to detect a spill or isolate Lake Oahe with the EFRDs. The Corps cannot take credit for the successful CPM/SCADA detection of a spill in 3 minutes with an Energy Transfer CPM/SCADA detection rate of 13% and no performance testing as provided in modern pipeline safety standards. With EFRDs not subject to full verification of

---

[55] *Ibid.*

performance (no full valve stroke testing) and a lack of backup power to close the EFRDs during a power failure, the Corps cannot take credit for the functioning of the EFRDs in their WCD calculations.

29.     For the nearly doubling of DAPL capacity to 1.1 million BPD, a more realistic WCD that the Corps did not review needs to incorporate the maximum total shutdown time rather than the best case of equipment and instrumentation functioning the Corps has utilized. **The data used by the Corps in the 2023 WCD calculations was not independently derived or analyzed.** The spill model report by RPS acknowledges "The site specific characteristics used in this DAPL release volume modeling included pipe diameter, flow rate, valve location, the elevation profile along the pipeline, and conservative estimates of leak detection, pump shutdown, and valve closure times **provided by Dakota Access.**"[56] Rather than taking an independent, hard look at the critical WCD calculation, the Corps is employing key data uncritically from Energy Transfer. The information goes to the heart of the risk posed by DAPL and the effectiveness of spill mitigation, emergency response planning, spill modeling and impacts yet the Corps takes the information verbatim –without questioning or supporting analysis.

30.     The updated oil spill modeling results continue to focus on the potential effects of a catastrophic failure of the pipeline, like a full bore rupture (FBR). The Corps assumes that this scenario represents the worst case spill for environmental effects. However, there is also potential for a smaller, chronic leak or a spill under the leak detection limit that goes undetected for a long period of time that results in the "largest volume" WCD. For example, there could be a weeks- or months-long discharge under the detection limit during ice conditions, or a discharge under the detection limit discovered by an observation flight at its interval of 10-days or even the longest acknowledged by Energy Transfer to

---

[56] DEIS, Appendix G, p. 13.

be 21 days.[57] Another example is the pinhole leak such as Energy Transfer's own 2016 Sunoco Pipeline incident that released 8600 Bbls. during a 12-day period. The Tribe's hydrogeological analysis by an expert contaminant hydrogeologist indicates that the oil could be pooling for months or years once the oil enters the subsurface. The Corps did not analyze important WCD scenarios such as smaller leaks under the detection limit that could be pooling under the lakebed before entering the Lake Oahe.  This includes the scenario of ice cover in winter conditions where aerial surveillance or ground patrols would be ineffective depending on the ice conditions. It is a credible scenario that such a leak could persist until it reaches the SRST's water intake and is discovered once it is in the Tribe's water system.

31.     The scenarios examined by the Corps are all full bore release (FBR) examples.[58] The Corps itself acknowledges "detection times for small releases have historically taken anywhere from minutes to weeks to detect, depending on the pipeline and instrumentation configuration."[59] The Corps further acknowledges that a flow under the detection limit would be more difficult to detect and more slowly contaminate Lake Oahe.[60] However the Corps claims without credible analysis that a smaller leak under the detection limit would likely migrate to the HDD sites where it would be detected before entering the Lake. However, in the Tribe's expert hydrogeological analysis there is little capacity for the oil to move up the 3" opening of the annulus between the HDD borehole and the pipeline.  The force of the oil will be significant even for a pinhole release. Under this pressure, the oil will scour the annulus and penetrate the borehole, migrating into less resistant material and eventually into the lake bottom. The language of the PHMSA WCD provisions do not limit the WCD to a full bore release. In fact, the PHMSA regulatory language uses the wording "largest volume" and does not specify a

---

[57] DAPL North Facility Response Plan, Energy Transfer, p. 17. "Aerial patrol flights will be made 26 times a year  not to exceed 21 days apart."
[58] DEIS, at p. 3-36,37.
[59] DEIS, ay p. 3-34.
[60] DEIS, at p. 3-48.

particular release scenario. The lack of an under the detection limit scenario for a WCD is a serious

deficiency in the DEIS.

32.    In the Tribe's analysis, a leak under the detection limit represents the strongest credible

scenario for a worst case discharge at the Lake Oahe undercrossing. The Tribe's WCD scenarios

displayed in Table 2.[61] challenge the assumptions of the Corps' calculation by including credible

scenarios with true maximum times and volumes as required by the PHMSA regulation.

| | Detection Time Including Evaluation | Shutdown Decision-making | Pump Shutdown Time | EFRD Closure Time | Total Shutdown Time[62] | Drain Down Volume | Total WCD Volume bbl |
|---|---|---|---|---|---|---|---|
| **Leak UDL (Aerial Surveillance) ULO** | Maximum 10 days – aerial surveillance | 1 hour | 9 minutes | 3.9 minutes | Maximum ~10 days* 22k BPD MFR or 220k bbl | 15,695 bbl | 235,695 bbl |
| **Leak UDL Winter Ice Cover ULO** | Migrating Oil, SRST water intake detection >10 days | 1 hour | 9 minutes | 3.9 minutes | Maximum ~>2 days* 22k BPD MFR or 44k+ bbl | 15,695 bbl | 58,695+ bbl |

**Table 2. WCD releases from Under Lake Oahe (ULO) in Table 2 address an under the detection limit (UDL) 10-day aerial detection and under ice cover. Explanatory notes are referenced in Table 1 footnotes.**

The Tribe's WCD releases from under Lake Oahe (ULO) in Table 2 address an under the detection limit

(UDL) of 2% spill with a 10-day aerial detection time and an under ice cover scenario with a similar

detection time. Given the fact that detection would be measured in days not minutes, only detection time

and drain down volume were used to calculate the total volume for exemplary purposes. The

---

[61] The Table 2 references are the same as from Table 1. Please refer to footnotes 44-52.

[62] Using a 2% leak detection limit with the PHMSA formula, the increase of DAPL to 1.1 million BPD could result in 22,000 BPD "maximum flow rate" (MFR).

calculations used a 2% detection limit given Energy Transfer ineffective leak detection record and the Corps' 1% detection limit has not been subject to performance verification. The Tribe's calculations include one hour for both control operator investigation of CPM/SCADA alarms and instrument readings as well as the critical time of shutdown decision making as in these scenarios maximum shutdown time is largely driven by the detection time delays related to an UDL release.

33.     The Corps states that aerial surveillance flights occur every ten days[63] – that time is used in the Tribe's detection time calculations. For a UDL release in winter ice conditions, the scenario is using a 2-day detect time based upon the Glendive Montana community's delayed detection of Bakken crude in the town's water supply in the 2015 Bridger pipeline spill into the Yellowstone River.[64] The scenarios calculated a maximum drain-down volume of 15,695 bbl[65] based upon the full pipeline distance between the east and west EFRDs – "the **largest** line drainage volume after shutdown" rather than a modeled, less than maximum volume.[66] **The largest WCD is the UDL leak detected by aerial surveillance of 235,695 bbl.** This WCD is 14x the Corps' calculation of 16,996 bbl A leak of this magnitude would significantly increase the consequence and risk of a Lake Oahe spill. This larger WCD would require a reevaluation of the DAPL risk assessment, integrity management plan, spill modeling, and oil spill emergency response planning for Lake Oahe. For example, the Corps echoes

---

[63] DEIS, at p. 3-9.
[64] Note that in Bridger the pipeline was shut down after one hour of detecting "anomalies" but a spill was not suspected until the Glendive residents complained of the oily smell of their drinking water over a day later. Glendive was only seven miles downstream from the Bridger spill location. DAPL is estimated to be 75.4 miles downstream from the Fort Yates Municipal Water Intake, DEIS, at p. 3-76.
[65] **The** Drain Down Volume calculation **is significantly underestimated.** Bakken Crude has an API gravity of 40 – 43. Using 42 API gravity = 50.76 lbs./cu ft. The volume of a cylinder is pi*r^2*Length. For one mile of the 30 in. DAPL pipeline and a density of crude liquid at 50.76, one mile of Bakken crude in a 30" pipeline is 193,875 gals. or 4616 Bbls. The Wood Group calculated the distance of pipe between the West and East EFRDs as 3.4 miles (we do not have detailed as-built schematics to affirm or challenge that number). Not accounting for pipeline elevation or oil retention the "maximum" drain-down volume after the DAPL Lake Oahe EFRDs are closed is 15,695 Bbls.
[66] The Wood Group calculated the distance of pipe between the West and East EFRDs as 3.4 miles and that was used in the Tribe's calculation. Energy Transfer stated at the ND PSC permit hearing that it used the full length between the EFRDs for drain down volume. However, the company in their calculations modeled the drain down volume and asserted that only 1.8958 miles of pipeline would be capable of release or a DD volume.

Energy Transfer's statement that "resources are also in place to ensure Dakota Access can respond to a release six times larger than the largest conceivable release."[67] The UDL spill for 10 days is 2.3x larger than the size of spill that is significantly beyond the planning resources of Energy Transfer's oil spill response plan. The failure to plan for a WCD as required by PHMSA can result in significantly reduced mitigation capability at a time when it is most needed – a serious threat to the Tribe and the Lake Oahe environment.

## IV.    DAPL Currently Lacks a Feasible Emergency Oil Spill Response Plan - Made Worse by a Low Water Crisis at The Lake Oahe Oil Spill Response Zone.

34.    A spill of Bakken crude oil is high-risk given the operator's pipeline safety record. A maximum WCD spill could be catastrophic – many times larger than stated by the current DAPL Facility Response Plan (FRP).  Equally concerning is Energy Transfer's record of ineffective leak detection capabilities. Throughout the DAPL dispute the Tribe has detailed serious concerns with the Corps and Energy Transfer's transparency and emergency response coordination with the Tribe that can impair oil spill response.   As a result, the Tribe has taken steps to implement its own safety systems including leak detection and water testing to address this serious threat. Additionally, the Tribe has established a Tribal Emergency Response Committee (TERC) and developed its own Lake Oahe Pipeline Oil Spill Emergency Response Plan (ERP).  However, all the Tribe's efforts have been limited by resources and lack of critical information. The Corps has shown a dangerous lack of transparency by not providing the Tribe with unredacted safety critical documents that are vital for the Tribe's response planning and the protection of its emergency responders.[68] These documents include the DAPL Facility

---

[67] DEIS at p. 3–47.

[68] These DEIS documents include the recent versions of the DAPL Facility Response Plan (FRP), the Lake Oahe Geographical Response Plan (GRP) (DEIS Appendix F) and the RPS Spill Model (DEIS Appendix G). These documents are

Response Plan (FRP), the Lake Oahe Geographical Response Plan (GRP) (both in the DEIS Appendix F) and the RPS Spill Model Reports[69] Moreover, the substantial redactions by the Corps in these documents prevents the Tribe from fully evaluating their contents and effectively preparing for a spill. One of the most concerning set of redactions were to the most recent version of the GRP as it was determined that the GRP should not be subject to a protective order or redacted.[70] These actions by the Corps and Energy Transfer are a serious environmental injustice to the Standing Rock Sioux Tribe and other Tribal communities that would be seriously impacted by a DAPL spill.

35.     The Corps fails to effectively evaluate the impact of chronic low water levels in Lake Oahe particularly impacting the DAPL oil spill response zone. The low water conditions have been created by the Corps' operation of the Missouri River system and exacerbated by historic severe drought from climate change. Energy Transfer's emergency response plans for low water conditions are superficial and ultimately ineffective to the point of creating a serious threat to Tribe, its emergency responders, cultural resources, and the Lake Oahe environment. The compelling nature of the safety crisis of low water in Lake Oahe is that it not only impacts river access from unusable boat ramps, it also seriously impairs necessary movement up and down the river and the deployment of necessary response equipment (**Figure 2**). My review of the impact of low water on the effectiveness of oil spill emergency response includes a review of emergency response documents such as Energy Transfer's DAPL North Facility Response Plan (FRP) and Lake Oahe Geographic Response Plan (GRP). I have also made Lake Oahe site visits and examined Lake Oahe historic satellite imagery.  The site

---

highly redacted. The GRP version is dated and superseded and was provided to the Tribe under the direction of a 2018 decision by Federal District Judge Boasberg.

[69] Three reports including *Evaluation of Hydrocarbon Releases into Lake Oahe Using Oilmapland And Simap Trajectory, Fate, and Effects Modeling for The Dakota Access Pipeline Optimization*, RPS, December 2021.

[70] Memorandum Opinion, US District Court for the District of Columbia, Standing Rock Sioux Tribe *et al.,* v. U.S. Army Corps of Engineers, *et al.,* Civil Action No. 16-1534 (JEB), Document 206, Filed 04/07/17.

examination included two boat trips from Fort Rice to below the mouth of the Cannon Ball River, the

Lake Oahe GRP identified Control Points (1 and 2) and boat ramps from Fort Rice, ND to the Corps'

managed recreation area at Beaver Creek. The site visits were conducted in June 26-28, 2022, and

October 6-9, 2024.



**Figure 2. The Satellite Imagery (10-10-2022) on the left shows the severe impacts of low water conditions on Lake Oahe near the DAPL crossing above the Cannon Ball River compared to the Lake Oahe higher water level conditions image on the right just after the date DAPL began operation (7-13-2017). The is the area of Control Point 1, a critical location for effective oil spill mitigation.**

36.    The Corps' operation of the Missouri River system severely impacts Lake Oahe water levels (**Attachment 5**). Under the Corps' operation Lake Oahe has functioned as an auxiliary deplete and surge reservoir for the rest of the Missouri River system impacting the environment and livelihood of the SRST. This operation has also created a low water crisis in Lake Oahe intensified by severe drought particularly in the western headwaters of Missouri and Yellowstone system caused by climate change (**Figure 3**). A recent study[71] has described these conditions in the Western U.S. as the worst set of dry years since 800 AD resulting in "shrinking snowpacks, parched topsoil and depleted reservoirs."[72] The study also predicted the changes of the drought conditions as persisting through 2030. Low water from Fort Rice (approximately 4 miles north of the DAPL crossing) to Beaver Bay (approximately 10 miles south of the DAPL crossing) has created significant channelization and braiding of Lake Oahe water with large areas of exposed river bottom as seen in Figure 2.

---

[71] *How Bad Is the Western Drought? Worst in 12 Centuries, Study Finds,* New York Times, 2-14-22, https://www.nytimes.com/2022/02/14/climate/western-drought-megadrought.html last accessed 1-6-25.
[72] *Yes, the drought really is that bad,* High Country News, 5-16-22, https://www.hcn.org/articles/south-drought-yes-the-drought-really-is-that-bad/ , last accessed 1-6-25.



**Figure 3. Prolonged Drought Conditions Across the US – worst in 12 centuries, High Country News, 5-16-22.**

37. The Control Points 1 (CP-1) and (CP-2) just downstream from the DAPL crossing are the most critical for accessing Lake Oahe near the source of a DAPL spill and engaging in spill mitigation before greater volumes of oil can travel downstream and more seriously impact water intakes and the environment. In both my 2022 and 2024 Lake Oahe boat trips, the CP 1 designated boat ramp at Fort Rice allowed for placing the boat in the dock channel connected to the main lake channel but sandbars at the mouth of the narrow channel led to sandbar grounding. The GRP identified CP 2 designated boat ramp on the east side of Lake Oahe is not a boat ramp. I was shown the area by an adjacent property owner who stated it was not a boat ramp but an irrigation pump station pad proving a secure and stable

34

foundation for the irrigation piping. The rough 4 wheel drive primitive two track we took to see the irrigation pad was not suitable for towed vehicles or transporting the external low water equipment listed in the GRP except for canoes. The 2023 GRP[73] states that over 4000 ft. of containment boom will be deployed in the area which would be difficult if not impossible to transport to the identified CP 2 irrigation pad and placed with canoes as the text implies. **Figure 5** compares the CP-1 area from satellite imagery (4-18-24) to Energy Transfer's 2018 GRP[74] revealing the severely braided water and exposed river bottom in the 2024 Lake Oahe imagery contrasted with the DAPL GRP nearest the DAPL crossing. Energy Transfer's GRP requires significant boat and skimmer travel from boat ramps to their identified oil spill Control Points. This is even more of an issue if boat ramps are unavailable, and responders are forced to travel to a more distant boat ramp assuming one is useable. This was the case as seen in Figure 6 where the 2022 closures of the Beaver Creek Recreational Area boat ramps led to posting instructions to travel to the Jennerville boat access described as 7.7 miles away. The signage directing boaters to an access at Jennerville indicates that there were no available ramps in the Beaver Bay area. The campground and boat ramps closure at Beaver Creek were on federal property managed by the Corps.[75] Figure 4 is a web page from the North Dakota Fish and Game website captured in July of 2022 showing that the two key boat ramps for Control Points 1 and 3 at Fort Rice and Beaver Creek were not useable. The status of these boat ramps was designated as unusable for the majority of the months in 2022.

---

[73] DEIS, Appendix F, GRP, p. 214, 2023.
[74] Lake Oahe GRP, 2018 p. 54 of 270. The GRP version is dated and superseded. The GRP was provided to the Tribe under the direction of a 2018 decision by Federal District Judge Boasberg, US District Court for the District of Columbia, Memorandum of Opinion, Standing Rock Sioux Tribe v, Army Corps of Engineers, Case 1:16-cv-01534-JEB, Document 304 12/04/17, p. 7. The Court required safety related "interim conditions" including "Instead, the Court will order that the Corps, Dakota Access, and the Tribes coordinate to finalize spill response plans at Lake Oahe, and that the parties file such plans with the Court by April 1, 2018. During that court-ordered process, the Tribe received a less redacted copy of the GRP.
[75] Lake Oahe Dam Recreation, Army Corps of Engineers, https://www.nwo.usace.army.mil/Missions/Dam-and-Lake-Projects/Missouri-River-Dams/Oahe/ last accessed 1-10-25.



**Figure 4. The Lake Oahe boat ramps designated for access to response Boat ramps designated for Control Points (1-3) such as Fort Rice and Beaver Bay have been unusable during severe low water.  North Dakota Game and Fish, Boat Ramp Access, Lake Oahe, Website captured August 2022.**

38.     From the boat ramp at Fort Rice to the upper Control Points areas, Lake Oahe now flows in multiple channels and braids with much of the former lake bottom exposed with an expanding dense cover of plant life including invasive weeds. From my review of the satellite imagery this has been the condition of Lake Oahe in the area of the GRP Control Points for the majority of months for the last three years.  For example, GRP CP 1 identified locations for vacuum trucks and portable tanks on the north bank of the Cannon Ball River used for oil clean-up are now hundreds of yards of river bottom from the Lake Oahe smaller channels and braids. The locations for boats, skimmers and booms identified in the GRP are exposed river bottom and smaller channels and rivulets if accessible at all (see Figure 5). Under these conditions it will be impossible to move the surface oil with containment booms to the locations described in the GRP.



**Figure 5. Lake Oahe Geographic Response Plan (2018) Control Point #1 photo on the left showing the location of in Lake Oahe as well as on the north shore of the mouth of the Cannon Ball River oil skimmers, boats booms, vacuum trucks, and oil collection tanks. It is compared to a recent low water satellite image on the right (11-18-24). Note the yellow shaded area in the GRP image is the SRST northern exterior reservation boundary.**





**Figure 6. The photos above were taken June 26-29, 2022. The photos on top show the unusable condition and low water of the Tribe's Walker Bottom boat ramp in 2022 and 2024. The middle photo near Control Point 2 is the irrigation pumping station and not a boat ramp as the GRP claims. The four 2022 photos on the bottom show the Corp' Beaver Creek boat ramp closed and unusable - redirecting boats to the Jennerville ramp 7.7 miles away. (photos by Don Holmstrom)**

39.     Energy Transfer and the Corps have responded to the severe low water conditions in the

only in the most recent highly redacted 2023 GRP claiming equipment such as cranes, canoes, and

airboats can effectively address the low water problems.  This equipment is characterized in the GRP as

located externally to Energy Transfer or the OSROs with no location provided implying the equipment

will need to be procured in the event of a spill. The Corps states "improved boat ramps on Lake Oahe

should be capable of allowing access even in conditions matching the lowest known water levels at

Lake Oahe. In the event that water levels decrease to the point whether improved boat ramps are

inaccessible, the inaccessibility of the boat ramps will not inhibit the viability and timeliness of emergency response efforts."[76]  Yet Energy Transfer makes this statement while only providing for "typical conditions" in their response tactic description for each control point.[77] However as described herein the conditions in Lake Oahe are exceptionably variable concerning, boat ramp useability, water level, exposed river bottom, and channel location in low water and severe weather.  Where existing boat ramps have been modified for example at the Walker Bottom Marina, boat access has not improved. The OSRO's extended boat ramps, or the use of cranes are not a solution when exposed river bottom and unnavigable low water extend hundreds of yards from the historic "multipurpose" (MP) water level shoreline for most of the typical year (2022-2024). In my review of satellite imagery from April 2022 to May 2023, the Lake Oahe water level below the Cannon Ball River largest braid was (9 out of 12 months) more than halfway across the Lake (500-1000 yards) towards the eastern shore leaving vast areas of exposed river bottom on the western side.

40.     The use of cranes to place boats, skimmers, etc.  in Lake Oahe would be difficult if not impossible, seriously delay response activity, and ultimately be ineffective. In severe low water, the distance from the placement of the crane to navigable water would likely be hundreds of feet. The boom length of a portable crane would likely be unable to reach navigable water. Cranes require stable, level locations to be sited. The OSHA Standard for Cranes and Derricks in Construction[78] requires

The equipment must not be assembled or used unless ground conditions are firm, drained, and graded to a sufficient extent so that, in conjunction (if necessary) with the use of supporting materials, the equipment manufacturer's specifications for adequate support

---

[76] DEIS, Appendix F, GRP, p. 33-34.
[77] DEIS, Appendix F, GRP Appendix A Control Points, p.214.
[78] 29 CFR § 1926.1402 Ground conditions.

and degree of level of the equipment are met. The requirement for the ground to be
drained does not apply to marshes/wetlands.

The possible locations to position a crane for a boat lift for example at Fort Rice or Beaver Creek boat

ramps are accessed on rural dirt roads with unstable soil near the water's edge and rocky terrain that is

not level. The boat ramps themselves are not by definition level. Moreover, cranes are not itemized in

the Energy Transfer's company owned response equipment listed as on hand.[79] Energy Transfer's GRP

states that the contracted Oil Spill Removal Organizations (OSROs) have response equipment but does

not verify that external equipment listed for low water such as airboats, cranes, etc. are readily available

on the OSRO contractors site.[80] The DAPL North Facility Response Plan states "Lists of the OSRO's

equipment resources  may be found in  their services contract" however the sections of the OSRO

contract where that information may be found are not included.  If not on site, cranes for example, are

often leased in advance and may not be on hand or quickly obtainable as needed for oil spill emergency

response. The same can be said of claim of the use and availability of airboats. Energy Transfer and the

Corps' claims about the effective use of cranes is similar to many of its low water response statements

which are replete with unsupported claims and pronouncements.


41.    In the Lake Oahe boat trips, I observed that river navigation in a low-draft pontoon boat

was extremely difficult from the Fort Rice boat ramp channel to the area upstream of the town of

Cannon Ball. The Tribe's low draft pontoon boat was repeatedly stuck and needed to be pulled over

sand bars in both 2022 and 2024. What appeared to be a channel would transition abruptly to less than

two feet of water. The existence of a stable channel could not be trusted. In some locations finding a

way forward became an activity of trial and error. In both trips boat travel downstream was blocked by

---

[79] DEIS, Appendix F, GRP, p. 15.
[80] DEIS, Appendix F, DAPL North Facility Response Plan, p. 23.

extremely low water between the mouth of the Cannon Ball River and the exposed river bottom adjacent to the town of Cannon Ball. Travel between Lake Oahe Control Points 1 and 2 for example would be infeasible during severe low water. Walking on the exposed river bottom was unstable. The extreme fluctuations in water level and unstable exposed river bottom make it difficult to create a stable alternative for river access and cleanup activities.

42.    The braided river creates vast areas of exposed river bottom and more shoreline geography where increased oil deposition can occur. In a worst case discharge, lower water levels can lead to a greater concentration of toxins that are already elevated in Bakken crude.  The worst of the low water impacts are most harmful where timely and effective oil spill response is most critical to mitigate oil spill harm from traveling downstream – closest to upper Control Points 1 and 2 where a spill could likely first enter Lake Oahe. In fact, that area is the most challenging location for emergency response activities in low water, for many miles up and down Lake Oahe. These urgent safety and environmental threats are not addressed in Energy Transfer's response plans nor in any review by the Corps.

43.    For higher Lake Oahe "multipurpose" (MP) water levels, Energy Transfer's Geographic Response Plan (GRP) has specific identified locations on maps for boat ramp usage, Control Points, boats, skimmers, booms, vacuum trucks, and oil storage tanks. With low water, there are no identified locations for that equipment or feasible plan of where it would be sited. This will result in an unplanned, chaotic and ineffective oil spill response. Unplanned actions to move heavy equipment to new, likely unstable and unidentified water and land locations, if undertaken, will irreparably damage the environment, SRST cultural resources, and seriously delay mitigation activities.

44.     Timely response to Lake Oahe oil spill is important for an effective response. The Corps states that Energy Transfer has "sufficient resources and personnel in place to respond to any incident along the pipeline within 6 hours."[81] It should be noted that 6 hours is the PHMSA minimum compliance for a Lake Oahe spill response in a high volume area.[82] However, Energy Transfer has noted in earlier drafts of its GRP that water intakes could be impacted within 6.7 hours.[83] This leaves little time to respond and effectively deploy personnel and equipment to prevent Bakken crude from reaching water intakes. This is even more critical given the flawed emergency plans and grossly understated WCD that leaves responders and the Tribe vulnerable to disaster.  The Corps fails to critically assess Energy Transfer's claims that it can undertake additional safety critical activities and deploy response equipment to mitigate a DAPL spill with cranes and airboats that are not listed in any company or contractor inventory. The FRP or GRP do not address the impact of any additional travel time to access more remote boat ramps, longer or impaired travel on the river to reach CPs that are not near the boat access or obtain low water equipment not in Energy Transfer's or their OSROs possession. The response plans also do not address the longer set up time it may take for unplanned or non-established Lake Oahe access including new travel routes, creating roadways for heavy equipment on unstable, rocky, or muddy soil such as exposed river bottom.

45.     The winter scenarios in the FRP modeling report assumed 100% ice cover and three ice Control Points (CPs). In calm and windy conditions, the response simulations assumed that three skimmers would be used at CPs 1-4, two skimmers would be used at CP 5, and one skimmer would be used at CPs 6-8.[84] This amounts to a total of 17 skimmers. However, in Section 3.3 of the FRP and

---

[81] DEIS, at p. 3-9.
[82] 49 C.F.R. § 194.115 Response resources
[83]  Dakota Access Pipeline Geographical Response Plan, April 2017, p. 4. "Based on the current Spill Model, the first oil from an unabated release of this volume would take an estimated 6.7 hours to travel downstream before reaching Intake 1."
[84] DEIS Table 4-14, Page 90.

Section 4.6 in the GRP, skimmers are not included in the list of company-owned response equipment and are not pre-positioned at any of the staging locations.[85] Since skimmers would need to come from external sources, fails to address how long it would take for the 17 skimmers to be mobilized and on site, and whether this information is consistent with the assumptions used in the FRP oil spill modeling report.

46.    The Corps' analysis and Energy Transfer's emergency response plans have serious deficiencies in other areas:

- The Corps and Energy Transfer do not adequately address deficiencies with response to spills in winter conditions.  For example, the 2023 GRP states that the limit for acceptable work on is on ice 4" and greater. The GRP does not provide any emergency response plan guidance of what to do for mitigation with a spill occurs with less than 4" of ice on Lake Oahe.  The plan fails to provide other needed safety guidance for spills on ice such as the use of non-sparking tools or intrinsically safe equipment for cutting slots in ice with highly flammable Bakken crude. The plan does not address the impacts from the significant delay for mitigation that would occur with the use of non-powered tools such as augers. The Corps also did not address lessons learned from the 2015 Bridger pipeline Yellowstone River spill under ice. The harsh winter conditions made crude oil recovery very difficult and the ice slotting using plywood to direct the spill was highly ineffective. The EPA reported oil from the spill was detected as far as 60 miles downstream as far as Williston ND. The after action review noted that "ice cover on the Yellowstone River appears to have contributed to the crude oil's effects on the drinking

---

[85] DEIS, Appendix F, FRP, p.23-24 and GRP, p. 13-15.

water supply," the ice cover was described as having prevented the volatile components from evaporating and provided the right conditions for benzene and other VOCs to dissolve into the water. The Glendive MT water supply was shut down when the drinking water exceeded safe levels for benzene. The town's water supply was again contaminated in the March ice breakup when additional crude oil entered the river that was coating the ice. None of these issues were addressed by the Corps or Energy Transfer's GRP.

- The Corps and Energy Transfer again fails to address the serious elevated hazards of Bakken crude oil detailed in the Tribe's previous reports putting the emergency responders, tribal members, and the environment at risk. The Corps merely repeats superficial information concerning Bakken crude hazards[86] that the Tribe critiqued in previous reports. For example, in the FRP's Table 7.2 the listing of crude oil is slightly hazardous for toxic hazards even though the Health Hazard Warning Statement acknowledged crude oil contains carcinogenic benzene and toxic H2S.[87]

- The Corps and Energy Transfer do not address the concern that DAPL's procedures for operations, maintenance, and emergencies as required by PHMSA[88] are specific to DAPL. Herein I have noted that Energy Transfer, however, did not have a DAPL specific, PHMSA compliant set of operation, maintenance and emergency procedures prepared at the time the pipeline was put into service or during the NEPA litigation. Such

---

[86] DEI, at p.3-5.
[87] FRP (Appendix F) at p. 51.
[88] 49 C.F.R. 195. 402(a), Procedural Manual for Operations, Maintenance and Emergencies.

45

procedures would include DAPL specific emergency response requirements for employees and contractors in the event of a Lake Oahe spill.

- The Corps and Energy Transfer do not examine contingencies that a DAPL spill may be caused by or occur during another emergency such as power failure, flooding, landslide, or earthquake.

- The Corp and Energy Transfer do not include in their GRP adequate notice and communication with impacted Tribal populations on the SRST Reservation including the planning for shelter- in-place or evacuation notices.  The GRP "Initial Response Checklist" does not identify the need to conduct air sampling for benzene, a highly toxic component of Bakken crude oil.[89]

- The Corps does not evaluate nor does Energy Transfer's FRP or GRP plan for access approval or protection of sensitive SRST cultural and environmental receptors. The Tribe has identified the vicinity of the waters, tributaries, estuaries, and banks of Lake Oahe Lake all as sensitive environmental, ecological, cultural resources and burial sites, and human receptors. Significant receptors are found at the Lake Oahe water's edge. All these areas are of vital importance to the SRST and its culture. Energy Transfer falsely claims, and the Corps did not address the GRP statement "multiple requests for the identification and location of Tribal significant environmental receptors were made to the Standing Rock Sioux Tribe, and Cheyenne River Sioux Tribe, but no information was provided."

---

[89] Energy Transfer GRP, Appendix F, Table 4.1, pp. 8-9.

The Corps also incorrectly states multiple outreach efforts were made to meet with the SRST concerning Lake Oahe emergency response planning.

- The Corps and Energy Transfer have only superficially addressed the Tribe's comments on issues such as spill modeling and analysis of the Lake Oahe hydrogeology. Energy Transfer's Lake Oahe Geographic Response Plan (GRP) solely focuses on a cleanup of floating crude oil utilizing booms, skimming devices and vacuum trucks. However, Energy Transfer's own oil spill modeling for a possible release of Bakken crude oil in Lake Oahe projects that the oil will be on the water surface only hours and then will primarily be entrained in the lake's water column (submerged oil). Oil spills entrained in the water column are much more difficult to remediate and require different prototype clean-up methodologies than oil on the surface. The Department of Homeland Security has evaluated methodologies for the challenge of remediation of oil in the water column.[90] DHS found that mitigation of submerged oil was complex and difficult with "no well-established technology, technique, or strategy to prevent the detected submerged oil from having further adverse impacts on the environment or manmade structures."[91] However, the Corps and Energy Transfer fail to effectively address the difficulty of recovering subsurface oil that is entrained within the water column. The Tribe's spill modeling expert based on the mass balance results listed in Tables 6-2 and 6-3 of the oil spill modeling report, determined at the end of the 10-day simulations, a substantial

---

[90] Department of Homeland Security, *Mitigation of Oil in the Water Column: Mitigation Prototype Tests*, June 2017, pp. 2-3. "Responding to oil spills on the water surface is often a difficult task with recovery rates generally averaging about 20 percent or less of the oil spilled. Responding to spills of submerged oil is far more complex due to the problems associated with operating in an underwater environment where oil is constantly spreading and dispersing in three-dimensions visibility is limited, and deploying divers is dangerous. Recovery equipment must be far more robust and complex than that used on the surface."
[91] *Ibid.*

47

percentage of the total volume spilled remains entrained in the water column (30.8 to 57.3 percent for the Lake Oahe crossing, and 18.4 to 44.1 percent for the ND-380 valve site). Since the oil degradation rates used in the model simulations were likely too high for winter conditions in Lake Oahe (as acknowledged in the oil spill modeling report), these percentages of entrained oil in the water column are likely underestimated. If the model simulations were extended beyond 10 days, this entrained oil would continue to move downstream and degrade and could resurface during periods of reduced winds and/or currents. Entrained oil droplets are extremely difficult to detect and track in real-time and cannot be recovered by typical spill response measures such as the placement of surface booms, skimming, or other types of surface recovery. The U.S. Coast Guard Research and Development Center (RDC) have sought to identify and develop methods of mitigating the impacts of entrained oil through containment, diversion, or removal.[92] The prototype systems evaluated by the RDC have shown some promise for mitigation of entrained oil but need further development. Mitigation technologies that could be used for entrained oil droplets include deep draft booms, silt curtains, sorbents, and pneumatic barriers (bubblers), but these methods are not without limitations and literature about the application of these technologies to real-life spills is lacking. The DEIS does not consider any of these technologies.

- The discussion in Section 3.1.6.3 of the DEIS assumes that entrained oil can be cleaned up by relying on calm conditions to allow oil to resurface, using berms to create a calm, deep area of water, or deflecting oil to calm areas where oil can naturally separate from

---

[92] U.S. Coast Guard Research and Development Center. 2017. Mitigation of Oil in Water Column: Mitigation Prototype Tests.

the water column.[93] The Corps and Energy Transfer do not discuss the feasibility of these approaches for Lake Oahe which at higher water levels is a sizeable body of water. Using berms for containment is further described in the FRP[94] and is intended for small to medium size streams (fast flowing creeks) rather than a large impoundment such as Lake Oahe. Just downstream of the pipeline crossing, where surface oiling amounts would likely be greatest, Lake Oahe is not a small or medium stream at higher water levels, and this methodology would not be feasible. In fact, the FRP[95] states that "The containment techniques differ considerably on large streams and rivers. First, the smooth calm area of water necessary for oil-water separation must be found along the stream or river rather than creating one, as with small streams." It is not clear where and during which flow conditions/seasons these calm areas would be expected to exist downstream of the Lake Oahe crossing (if they are expected to be present at all). The GRP also does not address how to effectively mitigate spills in under ice conditions where the oil is entrained in the water column. It is unlikely that a large proportion of entrained oil would be recovered using the methods described in the DEIS, unless conditions at the time of a spill happened to be ideal. Energy Transfer fails to address, and the Corps fails to analyze the potential serious impacts to the environment, graves, sacred plants, and cultural sites from using heavy equipment to create described berms. The DEIS should fully address the implications of the spill modeling results for spill response planning. This should include discussion of the difficultly of responding to spills with a short duration of surface oiling and spills with a high proportion of oil entrained in the water column.

---

[93] DEIS, at p. 3-31.
[94] Page 34.
[95] Page 36.

**V.**    **Energy Transfer has not effectively applied modern more rigorous safety standards to the design, construction, operation and maintenance of DAPL or their other hazardous liquid pipelines. This serious system level deficiency has contributed to Energy Transfer's safety system performance impacting both their spill prevention and mitigation systems.  Poor safety performance increases spill risk and magnifies the threat of spill impacts from their deficient pipeline spill mitigation systems**

47.     It is not coincidental that this troubled safety performance described herein coincides with Energy Transfer failing to effectively apply, and the Corps not requiring, the application of key pipeline consensus safety standards to DAPL.  As a result, safety critical hazards and vital needed controls remain unevaluated or verified - and even more importantly unimplemented for DAPL. This is a critical omission. Applicable pipeline Recommended Practices (RPs) and standards such as those from the American Petroleum Institute (API) have been updated in recent years incorporating a safety system approach to prevention of major pipeline incidents. For API RPs such as American Petroleum Institute (API) Recommended Practice (RP) 1173, *Pipeline Safety Management Systems* (2015) and API RP 1160, *Managing System Integrity for Hazardous Liquid Pipelines* (2019) corporate pipeline safety management system leadership is a key principle.[96] Corporate leadership is especially crucial to provide direction and correct the type of widespread safety system failures seen in Energy Transfer's incident record.  API RP 1173 also emphasizes "Pipeline operators conform to applicable industry codes and consensus standards with the goal of reducing risk, preventing releases, and minimizing the occurrence of abnormal operations" as another key principle of its Recommended Practice. Many of these standards changes have been in response to federal government agency recommendations and

---

[96] Recommended Practice (RP) 1173, *Pipeline Safety Management Systems* (2015) "Commitment, leadership, and oversight from top management are vital to the overall success of a PSMS (Pipeline Safety Management System)."

bipartisan Congressional activity. Major chemical accident prevention including pipeline hazardous liquid spill incidents require both prescriptive and goal setting elements. The source for prescriptive requirements typically comes from consensus industry safety standards and recommended practices.[97] The Federal pipeline safety regulator PHMSA recognizes this and has incorporated many pipeline safety standards into its regulatory scheme.[98] However, there have been no standards incorporated in over ten years making the voluntary application of the recent, more rigorous revisions incorporating lessons learned from recent disasters even more important.[99] It is critical that the oil industry be held accountable to apply the safety standards they developed and hold up as important pipeline good safety practice. This is especially important as PHMSA has not incorporated key modern standards into their regulatory scheme.  Many of these standards will be referenced in this review including API RP 1173, RP 1160 (2019), RP 1130, or RP 1175. Federal law has long recognized the importance of the use of voluntary consensus technical standards to carry out agency decision-making. The National Technology Transfer and Advancement Act of 1995[100] states that

> Except as provided in paragraph (3) of this subsection, all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities determined by the agencies and departments.[101]

---

[97] "A prescriptive regulation or standard describes the specific means or activity-based actions to be taken for hazard abatement and compliance.  Performance or goal-based regulations, on the other hand, state the objective to be obtained (such as risk reduction or hazard abatement) without describing the specific means of obtaining that objective." *Chevron Regulatory Report*, US CSB, 2014, p. 9.

[98] 49 CFR § 195.3

[99] For example, PHMSA has not incorporated a new API standard by reference into their regulatory scheme since 2013. 49 CFR § 195.3.  API standards are typically updated on a 5-year schedule.  PHMSA has not incorporated key modern standards into their regulatory scheme under 49 CFR § 195.3 including API RP 1173, RP 1160, RP 1130 or RP 1175.

[100] The National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113, 110 Stat. 775 (Mar. 7, 1996).

[101] *Id.* § 12(d)(1). Exceptions are provided in Section 12(d)(3) for standards that are "inconsistent with applicable with federal law or otherwise impractical." It will be argued herein that these exceptions do not apply.

The language in the Act broadly addresses the use consensus technical standards[102] and is not limited to the use of standards by agencies that have been incorporated by reference in federal regulations. Federal agencies such as the Army Corps are required to use relevant consensus standards in their activities, including in the EIS process, but have failed to do so. As a result, the design, construction, operation and safety evaluation of DAPL by the Corps and Energy Transfer is lacking the implementation of these important standards and recommended practices.

48.    Energy Transfer's deficiencies are corporate wide, pervasive, and not limited to DAPL or DAPL's operator Sunoco.[103] A striking documented example of these widespread management system failures is the recent October 14, 2023, PHMSA Notice of Proposed Safety Order[104] (NOPSO) to Energy Transfer's Mid-Valley subsidiary with an over 1000 mile crude oil pipeline and related operations. The status of the 2023 NOPSA is still open on the PHMSA enforcement website.[105]  In the notice, PHMSA details 34 failures[106] since 2014, "from various causes, including internal corrosion, pump failures, third-party damage, faulty equipment, hydrogen cracking, stress corrosion cracking, pipeline exposures, failed repairs, operator errors, and unidentified causes."[107] PHMSA identified more systemic deficiencies as well including failure to investigate incident causes, disregarding PHMSA

---

[102] *Id*. The Act defines "technical standards" as "performance based or design-specific technical specifications and related management systems practices."

[103] Energy Transfer was designating Sunoco its wholly owned subsidiary as the DAPL operator and drafting a Facility Response Plan as early as June 2015. See *Sunoco Pipeline L.P. Facility Response Plan Dakota Access Pipeline North Response Zone*, V.1, June 2015.

[104] Appendix C, *Notice of Proposed Safety Order, Mid-Valley Pipeline Co. LLC*; PHMSA; October 14, 2023; https://primis.phmsa.dot.gov/enforcement-documents/42023056NOPSO/42023056NOPSO_Notice%20of%20Proposed%20Safety%20Order_10132023_(23-281044).pdf  last accessed 12-17-24.

[105] https://primis.phmsa.dot.gov/enforcement-data/case/42023056NOPSO last accessed 12-17-24.

[106] Six of the listed incidents were in the last 10 months from the issuance of the NOPSO.

[107] *Id*. NOPSA at p. 10.

requests for pipe removal and testing, not performing needed follow-up evaluations, and an accident history that indicates the threats "are unmitigated:"[108]

> There have been releases due to time dependent threats such as external corrosion, internal corrosion, stress corrosion cracking, and hydrogen cracking. **It is unclear what preventative and mitigative measures the Energy Transfer has taken** to prevent additional similar failures…

> The Mid-Valley Pipeline **accident history indicates there are unmitigated threats** (emphasis added) associated with internal corrosion, time dependent threats, third party damage, equipment failure, and operator error (emphasis added).[109]

PHMSA also found pervasive problems with Energy Transfer's leak detection and self-monitoring systems:

> Numerous failures have been discovered by members of the public and or contractors. Other failures were discovered by Energy Transfer personnel during routine movements around its facilities, and not through Energy Transfer's instrumentation and control system. **These trends indicate Energy Transfer's inability to self-monitor and detect failures** (emphasis added).

49.    It is particularly important to note that the systemic issues with Mid-Valley's crude pipeline operations such as safety threats that have gone unmitigated, failure to investigate incident causes, and poor integrity management practices for equipment testing created common failure modes such as internal corrosion across different equipment types (pump stations, pipeline and valves, breakout tanks). **This is evidence of broader safety management system (SMS) failures that are the root causes of incidents,[110] not merely one-off issues only tied to specific equipment,**

---

[108] *Id.* at p. 12.
[109] *Id.* at p. 12.
[110] *Guidelines for Investigating Chemical Process Incidents,* Center for Chemical Process Safety (CCPS) of the American Institute of Chemical Engineers (AICHE), 1992, at p.130. CCPS states that these specific failures may be immediate causes or initiating events but not root causes. Underlying them is a management system failure such as design, integrity management, procedures or root cause investigative system.

**hazardous liquid, etc..** These same corporate-level SMS deficiencies can be causal to incidents across subsidiaries, pipelines equipment types as seen in Mid-Valley, or transporting different hydrocarbon hazardous liquids [crude oil, highly volatile liquids (HVL), or refined products]. These safety management system deficiencies can cause similar incidents that are not limited to one part of a pipeline operation or hazardous liquid commodity. Similar to PHMSA's review of Energy Transfer's Mid-Valley pipeline, I conclude that Energy Transfer's troubling incident history is systemic and pervasive. The data will show Energy Transfer's SMS deficiencies impact all corporate hazardous liquid pipeline operations. Consequently, because these problems are corporate-wide, this report will examine the safety performance of all of its major hazardous liquid pipeline subsidiaries and other serious pipeline incidents.

**VI.     From 2017-2024, Energy Transfer L.P. and its major subsidiaries have the worst overall hazardous liquid pipeline spill record, integrity management performance and regulatory enforcement penalties. For the most recent three years, their performance has deteriorated. Energy Transfer's failure to accurately assess performance and take effective action renders DAPL an unsafe pipeline. Poor safety performance increases spill risk and magnifies the threat of spill impacts from their deficient pipeline spill mitigation systems.**

50.     From 2017-2024, Energy Transfer and its subsidiaries including DAPL Operator Sunoco Pipeline LP, have the worst overall spill record for hazardous liquid pipelines looking at the full picture of spill numbers, significance, volume, property damage, enforcement cases and penalties among pipeline corporate families with the most spills (**Attachment 2 Table**). Evaluating the risk of DAPL's Lake Oahe undercrossing requires analyzing both spill incident and integrity management[111]

---

[111] "An integrity management program is a set of safety management, operations, maintenance, evaluation, and assessment processes that are implemented in an integrated and rigorous manner to ensure operators provide enhanced protection for

performance data. PHMSA requires that hazardous liquid pipeline spills meeting specific criteria be reported to the agency[112] and assigns an Operator ID for each pipeline system identified in PHMSA submissions. In evaluating the PHMSA data it's important to note that even the oil industry trade association – the American Petroleum Institute (API) states **the goal for pipeline safety is zero spills**.[113] The risk management approach of API RP 1173 emphasizes gathering data related to the specific pipeline system to assess the operator's performance:

> **These data serve as the foundation of risk management** and shall include available data over the pipeline life cycle and shall be updated based on work performed and as needed during the life of the pipeline. **Incident data, including the cause of incidents, shall be included as appropriate.** The pipeline operator shall conduct a regular review to identify data gaps and evaluate data quality as part of risk assessment, consistent with continuous improvement[114] (emphasis added).

51.     To effectively evaluate the risk of DAPL is important to examine the full picture of Energy Transfer's relevant pipeline safety performance including an accurate picture of the hazardous liquid pipelines subsidiaries under the parent company's responsibility. This is especially important given Energy Transfer's demonstrated record of widespread pipeline safety management system deficiencies in hazardous liquid service. My analysis examined PHMSA data[115] for twelve of Energy

---

(High Consequence Areas) HCAs." Overview Integrity Management" PHMSA, 49 CFR Part 195, § 195.452, https://primis.phmsa.dot.gov/comm/Im.htm#:~:text=An%20integrity%20management%20program%20is,provide%20enhanced%20protection%20for%20HCAs last accessed 1-7-25.
[112] 49 CFR §195.50. Reporting Accidents requires an accident report for hazardous liquid spills (with some exceptions) that result in spills over 5 gallons, explosion or fire, death of a person, personal injury requiring hospitalization, estimated property damage exceeding $50,000.
[113] API RP 1173, p.vii.
[114] API RP 1173, 7.2 Risk Management, Data Gathering, p.11.
[115] PHMSA Operator data is available at https://www.phmsa.dot.gov/data-and-statistics/pipeline/operator-information  last accessed 1-3-2024)

Transfer LP's largest[116] hazardous liquid pipeline subsidiaries and compared it to five other pipeline companies and their subsidiaries that had experienced the most spills in that period.[117]

52.    The Corps and Energy Transfer have incorrectly claimed that "generic pipeline release data is worse that Energy Transfer's incident record, therefore using industry-wide pipeline incident data is more conservative."[118] To reach this conclusion their analysis severely omits, ignores and truncates important incident data leaving out entire subsidiaries, time periods, types of equipment or hazardous liquid service, etc. One important example is the treatment of Sunoco Pipeline LP.  Sunoco was purchased by Energy Transfer Partners in 2012 for $5.3 billion.[119] In 2012, the parent company Energy Transfer Equity (ETE) announced the "successful completion of merger" between Sunoco and Energy Transfer Partners another subsidiary of ETE.[120] ETE was the predecessor parent corporation to Energy Transfer LP. This change was a result of a merger described as a name change that simplified the corporate structure.[121] The Corps claims Sunoco "operated entirely independently from Energy

---

[116] Data was taken from eleven of the largest (over 100 miles) Energy Transfer LP subsidiaries hydrocarbon hazardous liquid (HL) pipelines [crude, refined products, highly volatile liquids (HVLs) excluding CO2, Ammonia, etc. and terminals/tank farms system part involved, offshore, etc.]. See **Table 1** for the Energy Transfer subsidiaries analyzed. Note Enable Gas Gathering with data from 2022-2023 has over 100 miles of crude pipeline. The date the incident report was received established the time period.   PHMSA 2022 data indicates there are 223,970 miles of crude, refined product and HLV U.S. pipelines active in 2022. The active pipeline operator count is 197. Energy Transfer's 2022 hydrocarbon HL combined (crude, HVL and refined products) mileage is 19,702 or 8.7% of the total combined PHMSA mileage.

[117] The subsidiaries of the parent Energy Transfer L.P. and other hazardous liquid pipeline operators have been confirmed in the corporation's 10K Reports to the SEC and are connected in the PHMSA database with the same Primary Operator ID [for Energy Transfer (32099)] and Safety Program Relationship (SPR).

[118] DEIS at p. 314.

[119] *Energy Transfer Partners to Acquire Sunoco in $5.3 Billion Transaction;* Energy Transfer Press Release; April 2012, https://ir.energytransfer.com/news-releases/news-release-details/energy-transfer-partners-acquire-sunoco-53-billion-transaction last accessed 1-3-24.

[120] Energy Transfer Partners and Sunoco Announce Successful Completion of Merger, Energy Transfer Website, 10-5-2012. https://ir.energytransfer.com/news-releases/news-release-details/energy-transfer-partners-and-sunoco-announce-successful last accessed 1-3-23.

[121] Energy Transfer Equity LP (ETE) merged with its subsidiary Energy Transfer Partners in 2018 to form Energy Transfer LP in a move described as a name change that simplified its corporate structure – "Energy Transfer Equity now called Energy Transfer LP," *Energy Transfer Equity, L.P. And Energy Transfer Partners, L.P. Complete Merger, Simplify Structure*, Energy Transfer Press Release, October 19, 2018, https://ir.energytransfer.com/news-releases/news-release-details/energy-transfer-equity-lp-and-energy-transfer-partners-lp . Prior to the merger, Energy Transfer Partners had been a consolidated subsidiary of ETE, *Energy Transfer Equity 2012 Annual Report*, p.4, https://ir.energytransfer.com/static-files/6a687e75-d5fc-4a96-bc4d-b346e79ab250 .

Transfer"[122] during those dates. As a result, the Corps severely abbreviates the time frame of Energy

Transfer's spill data presented to examine only incidents from 2018 to 2020. They also fail to examine

data from 2021 to onward. However, contrary to that assertion - from 2012-2024 Sunoco is described

as a consolidated subsidiary" in the parent corporation 10K Reports with Sunoco's liabilities listed as

those of Energy Transfer.[123] For example, while the Corps' claims ETE had no responsibility or

liability for Sunoco's pipelines from 2012 to 2017, ETE's 2016 10K Report states otherwise. In its

2016 10K section on legal proceeding, ETE lists eight legal proceedings for hazardous liquid spills or

other environmental violations against Sunoco including liability for MTBE contamination across

multiple states, spills in Ohio, Texas, Oklahoma. ETE as the parent corporation was responsible and

liable for Sunoco's safety and environmental performance as detailed in their own 10K report to the US

SEC – which is a necessary disclosure requirement for potential investors.[124] These and other Sunoco

legal proceedings were listed from 10k reports from 2013 to 2017 during which the Corps incorrectly

states ETE had no accountability or liability for Sunoco's violations.[125]

53.    As the parent company ETE was responsible for not only the liabilities but also

ultimately the safe operation of Sunoco's pipelines. **The Corps acknowledges Sunoco's terrible**

**safety record, "Sunoco Pipeline's release record is one of the worst pipeline release records to**

**date."**[126]  Yet, the Corps mischaracterizes the relationship and fails to point out that Sunoco was a

---

[122] DEIS, p. 3-13.
[123] 2012 US Security Exchange Commission, Form 10K, Energy Transfer Equity L.P. 2013, (p.4).
[124] 2016 US Security Exchange Commission, Form 10K, Energy Transfer L.P. 2017, (p.67-69)
https://ir.energytransfer.com/static-files/64885901-c785-4b94-8493-62e70602978d last accessed 12-4-23.
[125] Energy Transfer Reports, on their website https://ir.energytransfer.com/financial-profile/annual-reports  last accessed 1-4-24.
[126] DEIS, p. 3-13

subsidiary of the parent ETE starting in 2012.[127] It was not operating "independently"[128] through 2017 as the Corps claims. The Corps also misstates facts related to the 2017 merger. The merger was between two subsidiaries Energy Transfer Partners and Sunoco – not with the parent Energy Transfer (ETE).[129] The Corps cannot disconnect responsibility for the Sunoco incidents that occurred from the date of purchase in 2012 and the acknowledged Sunoco "worst pipeline release record to date" through omissions and mischaracterizations. There was certainly enough control for Energy Transfer to make Sunoco - its "consolidated subsidiary" with the "worst" pipeline record - the named DAPL operator as early as 2015 during the alleged period of lack of control.  These facts are important as they underscore the Corps efforts to diminish Energy Transfer's responsibility and accountability for a record of harmful spills and property damage including in water and HCAs like Lake Oahe. This also reflects a lack of corporate safety leadership over safe operations and continuous improvement as emphasized in API RP 1173.[130] This approach by the Corps and Energy Transfer's is reoccurring in the DAPL dispute – omitting and mischaracterizing facts perceived as negative for Energy Transfer rather employing balanced judgement and a scientific methodology.

54.     The Corps omits and mischaracterizes the safety and enforcement record of DAPL. DAPL and ETCO are considered the same "Bakken Pipeline" in the Corps 10K reports to the US Security Exchange Commission (SEC):[131] "the Dakota Access Pipeline and Energy Transfer Crude Oil

---

[127] *2012 Annual Report*, Energy Transfer Equity (ETE), 2013, p. 4. "Unless the context requires otherwise, references to "we," "us," "our," the "Partnership" and **"ETE" mean Energy Transfer Equity, L.P. and its consolidated subsidiaries**, which include **ETP,** ETP GP, ETP LLC, Regency, Regency GP, Regency LLC, Southern Union, **Sunoco, Sunoco Logistics** and Holdco.  References to the "Parent Company" mean Energy Transfer Equity, L.P. on a stand-alone basis. https://ir.energytransfer.com/static-files/6a687e75-d5fc-4a96-bc4d-b346e79ab250 last accessed 12-4-23.
[128] *Ibid.*
[129] Sunoco Logistics Partners and Energy Transfer Partners Announce Successful Completion of Merger, Energy Transfer Press Release, April 28, 2017. https://ir.energytransfer.com/news-releases/news-release-details/sunoco-logistics-partners-and-energy-transfer-partners-announce last accessed 12-4-23.
[130] API RP 1173, at
[131] 2022 US Security Exchange Commission, Form 10K, Energy Transfer L.P., p. 27, 2023.

Pipeline are collectively referred to as the 'Bakken Pipeline'." Both pipelines were constructed in 2017, and they are described by Energy Transfer as connected and functioning together: "the Bakken Pipeline is a 1,915-mile pipeline that transports domestically produced crude oil from the Bakken/Three Forks production areas in North Dakota to a storage and terminal hub outside of Patoka, Illinois, or to gulf coast connections including our crude terminal in Nederland, Texas."[132] In the PHMSA database DAPL-ETCO has one Operator Primary ID and all data for incidents, integrity management information, and PHMSA enforcement actions are reported under DAPL-ETCO. The Corps distorts the relationship and separates out the data related to the DAPL segment of the Bakken Pipeline in the analysis which presents the appearance of fewer incidents and harm than including the full record for the Bakken Pipeline as a whole (DAPL-ETCO). The Bakken Pipeline (DAPL-ETCO) has experienced 16 spills[133] since beginning operations in 2017. From 2017 to present, DAPL-ETCO has spilled 154 bbl (6,468 gals) of crude oil leading to $191,428 of property damage not addressed in the Corps analysis. DAPL-ETCO during this period experience one significant spill as defined by PHMSA and one large spill in a High Consequence Area like Lake Oahe – both also not listed.

55.     Significantly for a newer pipeline, there have been three separate enforcement actions against DAPL all initiated in 2021 involving violations, fines, and warning letters upheld by PHMSA. In the DEIS only one of the three enforcement actions is mentioned.[134] Three PHMSA enforcement actions in one year for a new installation raises serious concerns and this omission by the Corps is flagrant. In a 7-22-21 DAPL enforcement action, PHMA issued a Notice of Probable Violation

---

[132] *Ibid.*
[133] Two of the 16 occurred in the PHMSA incident reporting system under "system part involved" as "terminal/tank farm equipment." No "terminal/tank farm equipment" incidents were included in my PHMSA safety data comparisons.
[134] DEIS, at p. 3-11.

(NOPV) listing seven categories of probable violations some with multiple offenses.[135] A fine of $20,000 was assessed ($94,000 was initially proposed). Some violations were reduced or dropped in a Consent Agreement which is not atypical for a negotiated resolution[136] for PHMSA enforcement cases. However, the Corps mischaracterizes and omits important details concerning the resolution of the enforcement action that attempts to lessen the severity of Energy Transfer's troubled safety record.  In the Consent Agreement three violations were upheld, two probable violations were changed to warnings letters and two violations were withdrawn.[137] The Corps misstates that four violations were withdrawn but fails to acknowledge that two of those were turned into warning letters. The rationale for withdrawing the two violations was the detail that Energy Transfer "completed the actions" proposed by PHMSA and for one of the withdrawn items, agreed to provide follow-up data. This fact is omitted by the Corps.[138]

56.    The Corps claims without justification that none of the violations were relevant to the DAPL Lake Oahe undercrossing. However, the violations upheld in the Consent agreement were of a general concern to the safety of DAPL-ETCO pipeline system. One example is the cited deficiencies of procedures that were not included in the PHMSA-required Procedural Manual for Operations, Maintenance, and Emergencies (OME). These procedures are by definition relevant to the entire

---

[135] Notice of Probable Violation and Compliance Order; PHMSA Correspondence to Matt Ramsey, Chief Operating Officer, Energy Transfer L.P.; July 22, 2021 https://primis.phmsa.dot.gov/comm/reports/enforce/documents/32021049NOPV/32021049NOPV_PCP%20PCO_07222021_(21-211190).pdf last accessed 12-4-23.

[136] Note that a common settlement approach for PHMSA is to agree to reduced penalties, warning letters or no further enforcement to ensure corrective actions are taken "without admission" for the safety issue identified.

[137] Consent Decree and Consent Order; PHMSA Correspondence to Matt Ramsey, Chief Operating Officer, Energy Transfer L.P.; p. 3-5, January 11, 2022. Note that the two violations were withdrawn in part as the parties acknowledged that that "DAPL without admission completed the actions set forth in the associated Proposed Compliance Order item" (Item 6) and "PHMSA also agrees that DAPL took steps, without admission, to address PHMSA's concerns" (Item 4). https://primis.phmsa.dot.gov/enforcement-documents/32021049NOPV/32021049NOPV_Consent%20Agreement%20and%20Order_01112022_(21-211190).pdf last accessed 1-3-24.

[138] *Ibid.*

pipeline system including the project area.[139] The Energy Transfer manual applies to the DAPL-ETCO pipeline system including Lake Oahe. The omitted procedures that were relevant to DAPL safety included pipeline pressure testing, repair procedures, management of change, and assessment of corrosion growth.[140] These OME procedural deficiencies were not an isolated issue. In my evaluation of the PHMSA "allegation of violation" items for Energy Transfer enforcement cases across their hazardous liquid pipelines, OME procedures (29) and Corrosion Control (26) were among the most common from 2017-2024. This is another example of an omission and mischaracterization by the Corps that leaves a false impression of the resolution of the enforcement action and Energy Transfer's safety record. This is also another instance of the corporate management safety system deficiencies related to OME procedures having widespread impact beyond a single pipeline segment, hazardous liquid or equipment type, etc.

57.     The deficiencies of DAPL's OME procedures are not a new issue. The Tribe's reports to the Corps have previously pointed out concerns related to OME procedures and Integrity Management plans failing to specifically address the DAPL pipeline segment as required by PHMSA regulations. Energy Transfer, however, did not have a DAPL-specific, PHMSA compliant set of operation, maintenance and emergency procedures prepared at the time the pipeline was put into service or during the Corps remand process. To the best of my knowledge, it still does not exist.

58.     Energy Transfer acknowledged there was no DAPL specific operations and maintenance procedures.[141] Sunoco as the DAPL operator had used instead a generic set of maintenance procedures

---

[139] Notice of Probable Violation and Compliance Order, at pp. 3-7.
[140] *Ibid,* See also Consent Decree and Consent Order at p.4.
[141] Email string between Army Corps' Brent Cossette and Energy Transfer's Tom Siguaw, *DAPL – Lake Oahe – Operations Manual ****Submittal to USCOE****,* April 10, 2018, RAR004499.

that contain no DAPL specific information: **"prior to issuing the easement conditions for the Lake Oahe crossing, this Liquids Pipeline Operations and Maintenance Manual was not fully developed to include this new DAPL system."**[142] The Sunoco manual only referenced the name DAPL-ETCO once in the manual in a list of Sunoco operated pipelines.[143] Energy Transfer stated that they planned an update at some unspecified time in the future to include the DAPL.[144] In fact, the attached *Sunoco Pipeline L.P. (SPLP) & Affiliates DOT 195 Maintenance Manual* contained no procedures related to operations or emergencies at all. This was not the first time the Corps had requested this manual. The production of the manual was specifically required by the Corps' Environmental Assessment (EA) and the Lake Oahe easement conditions.[145] Energy Transfer has been in breach of these requirements as evidenced by the record in this matter.

59.    In the 2020 DAPL/ETCO Hazardous Liquid Pipeline Annual Report to PHMSA, Energy Transfer revealed significant integrity management issues for a pipeline that had been in service for only three years. Energy Transfer reported four "anomalies" that required excavation and repair, three of which could affect a High Consequence Area (HCA) like Lake Oahe. More concerning is one of those HCA impacting anomalies was an "immediate repair condition"[146] which required PHMSA

---

[142] *Id.* at RAR004499-4500.

[143] *Id.* at RAR004507.

[144] *Id.* at RAR004500.

[145] U.S. Army Corps of Engineers – Omaha District, Environmental Assessment: Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Land, July 2016, p. 3-4.

[146] Hazardous Liquid Integrity Management Performance Measures, PHMSA website, "Immediate Repair - More specifically defined in 49 CFR 195.452 (h)(4) (i), these repairs are deemed important enough to require a temporary reduction in operating pressure or shutdown of the pipeline until such time as the urgent repair is completed." https://www.phmsa.dot.gov/pipeline/hazardous-liquid-integrity-management/hl-im-performance-measures#:~:text=Immediate%20Repair%20%2D%20More%20specifically%20defined,the%20urgent%20repair%20is%20completed. Last accessed 1-7-25.

notification and immediate shutdown or reduction in pressure for repair. It is concerning that a condition that required shutdown or pressure reduction was required for a relative new pipeline.

60.    A 2024 report by Exponent, Inc.[147] commissioned by Greenpeace in North Dakota state court litigation with Energy Transfer LP identified a "significant number" of lost drilling mud and high annulus pressures during the 2017 DAPL construction-related horizontal directional drilling (HDD) under Lake Oahe:

> While GeoEngineers reported in their FRs (field reports) **a significant number of instances of "nonexistent returns"** to the mud pits and high annulus drilling mud pressures, the field responses to these events are not explicitly described in the FRs. It is not clear that drilling operations were temporarily ceased, or if and how evidence of surface expressions of drilling mud were investigated on the ground or in Lake Oahe along the HDD alignment.[148]

61.    Exponent estimated that the volume of DAPL drilling mud reported to be "nonexistent" during the HDD "drilling was **approximately 1.4 million gallons**"[149] (emphasis added). Exponent determined that **the fraction of mud lost to the environment "was, in my opinion, relatively high**."[150] The report states "it is my opinion that given the volume of mud lost to the surrounding soil, **efforts to verify the volume of mud lost and where it migrated should have been a priority"[151]** (emphasis added) but "it is not known where the lost drilling mud migrated."[152] HDD drilling mud can contain additives that are toxic and can be harmful to wildlife and the environment. These large releases of HDD drilling mud are especially a concern because of findings in the Pennsylvania Mariner 2 East

---

[147] Exponent Inc. Report, Energy Transfer LP; Energy Transfer Operating, L.P.; and Dakota Access LLC v. Greenpeace International; Cody Hall; and Krystal Two Bulls, prepared for Steve Caplow, Esq. and Matt Kelly, Esq., January 16, 2024.
[148] *Id*. at p. 14.
[149] *Id.* at p. 21.
[150] *Id.* at p. 29.
[151] *Id.* at p. vii.
[152] Id. at p. 29.

criminal plea agreement and the Ohio Rover pipeline FERC enforcement action[153]. In both actions regulators found that Energy Transfer added toxic unapproved additives to drilling mud including toxic hydrocarbons.[154] These events have not been revealed by the Corps or Energy Transfer to the Tribe or previously publicly reported. It is not known if the release were reported to North Dakota regulators. Even more troubling is the fact that the **774 lost mud return incidents described by Exponent were not disclosed in the Federal Court-ordered 2018 Independent Assessment of Dakota Access Pipeline**.[155] The Independent Assessment report stated it reviewed similar information as Exponent including GeoEngineers and Perennial Environmental Inspection documentation, interviews, etc. but only described one mud spill to the environment related to a release from a containment berm.[156]

62.    Exponent noted that typically for lost returns, the field reports stated ""no surface indications for the inadvertent drilling fluid returns along the HDD alignment."[157] Yet in one four-day period as reported by Exponent there were 437 lost return incidents. The response to the lost mud returns in Energy Transfer's HDD Contingency Plan is described as "one of the most significant contingency plans."[158] The repeated use of the phrase "no surface indications" for so many of the lost

---

[153] *FERC Order to Show Cause and Proposed Penalties*, Energy Transfer Rover Pipeline, pp. 3, December 16, 2021, https://www.ferc.gov/media/in17-4-000 last accessed 12-19-24. "HDD crew members added unapproved additives to lubricate the drill and speed up drilling progress, and that this was also done intentionally and routinely,"

[154] *Mariner East 2 Grand Jury Presentment*, Pennsylvania Attorney General, October 5, 2021, pp.61-63, https://www.attorneygeneral.gov/wp-content/uploads/2021/10/2021-10-05-Mariner-East-Presentment.pdf; last access 12-19-24. *FERC Order to Show Cause and Proposed Penalties*, Energy Transfer Rover Pipeline, pp.1 and 3, December 16, 2021, https://www.ferc.gov/media/in17-4-000 last accessed 12-19-24. "by (1) intentionally including diesel fuel and other toxic substances and unapproved additives in the drilling mud during its horizontal directional drilling (HDD) operations," "HDD crew members added unapproved additives to lubricate the drill and speed up drilling progress, and that this was also done intentionally and routinely."

[155] 2018 Independent Assessment of Dakota Access Pipeline, U.S. Army Corps of Engineers, Easement Special Conditions, Process Performance Improvement Consultants (PPIC), LLC, March 29, 2018. The audit report cover sheet stated PPIC "Prepared this Assessment Report at the Request of Dakota Access and in Accordance with the District Court's December 4, 2017, order."

[156] *Id.* at pp. 4-5. "GeoEngineers documented the execution of the horizontal directional drilling operation. They completed a three-volume report, including Daily Field Reports. Environmental Inspection reports were filed by Perennial Inspectors. Additional information was obtained through direct interviews with the pipeline Operator."

[157] *Id.* at p.28.

[158] *Id.* at p. 12. Exponent report quote from Michels Directional Crossings, Directional Drill Plan of Procedure,

returns is troubling especially when it would be extremely difficult if not impossible to cease operation, investigate, implement corrective action, and assess the impacts to surface water[159] for each of the 437 lost mud incidents as required by the Energy Transfer HDD drilling plan in such a short time frame. This is especially true if it was not known where the lost mud returns migrated. How did Energy Transfer assess the potential impacts to ground water - was it sampled, especially in this time frame? Moreover, how did Energy Transfer visually assess the impacts to Lake Oahe when during the entire HDD drilling period (January 4 – March 20) Lake Oahe was frozen over with a thick layer of ice and no visual inspection of the surface water was possible.

63.    From 2017-2024, Energy Transfer L.P. and its major subsidiaries[160] including DAPL and the pipeline's operator Sunoco Pipeline[161] (**Attachment 3 Table**), have **the worst overall spill record** for hazardous liquid pipelines among pipeline corporate families with the most spill incidents in that period (**Attachment 2 Table**). Energy Transfer's operations resulted in the largest total spill volume (84,468 bbl; 3,547,656 gal) and property damage ($70,521,948.00), most serious spills (2)[162], 1000 bbl spills (18), most spills in water (25), and enforcement cases (58) and penalties collected

---

Dakota, Dakota Access Pipeline Project, Lake Oahe HDD Crossing, Morton & Emmons Counties, North Dakota Installation of 30" Steel Pipe, August 18, 2015, Attachment, Contingency Plans for HDD Crossings.

[159] *Id* at p. 14. "**Dispatch experienced observers as required to monitor the area in the vicinity of the crossing, for inadvertent returns of drilling fluid at the surface or in the river,**" (emphasis added in Exponent report). Exponent report quote from Michaels Drill Plan, Attachment, Contingency Plans for HDD Crossings.

[160] The subsidiaries of the parent Energy Transfer L.P. and other hazardous liquid pipeline operators have been confirmed in the corporations' 10K Reports to the SEC and are connected in the PHMSA database with the same Primary Operator ID [for Energy Transfer (32099)] and Safety Program Relationship (SPR).

[161] The subsidiaries of the parent Energy Transfer L.P. and other hazardous liquid pipeline operators have been confirmed in the corporations' 10K Reports to the SEC and are connected in the PHMSA database with the same Primary Operator ID [for Energy Transfer (32099)] and Safety Program Relationship (SPR).

[162] Serious and significant spills are defined by PHMSA regulations. PHMSA states "serious incidents are those including a fatality or injury requiring in-patient hospitalization, but fire first incidents are excluded." https://www.phmsa.dot.gov/data-and-statistics/pipeline/national-pipeline-performance-measures#:~:text=%22Significant%20Incidents%22%20are%20those%20including,more%3B%20and%20(4)%20Liquid last accessed 1-7-25. Energy Transfer tied with Enterprise Products for most serious spill incidents.

($3,926,990.00).[163] The eighteen 1000 bbl spills represents 19% of all such PHMSA reported hazardous

liquid spills using the same criteria. Enterprise Products experienced the most spill incidents (257) and

significant[164] incidents (137) while Energy Transfer LP was a second for most spills (215) and

significant incidents (80). Phillips was a distant third with (117) spill incidents and significant incidents

(52). Energy Transfer has the highest number (93) of spills in High Consequence Areas (HCAs) like the

DAPL Lake Oahe crossing and the most spills offsite in the pipeline Right of Way (ROW) or migrating

off company property (78). Enterprise Products experienced the most PHMSA-defined large HCA

spills[165] (77) while Energy Transfer had the next most (31). Corps' analysis of Energy Transfer's

incident record is truncated and incorrect.[166]

64.    In the most recent three year period from 2022-2024, Energy Transfer's hazardous liquid

pipeline spill numbers rather than "trending downward" as alleged by the Corps - has significantly

deteriorated (**Attachment 4 Table**). In fact, Energy Transfer experienced the worst performance in

seven spill incident categories tracked by PHMSA among corporate pipeline companies and their

relevant subsidiaries with the most spills (**Attachment 2 Table**). Energy Transfer's operations yielded

the most spills (91), the largest total spill volume (65,625 bbl 2,756,838 gal) and property damage

($41,357,574), the most PHMSA-defined significant (44) and serious (2) spills incidents, the most

---

[163] Enterprise Products experienced the most spill incidents (257) and significant incidents (137) while Energy Transfer LP was a second for most spills (215) and significant incidents (80). Phillips was a distant third with (117) spill incidents and significant incidents (52).

[164] Significant Incidents are those including any of the following conditions, but Fire First incidents are excluded: 1. Fatality or injury requiring in-patient hospitalization, 2. $50,000 or more in total costs, measured in 1984 dollars, 3. Highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more, 4.    Liquid releases resulting in an unintentional fire or explosion.

[165] PHMSA defines a "large spill" in a High Consequence Area (HCA) as a hazardous liquid release from a pipeline that results in a spill of 5 bbl or more of hazardous liquid, water pollution, or causes significant consequences like a death, personal injury requiring hospitalization, property damage exceeding $50,000, an explosion, or fire, https://www.phmsa.dot.gov/pipeline/hazardous-liquid-integrity-management/hl-im-performance-measures,  last accessed 1-14-25.

[166] DEIS Table 3.1.3-1

spills in water (15).  Energy Transfer's hazardous liquid pipelines have had 12 hazardous liquid spills over 1000 bbl (42,000 gal), while the next worst corporate operator in that period had two. **Those twelve 1000 bbl spills are more than twice as many as the combined total (5) of the next five pipeline companies examined with the worst spill records**. Energy Transfer accumulated a greater degree of spill impact for the most recent three year period (2022-2024) compared to the total for the previous five years (2017-2021). The categories where the recent 3-year period exceeded the prior five years are total spill volume, property damage, 1000 bbl spills, serious and significant spills incidents, and spills in water. Enterprise Products for both periods examined had the most PHMSA-defined large spills in HCAs (74). Again, for this period Energy Transfer had the most spills in HCAs (46) and the most spills with offsite impacts in the pipeline right of way and migrating off the operator's property (38).

65.    Equally concerning is Energy Transfer's history of regulatory violations and enforcement actions both in terms of cases initiated by PHMSA and penalties collected. For the period 2017-2024, PHMSA has initiated 58 enforcement actions against Energy Transfer and its major hazardous liquid subsidiaries (**Attachment 4 Table**). As a result, Energy Transfer has paid $3,926,990.00 in penalties assessed.  Penalties collected from Energy Transfer are more than double the next worst penalized company examined (**Attachment 2 Table**). Energy Transfer was under two Corrective Action Orders (CAOs) during 2017-2024. Both were open for multiple years. One initiated in 2015 (West Texas Gulf) was closed in 2020 and the other (Sunoco's Permian Express II) is still open after eight years. CAOs are one of PHMSA most serious enforcement tools – one that is rarely employed.[167] PHMSA states "A Corrective Action Order usually addresses issues resulting from an accident, spill, or other **significant,**

---

[167] PHMSA has averaged only three CAO per year from 2017-2024. https://primis.phmsa.dot.gov/enforcement-data/case-status/CAO last accessed 1-7-25.

**immediate, or imminent safety or environmental concern**"[168] (emphasis added). CAOs may require long term corrective action by pipeline operators and can remain open for prolonged time periods as seen with Sunoco's Permian Express II CAO that has been open for over eight years.[169]  Energy Transfer is tied with Colonial Pipeline for the most CAOs initiated or under process for 2017-2024. A number of Energy Transfer's PHMSA enforcement actions include repeat citations with a history of failure to effectively report or investigate incidents; develop operations, maintenance and emergency response procedures; and implement integrity management and corrosion control plans. Energy Transfer has demonstrated that it tolerates systematic safety problems in its pipeline operations. For example, in March 2015, PHMSA issued a Corrective Action Order to ET's West Texas Gulf Pipeline Company that wasn't closed until 2020.[170] As a result of a February crude oil spill. PHMSA discovered that a portion of the pipeline with 80% metal loss was "fixed" with a clamp, which the CAO rejected and required the section of pipeline be replaced. The original CAO was amended in September, 2015, as a result of multiple additional incidents that PHMSA described as causing **"the expansion of PHMSA concerns regarding the safety of the West Texas Gulf System."[171]** The events that led to the amended CAO include a prior failure to report a February 19, 2013 incident; additional incidents in April, 2015 of improper pipeline repairs; a second leak on June17, 2015 due to metal loss near the location of the original February spill; a June 19, 2015 "major release" of 138,600 gallons (3300 Bbl) of crude; two additional incidents on May 28, 2015 and June 23, 2015 on the Permian Express II managed by West Texas Gulf (analyzed herein); and a November 10, 2015 spill that sent five workers to the hospital. **Most significantly, Sunoco was ordered by PHMSA and later agreed in an October 3, 2016, Consent**

---

[168] PHMSA Enforcement Website, https://primis.phmsa.dot.gov/enforcement-data/case-status/CAO last accessed 1-12-25
[169] *Id.*
[170] PHMSA Enforcement Data, West Texas Gulf, https://primis.phmsa.dot.gov/enforcement-data/case/420155005H last accessed 1-9-25.
[171] Pipeline and Hazardous Materials Safety Administration Consent Agreement, CPF No. 4-2015-5005H, In the Matter of West Texas Gulf Company, October 2016, p. 1, https://primis.phmsa.dot.gov/enforcement-documents/420155005H/420155005H_Amended%20Corrective%20Action%20Order_09042015.pdf last accessed 1-9-25.

**Agreement to create "a Safety Management System promoting a safety culture" based upon the elements of API RP 1173.**[172] Those RP 1173 system elements listed included Management Commitment and Leadership, Risk Management, Incident Investigation, Safety Assurance and Continuous Improvement and Emergency Preparedness and Response highlighting the multiple SMS deficiencies that are still seen in Energy Transfer's pipeline safety performance.

66.    Energy Transfer's pipeline safety incidents have led to unprecedented incidents and regulatory actions related to the construction and operation of its pipelines, for many different violations on different pipelines throughout the United States. Pipeline safety performance deficiencies that are reflected in a range of activities, locations, hazardous materials transported, and phases of work can be evidence of broader corporate level, systemic problems that has and can impact all operations including DAPL if not corrected. This is the case for Energy Transfer, and it requires a broader, corporate-level review of its safety record.

67.    In 2022 Energy Transfer and Sunoco have been convicted of 23 Clean Water Act (CWA) criminal violations[173] related to the Mariner 2 East pipeline construction in Pennsylvania and an explosion on the Revolution gas pipeline.[174] The convictions stemmed in part from over 176 spills of HDD[175] drilling fluid laden with unapproved toxic additives into environmentally sensitive lakes, rivers,

---

[172] *Id.* at p.5.
[173] Energy Transfer Mariner 2 East Pipeline, Pennsylvania Attorney General Signed Criminal Plea Agreement, August 5, 2022; Energy Transfer Mariner 2 East Pipeline, Pennsylvania Attorney General Signed Criminal Complaint, October 5, 2021 https://www.energytransfer.com/wp-content/uploads/2022/08/SunocoPipelineLP-and-ETCNortheastPipeline-Plea-Packets.pdf ; Energy Transfer Mariner 2 East Pipeline, Forty-Fifth Statewide Investigating Grand Jury Presentment to the Court, May 28, 2021, last accessed 1-16-25.
[174] *Case Update: Energy Transfer Convicted of Criminal Charges Related to Construction of Mariner East 2 Pipeline, Revolution Pipeline in Pennsylvania*, Pennsylvania Attorney General website, August 5, 2022. https://www.attorneygeneral.gov/taking-action/case-update-energy-transfer-convicted-of-criminal-charges-related-to-construction-of-mariner-east-2-pipeline-revolution-pipeline-in-pennsylvania/ last accessed 1-15-25.
[175] Horizontal Directional Drilling (HDD).

and ground water of Pennsylvania – many of which were (HCAs). Energy Transfer utilized the illegal toxic additives even after being warned by the Pennsylvania DEP – "Even after it learned of the use of unapproved additives, however, Sunoco did not direct drillers to stop, nor did it alert DEP."[176]  The Energy Transfer wholly owned subsidiary Sunoco is the operator of DAPL.[177]

68.    Prior to the criminal convictions, Energy Transfer's Mariner 2 East pipeline construction in Pennsylvania has been plagued with regulatory violations, construction stoppage orders, sinkholes and water system contamination. The Pennsylvania DEP fined Sunoco $2 million in January 2020 for a spill during the construction of its Mariner East 2 of three million gallons of drilling fluid.[178] Those releases occurred over several months in 2017 and led to 208,000 gallons of drilling fluid settling on the bottom of a Pennsylvania lake.

69.    As a result of the Pennsylvania CWA convictions, **the Environmental Protection Agency (EPA) has debarred of both DAPL's parent company Energy Transfer L.P. and DAPL operator Sunoco Pipeline LP from Federal Agency contracting.** EPA's Suspension and Debarment Official acted based upon a Debarment Council Recommendation Memorandum to issue a Notice of Proposed Debarment (NPD).[179] The NDP states "The exclusions are effective throughout the executive branch of the Federal Government and apply to procurement and non-procurement programs."[180] Both companies names have been published in the System for Award Management's (www.SAM.gov)

---

[176] *Mariner East 2 Grand Jury Presentment*, Pennsylvania Attorney General, October 5, 2021.
https://www.attorneygeneral.gov/wp-content/uploads/2021/10/2021-10-05-Mariner-East-Presentment.pdf
[177] DEIS, Appendix F, FRP, p.1. "Sunoco LP has been appointed as operator of the Dakota Access Pipeline on behalf of DAPL-ETCO Operations  Management, LLC."
[178] Farm and Dairy News, *Sunoco Fined Nearly $2M for Pennsylvania Pipeline Violations,* January 16, 2020, https://www.farmanddairy.com/news/sunoco-fined-nearly-2m-for-pennsylvania-pipeline-violations/595368.html.
[179] Notice of Proposed Debarment Correspondence to Energy Transfer LP, *et al,* from Nicholas Holtz, EPA Acting Suspension and Debarment Official, 10-28-22, p. 1.
[180] *Id.* at p.5.

70

exclusion list maintained by the General Services Administration, for parties debarred, suspended, proposed for debarment under the FAR. **As of the date of this submission to the Court, on the SAM.gov website the exclusion status of Energy Transfer LP and Sunoco Pipeline LP as active.[181]** The Notice of Proposed Debarment (NPD) has been in effect for over two years since October 28, 2022, and respondents may contest the action. The NPD states that while debarment is generally for a period not to exceed three years, **"Debarment Counsel, has recommended that I consider a ten-year debarment period, and I will consider that recommendation"[182]** (emphasis added). As Energy Transfer acknowledges in the 2022 10K Report submitted to the SEC: **"the NPD presently prevents the named entities from pursuing or renewing Federal government contracts or Federal financial assistance agreements"[183]** (emphasis added). The Energy Transfer statement acknowledges that it cannot pursue or renew "Federal government contracts" in its 10K report to the SEC. Any proposed DAPL Lake Oahe easement is a contract with monetary payment between the Corps and Energy Transfer.

70.    Federal Agencies have recently identified that Energy Transfer's safety deficiencies are pervasive and rise to the executive level. The Federal Energy Regulatory Commission (FERC) recently fined Energy Transfer $40 million. Like the Mariner 2 East pipeline, the FERC staff report states the company spilled HDD drilling fluid (over 2 million gallons) and "intentionally added diesel fuel and other toxic substances and unapproved additives to the drilling mud." FERC found

---

[181] Sam.gov, Exclusion, Energy Transfer, https://sam.gov/exclusions-new?pirKey=478731&pirValue=1667217418431194; Sunoco Pipeline LP, https://sam.gov/exclusions-new?pirKey=478772&pirValue=1667215287490013; last accessed 12-18-24.
[182] Notice of Proposed Debarment Correspondence to Energy Transfer LP, *et al,* from Nicholas Holtz, EPA Acting Suspension and Debarment Official, 10-28-22, p. 5.
[183] U.S. SEC Form 10K, Energy Transfer L.P. at pp. 70, 94; 2022. https://ir.energytransfer.com/static-files/659d7251-ddbb-47dd-9a27-76e04b3640d8

Contemporaneous evidence demonstrates that **these violations were the product of a corporate culture—one that equally infected the executives** managing the Tuscarawas River HDD and the onsite HDD crew—**that favored speed and construction progress over regulatory compliance**… In addition to the contract requirements, Rover's Executive Vice President of Engineering and Construction, Yousif (Joey) Mahmoud, continually applied direct pressure on the Vice President of its prime contractor, Bobby Poteete, to speed up construction, which funneled down to its subcontractor and HDD crews onsite (emphasis added). [184]

71.     **The executive named was the same executive over the construction and HDD drilling of DAPL.** FERC also found that Energy Transfer did not self-report the violations and committed "obstructionist conduct" during its investigation resulting in part in the large $40 million fine. The primary focus of the Corps and Energy Transfer's DAPL risk analysis and defense of their safety record is on the element of incident frequency of generic equipment failures. Their approach is based upon the false premise that the generic data from other operators is "worse than Energy Transfer's incident record."[185] As the data presented herein shows, a full picture of PHMSA safety data contradicts this claim. Moreover, it is important to note that major chemical incidents are low frequency, and with Lake Oahe as an HCA, high consequence by definition. As the Corps cited UK HSE guidance currently states, with credible scenarios, operators must take "take all measures necessary" to prevent a major incident. Most concerning is that the frequency-skewed risk assessment based upon omissions and mischaracterizations of the incident record is used by the Corps and Energy Transfer to rationalize the reliance on ineffective hazard controls such as the lack of a backup power supply to the safety critical EFRDs and ineffective leak detection.[186]

---

[184] *FERC Order to Show Cause and Proposed Penalties*, Energy Transfer Rover Pipeline, pp. 5, 42, December 16, 2021, https://www.ferc.gov/media/in17-4-000 last accessed 12-18-24.
[185] DEIS at p. 3-14.
[186] DEIS at p. 3-47.

72.    The frequency claims[187] are invalid in other ways including:

- API RP 1173 requires risk reduction and continuous improvement[188] and states "pipeline risk management steps are undertaken to reduce risk and support achieving a **goal of zero incidents**."[189] The Corps' focus on frequency compares relative degrees of failure as a goal such as spills per mile and rejects the goal of zero incidents as a benchmark.

- The Corps' treatment of the troubling pipeline spill numbers appears not in the context of a performance metric to justify additional preventative measures but rather an effort to suggest there is an acceptable number of spills. This normalizes spills rather than focuses on spill prevention. Risk experts such as Diane Vaughan writing about the space shuttle Challenger disaster have referred to this behavior as the "normalization of deviance."[190] The Center for Chemical Process Safety (CCPS)[191] in their major hazard guidance book *Recognizing and Responding to Normalization of Deviance,* defines the term as "the gradual erosion of standards of performance because of increased tolerance of non-conformance."

- The over emphasis on generic frequency obscures important distinctions relevant to spill consequence and prevention such as spill locations in high consequence areas, spills in

---

[187] DEIS Table 3.1.3-1, Figure 3.1.3-1, Table 3.1.4-1, and 3.1.4-2.

[188] API RP 1173, *Pipeline Safety Management Systems*, p. x. "The intent of the [management system] framework is to comprehensively define elements that can identify, manage and reduce risk throughout the entirety of a pipeline's life cycle and, at the earliest stage, help prevent or mitigate the likelihood and consequences of an unintended release or abnormal operations."

[189] Ibid. at p. 10. "Risk management is used to understand and evaluate threats throughout the pipeline life cycle and their interrelationships along particular pipelines. Risk management steps are undertaken to reduce risk and support achieving a goal of zero incidents."

[190] The Challenger Launch Decision, Risky Technology, Culture, and Deviance at NASA, Diane Vaughan, 2015.

[191] CCPS is an industry alliance within the chemical engineering professional society the American Institute of Chemical Engineers (AIChE) that include major oil industry members such as Chevron, Shell, BP and Conoco.

water, spills that are a reoccurrence of the same SMS deficiencies or in the same location, the size of the spill, the occurrence of the spill in environmentally sensitive areas or in population centers, or spills that result in significant enforcement actions. A number of Energy Transfer's PHMSA enforcement actions, such as the Mid-Valley 2023 Notice of Proposed Safety Order, includes repeat violations, failure modes, and incident locations with a history of failure to effectively report or investigate incidents; develop operations, maintenance, and emergency response procedures; and implement integrity management and corrosion control plans.

73.    Energy Transfer has demonstrated that it tolerates systematic safety problems in its hazardous liquid pipeline operations and is an unsafe operator. Energy Transfer has shown no recognition that it has serious pipeline SMS deficiencies. They have not put forward a plan for continuous improvement. This is a failure of corporate top management commitment and oversight that modern pipeline safety standards such as API RP 1173 address in detail.[192]

> The pipeline operator shall establish and maintain a PSMS (pipeline safety management system) and build a shared understanding of safety culture. Top management shall communicate expectations by documenting the pipeline operator's policies, goals, and commitment to safety, as well as identifying safety responsibilities of personnel at all levels. The pipeline operator shall improve upon the PSMS[193] and measure its effectiveness and maturity in accordance with the requirements of this document.

---

[192] API RP 1173, 5.0 Leadership and Management Commitment, at pp. 6-9.
[193] Pipeline Safety Management System (PSMS).

While Energy Transfer is responsible for its worst-in-class incident record, failure to acknowledge serious safety deficiencies and improve, the Corps and Energy Transfer mischaracterization and omissions of their incident history masks and enables its ongoing magnitude and impact.

VII.    **The Corps and Energy Transfer's Approach to Pipeline Safety Risk Management and Spill Prevention is Not Supported by Industry Pipeline Safety Standards and has been Withdrawn by the Cited Source. Use of outdated risk management approaches leaves DAPL vulnerable to disaster.**

74.    Pipeline risk assessment and management approaches taken by the Corps and Energy Transfer are not supported by the more rigorous methodologies developed by industry in response to recent serious pipeline disasters. The Corps applies a simplified and non-pipeline specific risk matrix "to identify the significance of impacts associated with a crude oil release at Lake Oahe."  The Corps does not provide a rationale why it does not apply widely recognized consensus pipeline industry risk and integrity management standards such as the American Petroleum Institute (API) Recommended Practice (RP) 1173, *Pipeline Safety Management Systems* (2015) and API RP 1160, *Managing System Integrity for Hazardous Liquid Pipelines* (2019) that adopt a safety management system (SMS) framework. **These recommended Practices adopt a "plan-do-check-act approach for pipeline spill prevention and continuous improvement. The methodology of these API RPs is company-specific, and data driven to achieve required risk reduction.** The API RPs, appropriate for potentially high consequence but low frequency incidents, do not focus on generic equipment failure rates like the Corps approach that ignore hazards and risk factors for a particular pipeline project or operator's performance.

75.     The 2010 Enbridge Marshall MI disaster underscores the compelling reason that the pipeline safety management system (SMS) approach is critical to incident and spill prevention. It is important to note that crude spills can be catastrophic – the Marshall MI spill was a disaster that spilled over a million gallons of diluted bitumen (tar sands) crude that reached 40 miles down the Kalamazoo River. It likely will never be fully cleaned up. This incident and the San Bruno gas pipeline multi-fatality incident also investigated by the NTSB led to many calls for reform of pipeline safety and critiques of PHMSA. The top leadership of PHMSA was eventually forced to resign due to their inaction from bipartisan calls for reform. PHMSA had been severely criticized for lengthy delays in rulemaking by Congress, GAO, and the DOT IG.   Subsequent pipeline safety rulemaking highlighted these two disasters as the need for reform.

76.     The NTSB Marshall MI report focused on the importance of Enbridge's organizational and management system safety deficiencies. The NTSB noted that PHMSA did not require a pipeline safety system framework and that was causal to the incident. This approach focuses on how safety systems under control of management are the root cause of all incidents.  This approach is widely recognized for chemical accident prevention rather than solely focusing on "operator error," and "unavoidable" or "unanticipated" events or the result of equipment failure rates separate from root causes. The NTSB report cites the 2007 US Chemical Safety Board's (CSB) BP Texas City report for the importance of organizational analysis and the SMS approach. Reviewing recent pipeline incidents, the NTSB concluded that the application of a safety management system approach was "needed to enhance the safety of pipeline operations."  The NTSB made a recommendation to the oil trade association API to adopt a pipeline safety system recommendation. API RP 1173 was developed with active participation by PHMSA and CSB staff. The NTSB graded the API response as "exceeds"

acceptable action. The NTSB specifically stated pointing to the voluntary RP that pipeline operators should not wait from action by PHMSA before improving safety.  The guidance in API RP 1173 underscores the problems with the Corps and Energy Transfer's analysis and the parent corporation's failed safety performance. API's RP 1162 on Integrity Management (2019) takes a similar SMS approach.

77.     In the Marshall, MI report, while the technical failure was a crack that "grew and coalesced" from corrosion fatigue there were several broader organizational and management system deficiencies that were the root cause that led to the incident – insufficient margin of safety, failure to incorporate lessons learned, etc. A key reason to adopt this approach is that fixing these broader issues will have a greater preventative impact. The purpose of incident investigation is to more broadly prevent similar incidents not just the specific fact pattern or the equipment failure of the one investigated. These broader organizational root causes and recommendations can lead to preventing other incidents in the corporation's pipeline operations not just in the particular hazardous hydrocarbon or segment of pipeline where the incident occurred. A prime example with Energy Transfer are the production pressures and use of unapproved additives in drilling fluid that led to toxic releases to sensitive environments in both the Mariner 2 East/Revolution pipeline CWA criminal convictions and the FERC $40 million fine with ET's Rover pipeline. FERC correctly identified that these were organizational causes – a failed "corporate culture" going all the way to the "executive level."

78.     So different pipelines, different corporate subsidiaries, with different hazardous material, can have serious hazardous material releases related to common organizational and cultural deficiencies within the corporate parent. It is critical to point out that from my review of PHMSA data Energy

Transfer's safety deficiencies are serious and widespread - evident in all hazardous liquid subsidiaries (12 largest examined, Attachment 3), hydrocarbon hazardous liquid pipeline commodities (crude, highly volatile liquids, refined products) and equipment types (pipeline and valves, pump/meter stations and breakout tanks). The importance of a broader review of Energy Transfer's pipeline operations shows systematic and repeat failures leading to more serious incidents, 1000 bbl spills, "large spills" in High Consequence Areas (HCAs), "significant spills" as defined by PHMSA. These spills are supposed to be rare, but with Energy Transfer they are not. As with the Marshall MI pipeline disaster, Energy Transfer's organizational failures are corporate safety system failures which are impacting specific equipment at a specific pipeline, but have the potential as the data shows to impact a broad array of similar incidents unless preventative measures at the corporate level are implemented.

79.    Low frequency/high consequence incidents with catastrophic potential require a different risk management approach. That approach focuses more on consequences and effective controls rather than rationalizing low frequency as a reason to dismiss the threats or needed protections. Energy Transfer's incident record is additional strong evidence that the corporate safety leadership, oversight and safety system performance are severely deficient. ET has a "run-to-failure" integrity management system as the data shows. For the Corps,' their choice of an inappropriate risk management approach (simplistic risk matrix withdrawn by the source cited) using generic incident frequency data (rather than company and project specific data), and a truncated review of ET's safety record (limited timeframe, hazardous liquid commodity types, pipeline equipment, etc.) are not supported by PHMSA regulations or pipeline consensus safety standards. The API risk management methodology in RP 1173 looks at continuous improvement to the corporations' safety performance, something lacking for Energy Transfer. The Corps wants to artificially restrict what is examined (only certain equipment, only a

specific geographical location, only crude oil, only from 2018 -2020, etc. It should also be pointed out that much the Corps data is misstated. A narrow approach is taken by the Corps because a broader review reveals larger more serious problems that are directly relevant to the safety of DAPL.

80.    The Corps uses a risk methodology that has been withdrawn by the primary authority cited, the UK HSE. The new UK HSE risk assessment guidance urges at a minimum the implementation of authoritative good practice which the Corps has failed to do in the DEIS. The references for the risk matrix in the DEIS[194] cite to a 2005 document from United Kingdom (UK) Health and Safety Executive[195] and a paper[196] authored by individuals from a symposium published by the UK iChemE.  The UK HSE is a credible source for guidance related to major chemical accident prevention. In the UK hazardous liquid pipelines are covered under their major accident hazard regulations. UK HSE regulations and guidance on driving major chemical accident risk to As Low as Reasonably Practicable or ALARP are recognized internationally. Similar major hazard prevention approaches have been implemented in the US by the Federal Aviation Administration (FAA) and the Nuclear Regulatory Commission (NRC).  However, the approach and conclusions of the document cited by the Corps – the *UK HSE Guidance on ALARP decisions in COMAH, SPC/Permissioning/12 (2005)* - **was withdrawn.** The current 2023 version of Guidance on ALARP decisions in COMAH, SPC/Permissioning/37[197] on the UK HSE website states:

---

[194] DEIS at p. 3-4.
[195] *Guidance on ALARP decisions in COMAH,* HSE (UK Health and Safety Executive). 2005.
[196] *Risk Ranking of Events by Frequency, Consequence and Attenuating Factor: A Three Variable Risk Ranking Technique;* Lee, et al; iChemE Hazards XXII, Symposium Series NO. 156; 2011. iChemE is the professional society of chemical engineers in the UK. This paper is authored by individuals in UK that are subject to the regulatory requirements and guidance provided in the HSE's *Guidance on ALARP decisions in COMAH.*
[197] *Guidance on ALARP decisions in COMAH* SPC/Permissioning/37
https://www.hse.gov.uk/foi/internalops/hid_circs/permissioning/spc_perm_37/, last accessed 1-7-25.

*This document aims to give guidance specifically on ALARP demonstrations in the COMAH[198] context and **replaces SPC/Perm/12 which is withdrawn** (emphasis added).*

81.    This change is important as significant revisions were made that underscore the importance of preventative action rather than idiosyncratic risk estimates to overlook or deny risk. In particular, the HSE emphasizes the use of industry good practice standards and guidelines. The withdrawn 2005 version of the HSE Guidance that the Corps recommends the use of a risk matrix as a one "simple qualitative approach" to risk assessment. The document provides an illustrative example and guidance for its use. The current version has eliminated the discussion of the use of a risk matrix and now emphasizes that "operators to "take all measures necessary (AMN) to prevent major accidents" which at a minimum must implement "authoritative good practice."

*"HSE starts with the expectation that suitable controls must be in place to address all significant hazards and that those controls, **as a minimum, must implement authoritative good practice** irrespective of situation based risk estimates" (emphasis added).*

The HSE guidance now places more emphasis on effective controls in place to prevent major hazards and the use of "authoritative good practice." The HSE makes clear that risk tools and estimates that ignore good practice are unacceptable. This is a criticism of the use of risk assessments and tools to deny major hazard risk with individual operator idiosyncratic risk estimates. An example is the use of individual frequency or consequence analysis while failing to implement good practice or examine the operators performance. The new HSE guidance reflects the modern view of major chemical accident prevention that places less focus on an emphasis on the use of frequency in the risk assessment and more on the controls in place and the use of "authoritative good practice" to prevent high consequence releases to the environment. The changes to the UK HSE Guidance strongly undermine the Corps'

---

[198] Control of Major Accident Hazards (COMAH)

primary risk emphasis – the inappropriate use of questionable equipment failure rates to assert a DAPL

spill is "remote," "unlikely," "very unlikely," etc. while failing to apply "authoritative good practice" or

evaluate Energy Transfer's troubled SMS performance and safety record.

82.     An infamous example of the inappropriate use of a simplified generic risk matrix was the

risk assessment performed by Transocean for the Macondo well leading up to the Deepwater Horizon

disaster that killed 11 workers. This was the worst environmental disaster in US history. The US CSB

in its Macondo report[199] identified that the use of a generic risk matrix is ineffective to prevent major

chemical disasters. Transocean had determined that because no blowout had occurred on the Deepwater

Horizon the likelihood of occurrence was low and more robust hazard controls were unnecessary.  Both

Transocean and BP stated that a well blowout in the Gulf of Mexico was unheard of and highly

unlikely. Despite the credible scenario of catastrophic consequences, event frequency was used to

dismiss the risks in Transocean's assessment. Therefore, the risk was downgraded, and effective

controls were not considered. Post-incident Transocean itself concurred the generic risk matrix

approach was ineffective and agreed that more effective risk methodologies such as the "bowtie"

approach typically used in concert with the ALARP risk reduction approach were preferred.

83.     The Corps, like Transocean uses a simplified generic risk matrix for a proposed increase

in DAPL capacity to 1.1 million BPD in a PHMSA defined environmental high consequence area. The

Corps uses a generic equipment-based frequency analysis, limited to a specific equipment and service

to dismiss the risk of a spill from DAPL in the project area to a near impossibility (for example, 1 in

949,116 years for a spill >1000 Bbls and <10,000 Bbls).[200]  This is despite doubling the flow, Energy

---

[199] Deepwater Horizon Incident Investigation Report, Drilling Rig Explosion and Fire at the Macondo Well, Volume 3, US
CSB, pp.174-175, https://www.csb.gov/file.aspx?DocumentId=5992 last accessed 1-7-25.
[200] DEIS at p. 3-24.

Transfer's pipeline-related criminal convictions and Federal government-wide debarment, worsening safety record, and failure to apply widely recognized pipeline safety standards. All these factors are ignored or summarily dismissed by the Corps. However, Energy Transfer's SMS serious deficiencies significantly elevate both DAPL spill consequences and likelihood. This renders DAPL an unsafe and high risk pipeline.

84.    There are many other serious deficiencies with the Corps' identification of hazards, risk assessment and implementation of controls.

•    There is no evidence that the Corps conducted a formal hazard assessment identifying DAPL hazards, reviewing all credible incident scenarios, evaluating the corporate and operator performance, identifying SMS deficiencies, implementing needed controls using the hierarchy of controls and verifying the existing controls are in place and operating effectively as required by industry standards such as API RP 1173.

•    The Corps has failed to conduct or evaluate an Energy Transfer Management of Change (MOC) review for the nearly doubling of the DAPL capacity proposed in the DEIS. The production of a technical MOC review and report is required by API RP 1173 and RP 1160 to assess the safety implications of this change. Safety issues specific to the doubling of the capacity not examined by the Corps include impacts to integrity management, surge prevention and protection, safety critical equipment performance such as leak detection systems and EFRDs closure in response to a spill, and emergency response. An MOC review typically requires an updated risk analysis or hazard analysis to assist in evaluating the changes and needed controls. There is no evidence in the DEIS that an updated

risk analysis has been conducted even though nearly doubling DAPLs capacity greatly increases the WCD and consequences from a spill.

•    API RP 1173 recognizes that covered pipelines are subject to high consequence low frequency events that requires focus on risk reduction and continuous improvement. The API RP omits reference to risk matrixes or use of generic incident or equipment frequency as preferred risk management approaches unlike the Corps methodology.[201]  API RP 1173 and 1160 focus on the pipeline operator's own SMS performance and not the generic performance of other pipeline operators.

•    The Corps fails to look at all credible release scenarios and grossly underestimates DAPL consequences including the worst case discharge as discussed herein. A much larger WCD significantly the consequences of a spill and hence spill risk. The Corps for example does not effectively consider a spill under the detection limit for credible scenarios such as a 10-day period between aerial surveillance or under winter ice cover conditions. The Corps baldly asserts DAPL's risk assessment approach "focused on prevention of releases for scenarios that had high consequences and low probabilities to reduce the overall risk"[202] but all the Corps cited scenarios show otherwise.

•    In their risk approach, the Corps only examines single event incident causes of generic equipment incidents and makes faulty assumptions from this mischaracterization. Industry safety guidelines recognize that major chemical incidents have multiple causes. While equipment failures can be initiating events of incidents, root causes are management system failures such as deficient integrity management or incident investigation systems. This is an important issue in the context of WCD and the

---

[201] API RP 1173, 7.0 Risk Management
[202] DEIS at p. 3-25

need to consider leak detection human factors issues in addition to equipment performance. The Corps states, however, that it is "important to avoid consideration" of multiple event incident causation referring to it as "double jeopardy." This is a startling acknowledgement that the Corps considers understanding the various possible causes of incidents not as an important opportunity for prevention but rather a punitive "double jeopardy." This also ignores the language of the PHMSA WCD regulation[203] and API RP 1130[204] (incorporated into the PHMSA regulations by reference) where every element including detection time must be considered separately for worst case determination. Given the possibility of false alarms and instrument indications, API RP 1130 requires pipeline control operators to evaluate leak detection alarms which is part of the process of detecting a leak and must be considered in the WCD despite the Corps unexplained concern for double jeopardy.

•       The risk matrix and spill scenarios do not evaluate consequences without mitigation from failures related to leak detection and operation of the Lake Oahe EFRDs. Given the lack of verification of actual performance of safety critical elements such as DAPL's leak detection system, and EFRD valve closure mitigation cannot be credited as functioning in the WCD or risk evaluation. Verification of performance is required by pipeline industry safety standards.

•       The DEIS fails to address the dire consequences of a DAPL crude oil release 90-120 feet under Oahe's lakebed. The DEIS acknowledges that that a leak under the detection limit "would likely take a substantial amount of time to reach Lake Oahe."[205]  A leak under a detection limit of 2%[206] of the flow could release up to 22,000 BPD and last for 10 days if detected by aerial surveillance or possibly longer

---

[203] Worst Case Discharge, 49 CFR 194.105(1)
[204] API RP 1130 on *Computational Pipeline Monitoring for Liquids* (2007)
[205] DEIS at p. 3-25.
[206] The DEIS cannot take credit for a 1% leak detection rate lacking actual performance verification. The actual CPM leak detection rate for Energy Transfer from 2017-2024 using the methodology from the PHMSA 2012 Leak Detection Study is 10%, undermining the DEIS claims that their CPM performance is state of the art.

under winter ice cover. The oil would pool and accumulate for "a substantial amount of time" creating a large reservoir of toxic crude oil released into Lake Oahe over time. This type of spill is extremely difficult if not impossible to mitigate and remediate. The flow of crude from under the lakebed into Lake Oahe could last for years and never be effectively remediated, harming the Tribe and environment for decades.

•    The Corps' risk approach is an exercise in risk denial and consequently works to dismiss the critical need for more effective controls such as improved leak detection and technologies, use of industry safety standards, verification of actual pipeline performance, or correction of Energy Transfer's failed safety management systems reflected in their pipeline spill record.

### VIII.  Conclusion

85.    Key principles to prevent pipelines spills and mitigate their consequences are not applied or incorporated into the Corps' review of the Dakota Access pipeline. A fatal flaw of the Corps' review or Energy Transfer's safety systems – the very safety standards[207] developed out of recent pipeline disasters that require more rigorous performance to prevent spills are not referenced by the Corps or applied effectively by Energy Transfer to DAPL. This is especially concerning given Energy Transfer's need for performance improvement to address their worst-in-class pipeline spill and enforcement record. Actual performance represents the real risk of continued operation. API RP 1173 – the modern, more rigorous risk management standard for the pipelines sector - is fundamentally based upon the importance of assessing performance with data, implementing risk reduction, and driving continuous

---

[207] The only reference to pipeline safety API Recommended Practices (RPs) is on page 3-30.  The Corps abstractly notes that some pipeline leak detection scenarios with ineffective performance "can be mitigated by following API RP 1175 and API RP 1130."  However, the DEIS neither applies this approach critically in their analysis nor evaluates Energy Transfer's application or required performance verification with the RPs.

improvement to the goal of zero incidents. A key principle is the necessity of up-to-date standards to reduce risk: "Pipeline operators conform to applicable industry codes and consensus standards with the goal of reducing risk, preventing releases, and minimizing the occurrence of abnormal operations."[208] API RP 1173 also identifies that "meeting and exceeding minimum standards" is evidence of a positive safety culture.[209] The lack of the effective use of pipeline safety standards is evidence that Energy Transfer safety culture is lacking. This was the exact critique from the Rover Pipeline FERC staff report that found for Energy Transfer: "**these violations were the product of a corporate culture— one that equally infected the executives.**" The West Texas Gulf Corrective Action Order (CAO) directed Energy Transfer in 2015 to implement "a Safety Management System promoting a safety culture" based upon the elements of API RP 1173[210] which they agreed to. However, for DAPL when asked in 2018 by the Corps, nearly one year after the operation of DAPL if they had implemented API RP 1173, they acknowledged they had not, but they were "developing" the plan.[211] To this date there is no evidence that Energy Transfer has implemented this RP and if they claim to have done so it is not reflected in their poor safety record that is deteriorating rather than continuously improving. The fact that PHMSA directed Energy Transfer to implement API RP 1173 to correct serious deficiencies in 2015 but told the Corps in 2018 they had not done so for DAPL is very troubling.

86.     Energy Transfer's multiple pipeline safety management system deficiencies documented herein have their basis in safety culture that goes to the executive level as noted in the FERC Rover Pipeline report. It is reflected not just in a poor safety record that is getting worse but in the risk denial by grossly underestimating a Lake Oahe WCD, a deficient emergency response plan that is infeasible in

---

[208] API RP 1173 Pipeline Safety Management Systems (2015), p. vii.
[209] *Id.* at xi.
[210] *Id.* at p.5.
[211] February 15, 2018, email from Brent Cossette, DAPL Remand - Letter Enclosure Info Current Status, RAR008403

severe low water, and a failure to implement and verify the reliability of safety critical equipment such as leak detection and the EFRDs that would mitigate a spill into Lake Oahe. Energy Transfer has had many opportunities to improve their safety performance, but they have not. An important step for improving performance is recognizing there is a need for improvement. Neither Energy Transfer nor the Corps has demonstrated that recognition. In fact, as shown in this report, Energy Transfer's pipeline safety system performance and spill record are deteriorating yet they claim the pipeline is one of the safest and Energy Transfer's performance is improving. It is also clear that the Corps will not act to ensure the safety of the Tribe or the Lake Oahe environment in their review.

87.     In sum, it is my expert opinion that continued operation of DAPL, presents untenable risks to the Standing Rock Sioux Tribe and others who rely on Lake Oahe. It is respectfully recommended that this court shut down the Dakota Access Pipeline in light of Energy Transfer and DAPL's deteriorating spill incident record, deficient safety management systems, regulatory enforcement record, flawed emergency response plans and capabilities, troubled emergency shutoff valve (EFRD) performance, and lax corporate oversight and leadership.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

 Dated this 16th day of January 2025.

 */s/ Donald S. Holmstrom*

Donald S. Holmstrom
6200 Gale Drive Boulder, CO 80303
303-990-1487(m)

# Attachment 1

DONALD HOLMSTROM CV

# DONALD S. HOLMSTROM
**6200 Gale Drive Boulder, CO 80303**
**Ph. 303-990-1487(m)**
**Donho2@comcast.net**

# Key Qualifications

Over 35 years of experience conducting chemical incident investigations for the oil industry and US government. Seventeen years of experience managing and leading chemical incident investigation and recommendations activities at the US Chemical Safety Board (CSB), a non-regulatory, scientific agency modeled after the National Transportation Safety Board (NTSB). Nineteen years of industry experience in oil industry operations, process safety systems and extensive involvement with incident investigation in process plants, pipelines and exploration and production. Recognized leadership in process safety problem solving. Broad knowledge of safety practices, standards and regulations. Demonstrated ability as a writer and public speaker.

# Work Experience

**US Chemical Safety and Hazard Investigation Board** (1999-2016, retired 111-16)

**Director, Western Regional Office (WRO)** (2008-2016)

- Managed and/or led over 70 major accident investigations - many of the largest and most significant chemical incident investigations in recent US history including the 2005 BP Texas City explosion, the 2010 Tesoro Anacortes oil refinery fire, the 2010 Deepwater Horizon offshore fire and explosion, the 2012 Chevron Richmond, CA oil refinery fire and the field investigation of the 2013 West, Texas ammonium nitrate explosion.
- Developed and successfully advocated the implementation of important technical, safety standard and regulatory recommendations that were addressed to parties such as the National Fire Protection Association (NFPA), the American Petroleum Institute (API), National Association of Corrosion Engineers (NACE), the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA).
- Responsibilities included managing multi-disciplinary teams of chemical and mechanical engineers, chemists, human factors specialists, and lawyers – approximately two thirds of the agency investigators reported to the WRO.

**Total Petroleum Inc./Ultramar Diamond Shamrock/Asamera Oil** (1981-1999) **Operations and Process Safety** (1981-1999)

89

Donald S. Holmstrom                    Page 2                                    CV

- Participated in and led numerous chemical accident investigations. Implemented the first root cause analysis and process hazard analysis activities at Total Petroleum Inc. in response to serious process safety issues. These activities led to establishing new procedures for incident investigation, the elimination of unsafe refinery equipment, process winterization, decommissioning process equipment, establishment of more rigorous mechanical integrity protocols, asbestos handling protocols for insulation removal, and safe lighting of fired heaters.

## Additional Experience

- Numerous technical certifications and/or training related to fire and explosion investigation, hazardous materials, mechanical integrity, root cause determination, process safety systems, human factors analysis, chemical testing, and emergency response.
- Speaker on CSB investigation reports and recommendations to such organizations as American Petroleum Institute (API), the American Industrial Hygienist Association (AIHA), the Center for Chemical Process Safety (CCPS), the United Steelworkers (USW), the Department of Energy (DOE), the Pipeline and Hazardous Materials Safety Administration (PHMSA), the American Chemistry Council (ACC), the International Association of Drilling Contractors (IADC), the Texas Chemical Council, Exxon Mobil, Chevron, Covestro, Chlorine Institute, and the Society of Petroleum Engineers (SPE).
- Author or co-author of numerous articles on incident investigation and process safety in publications such as Chemical Engineering Progress, Loss Prevention Bulletin, Process Safety Progress, Journal of Hazardous Materials and the NFPA Journal.
- Colorado Governor's Panel of Health Advisors, 1993-94.
- Served on the 2014 Technical Panel for the project "Separation Distances in NFPA Codes and Standards" undertaken by The Fire Protection Research Foundation, an affiliate of NFPA.
- Presented the CSB's final two Macondo incident investigation reports on the day of release at the SPE International Conference on Health, Safety, Security Environment and Social Responsibility, "Macondo: Lessons Still to be Learned," Stavanger, Norway April 2016.
- Served as a member of the 2019 National Academy of Science, Engineering and Medicine (NASEM) Gulf Research Program's Safer Offshore Energy Systems Grants Review.
- Authored affidavit reports and assisted in the drafting of NGO submissions including the Petition for Reconsideration, In Re: Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, 84 Fed Reg. 69,834; Declaration Report of Donald Holmstrom (2020); and the Occupational Safety and Health Administration (OSHA) informal stakeholder process soliciting comments on Process Safety Management (PSM) modernization (2023).

## Education

Stanford University, Bachelor of Arts (Human Biology and English); 1974 University

of Colorado School of Law, Juris Doctor, 1978

## Publications

"The Hazards of On-line Maintenance: A Case Study of a Multiple Fatality Incident at the Tosco Avon Refinery in Martinez," California; D.S. Holmstrom; International Symposium Proceedings, Mary Kay O'Conner Process Safety Center, Texas A&M University, October 2000.

"A Multiple Fatality Incident at the Tosco Avon Refinery, Martinez, California; Donald Holmstrom, Stephen Selk, Stephen Wallace, and Isadore Rosenthal;" Loss Prevention Bulletin, Issue 167, Institution of Chemical Engineers (IChemE), October 2002.

"Chemical Hazards Management: A CSB Perspective," Don Holmstrom, Joint EFCOG/Department of Energy (DOE) Chemical Management 2002 Workshop Presentation/Paper, November 2002.

"Improving Reactive Hazard Management, the Implementation of Recommendations," John F. Murphy and Don Holmstrom, 18th Annual Center for Chemical Process Safety (CCPS) Paper, Managing Chemical Reactivity Hazards & High Energy Release Events, September 2003.

"Understanding Reactive Chemical Incidents," John Murphy and Don Holmstrom, Chemical Engineering Progress (CEP), American Institute of Chemical Engineers, March 2004.

"CSB Investigation of the Explosions and Fire at the BP Texas City Refinery on March 23, 2005," Don Holmstrom, Francisco Altamirano, Johnnie Banks, Giby Joseph, Mark Kaszniak, Cheryle MacKenzie, Reepa Shroff, Hillary Cohen and Stephen Wallace, Process Safety Progress, American Institute of Chemical Engineers, Volume 25, Issue 4, September 2006.

"Buildup to Disaster," Mark Kaszniak, Don Holmstrom, and Cheryl MacKenzie; National Fire Protection Association (NFPA) Journal, July/August 2007.

"Human Factors Analysis of the BP Texas City Refinery Explosion," Cheryl MacKenzie, Donald Holmstrom, and Mark Kaszniak; Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Vol. 51, Issue 20, October 2007.

"Investigating Beyond the Human Machinery: A Closer Look at Accident Causation in High Hazard Industries, Cheryl MacKenzie and Don Holmstrom, Process Safety Progress, American Institute of Chemical Engineers, Volume 28, Issue 1, December 2008."

"Trailer Siting Issues: BP Texas City," Mark Kaszniak and Donald Holmstrom, Journal of Hazardous Materials, Elsevier, Vol. 159, Issue 1, November 2009.

"Static Electric Discharge during Solvent Handling and Storage, Randy McClure, Donald Holmstrom, Laurence Britton and Mark Kaszniak; American Society of Safety Engineers (ASSE), 48th Annual ASSE Professional Development Conference Paper, July 2009."

"Valero-McKee Refinery Propane Release and Fire; Donald Holmstrom, Johnnie Banks, James Lay, Cheryl MacKenzie, and Vidisha Parasram;" Process Safety Progress, American Institute of Chemical Engineers, Volume 29, Issue 4, November 2010.

"Inadequacy of the Contractor Selection Process and its Impact on Worker Health and Safety: The US Chemical Safety Board Xcel Cabin Creek Hydroelectric Plant Investigation;" Don Holmstrom, Cheryl MacKenzie, Mark Kaszniak, Randy McClure, and Vidisha Parasram; 138th American Public Health Association (APHA) Meeting and Exposition Conference Paper, November 2010.

"The Human Factors of Process Safety and Worker Empowerment in the Offshore Industry Workshop Presentation," The CSB Macondo Report: Barriers to Worker Participation, National Academies Gulf Research Program, January 2018; presentation summarized in "The Human Factors of Process Safety and Worker Empowerment in the Offshore Industry, Proceeding of a Workshop," Steve Olson and Heather Kreidler, Rapporteurs, the National Academies Press, 2018.

"California's 2017 Process Safety Regulations for Oil Refineries - the Future of U.S. PSM Regulations?" Mike Wilson, Don Holmstrom and Bill Hoyle; 2018 Global Conference on Process Safety Paper, April 2018.

"Protecting Workers from Chemical Catastrophes: California's 2017 Process Safety Management Regulations for Petroleum Refineries;" Mike Wilson, Don Holmstrom and Bill Hoyle; requested and submitted to the Office of the High Commissioner for Human Rights, United Nations, UN Special Rapporteur regarding Human Rights and Worker Exposures to Toxic Substances, 2018.

"Evaluation of Alternative Contractor License Requirements for Battery Energy Storage Systems;" Carol Zabin, Betony Jones, Donald Holmstrom; UC Berkeley Labor Center, June 30, 2021.

# Interests

River running, hunting and fishing in the Rocky Mountains

# Attachment 2

## Safety and Enforcement PHMSA Sourced Data for Hazardous Liquid Pipelines 2017-2024 Compared to 2022-2024.

| | Enterprise 31618; 30829; 3445 (2017-2024 - 2022-2024) | Energy Transfer (2017-2024 - 2022-2024) | Magellan; 22610; 39504; 31579; (2017-2024 - 2022-2024) | Colonial 2552 (2017-2024 - 2022-2024) | Kinder Morgan 39440; 39023; 32678; 32619; 31957; 18092; 2190 (2017-2024 - 2022-2024) | Phillips 31684; 31130 (2017-2024 - 2022-2024) |
|---|---|---|---|---|---|---|
| HL Total Barrels Spilled | 73,761 bbls; 3,097,962 gal - 12,084 bbls; 507,528 gal | 84,468 bbls; 3,547,656 gal - 65,625 bbls 2,756,838 gal | 6329 bbls; 265,818 gal - 642 bbls; 26,964 gal | 49,740 bbls; 2,089,080 gal - 979 bbls; 41,118 gal | 13,362 bbls; 561,204 gal - 11,699 bbls; 491,358 gal | 74,944 bbls; 3,147,648 - 689 bbls; 28,938 gal |
| HL Total Property Damage | $51,519,332 - $15,015,002 | $70,521,948.00 - $41,357,574 | $33,927,142 - $3,916,122 | $161,038,829 - $29,570,137 | $49,650,178 - $39,670,738 | $40,372,498 - $4,483,486 |
| Incidents | 257/76 | 215- 91 | 88 - 28 | 75 - 26 | 55 - 20 | 117 - 19 |
| 1000 Bbls Incidents | 13/2 | 18 - 12 | 2 - 0 | 1 - 1 | 2 - 1 | 7 - 0 |
| PHMSA Defined Significant Incidents | 137/40 | 80 - 44 | 30 - 8 | 38 - 17 | 27 - 10 | 52 - 9 |
| PHMSA Defined Serious Incident | 2 - 0 | 2 - 2 | 0 - 0 | 0 - 0 | 0 - 0 | 2 - 0 |
| Spill in Water | 1 - 0 | 25 - 15 | 6 - 1 | 11 - 1 | 6 - 1 | 4 - 0 |
| High Consequence Area (HCA) | 81 - 22 | 93 - 46 | 60 - 19 | 50 - 15 | 32 - 12 | 34 - 5 |
| HCA Large Spill to 2023 | 77 - 18 | 31 - 5 | 40 - 8 | 31 - 9 | 26 - 7 | 25 - 6 |
| Spill in the Pipeline ROW or Migrated Offsite | 74 - 21 | 78 - 38 | 26 - 8 | 11 - 3 | 14 - 11 | 43 - 10 |
| Penalties Collected from 2017 - 2024 | $834,208.00 | $3,926,990.00 | $969,147.00 | $1,095,100.00 | $1,529,400.00 | $628,800.00 |
| Enforcement actions Initiated | 30 | 58 | 17 | 15 | 13 | 29 |
| CAOs Initiated, Open or Closed 2017 - 2024 | 1 | 2 | 1 | 2 | 0 | 0 |

**Attachment 2 Table. Safety and Enforcement PHMSA Sourced Data for Hazardous Liquid Pipelines 2017-2024 Compared to 2022-2024. The six companies and their relevant subsidiaries were selected for experiencing the largest number of spills from 2017-2024. The criterion for selection is described in Section VI of the Declaration.**

# Attachment 3

## 12 Major Subsidiaries of Energy Transfer LP Safety and Enforcement Data 2017-2024, 2022-2024

| | Bakken Pipeline DAPL-ETCO 39205 (2017-2024-2022-2024) | Energy Transfer; 32099; 39706 (2017-2024-2022-2024) | Inland Corps 32683 (2017-2024-2022-2024) | West Texas Gulf 22442(2017-2024-2022-2024) | Permian Express 39596 (2017-2024; 2022-2024) | Sunoco Pipeline 18718 (2017-2024; 2022-2024) | Mid-Valley 12470 (2017-2024; 2022-2024) | ET Crude Operating/Rose Rock 31476 (2020-2024; 2022-2024) | Bayou Bridge 39462 (2020-2024; 2022-2024) | White Cliffs Pipeline 32288 (2020-2024; 2022-2024) | Centurion Pipeline 31888 (2022-2024) | Enable Gas Gathering 39147 (2022-2023) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hazardous Liquid Mileage | 1918 | 16,685 | 613 | 584 | 1707 | 4279 | 1115 | 703 | 212 | 1066 | 2420 | 131 |
| HL Total Barrels Spilled | 149-2 | 55,206-49,801 | 1331-1313 | 483-447 | 6267-192 | 10,417-3288 | 6378-6360 | 313-306 | 22-21 | Jul-00 | 1725 | 2170 |
| HL Total Property Damage | $191,428-$32,355 | $12,105,690-$9,006,486 | $8,807,602-$7,317,796 | $3,002,292-$2,122,405 | $1,792,413-$965,457 | $31,413,527-$9,258,030 | $8,362,295 $7,892,468 | $596,440-$549,887 | $1,729,875-$1,711,020 | $18,716-0 | $1,285,870 | $1,215,800.00 |
| PHMSA Incidents | 14-1 | 42-28 | 8-4 | 16-8 | 13-4 | 78-17 | 16-9 | 8-4 | 4-3 | 1-0 | 12 | 3 |
| 1000 Bbls Incidents | 0 7-5 | | 1-1 | 0 1-0 | | 5-2 | 2-2 | 0 | 0 | 0 | 1 | 1 |
| PHMSA Defined Significant Incidents | 1-0 | 23-13 | 5-3 | 3-1 | 3-1 | 31-12 | 5-5 | 2-2 | 2-2 | 1-0 | 1 | 3 |
| PHMSA Defined Serious Incidents | 0 2-2 | | 0 | | 0 | | 0 | | 0 | 0 | 0 | 0 |
| Spill In Water | 0 2-2 | | 3-2 | 2-1 | 2-1 | 10-4 | 2-1 | 0 1-1 | | 0 | 0 | 3 |
| Could be in HCA/HCA Impacted | 5/1-0 | 10/6-7/6 | 7/5-3/1 | 3/1-1/0 | 4/3-1/1 | 52/36-26/16 | 6/4-2/1 | | 0 1-0-1/0 | | 0 5/3 | |
| HCA Large Spill thru 2023 | 1-0 | 1-0 | 3-0 | 1-0 | 3-1 | 17-2 | 3-1 | 1-0 | | 0 | 1 | 0 |
| Spills in the Pipeline ROW or Migrated Off Property | 1-0 | 19-13 | 4-2 | 5-1 | 1-1 | 36-9 | 4-4 | | 0 1-1 | | 4 | 3 |
| Immediate Condition Repair IM thru 2023 | 1-0 | 86-3 | 6-0 | 8-0 | | 0 139-26 | 17-2 | 25-2 | | 0 1-0 | 2 | 0 |

### Energy Transfer Hazardous Liquid Enforcement Actions 2017- 12/02/24

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Penalties Collected from 2017 - 2024 | $20,000.00 | $131,300.00 | $0.00 | $1,335,600.00 | $28,200.00 | $1,570,090.00 | $141,800.00 | $700,000.00 | $0.00 | $0.00 | $0.00 | 0 |
| Enforcement actions Initiated 2017 - 2024 | 3 | 9 | 1 | 5 | 6 | 25 | 3 | 4 | 0 | 2 | 0 | 0 |
| CAOs Initiated, Open or Closed 2017 - 2024 | 0 | 0 | 0 | 1 closed 2020 | 0 | 1 still open 2025 | 0 | 0 | 0 | 0 | 0 | 0 |
| Common Enforcement Item Subjects | 2 OME manual; 1 integrity management | 8 OME manual, 5 corrosion control; 14 integrity Management | NA | 1 OME manual; 1 corrosion control | 2 corrosion control; 2 integrity management | 12 OME manual; 16 corrosion control; 8 integrity management | 1 OME manual, 1 corrosion control | 3 OME manual; 1 corrosion control; 1 integrity Management | NA | 2 OME manual | NA | NA |

**Attachment 3 Table. Safety and Enforcement PHMSA Sourced Data for Hazardous Liquid Pipelines 2017-2024 Compared to 2022-2024 for 12 of Energy Transfer's largest subsidiaries. The criterion for selection is described in Section VI of the Declaration.**

# Attachment 4

**Summary Comparison of Energy Transfer LP Safety and Enforcement Record and 12 of its Major Subsidiaries from 2017-2024 to 2022-2024**

|  | Total 2017-2024 (96 months) | Total 2022-2024 (36 months) | Total 2017-2021 (60 months) |
|---|---|---|---|
| HL Total Barrels Spilled | 84,468 bbls 3,547,656 gal | 65,625 bbls 2,756,838 gal | 18,843 bbls 791,406 gal |
| HL Total Property Damage | $70,521,948.00 | $41,357,574.00 | $29,164,374.00 |
| PHMSA Incidents | 215 | 91 | 124 |
| 1000 Bbls Incidents | 18 | 12 | 6 |
| PHMSA Defined Significant Incidents | 80 | 44 | 36 |
| PHMSA Defined Serious Incidents | 2 | 2 | 0 |
| Spill In Water | 25 | 15 | 10 |
| In HCA/HCA Impacted | 93/59 | 46/28 | 47/31 |
| HCA Large Spill thru 2023 | 31 | 5 | 26 |
| Spills in the Pipeline ROW or Migrated Off Property | 78 | 38 | 40 |
| Immediate Condition Repair IM thru 2023 | 285 | 36 | 249 |
| PHMSA Penalties Collected from 2017 - 2024 | $3,926,990.00 |  |  |
| Enforcement actions Initiated 2017 -2024 | 58 |  |  |
| CAOs Initiated, Open or Closed 2017 - 2024 | 2 |  |  |
| Common Enforcement Item Subjects | 29 OME manual; 26 corrosion control; 26 integrity management |  |  |

**Attachment 4 Table. Summary total of Energy Transfers Safety and Enforcement PHMSA Sourced Data for Hazardous Liquid Pipelines 2017-2024 compared to 2022-2024. The totals are for the 12 Energy Transfer's subsidiaries detailed in Attachment Table 3. The criterion for selection is described in Section VI of the Declaration.**



**Attachment 5 Lake Oahe Severe Low Water Fort Rice to Beaver Creek Boat Ramps**
**Satellite Imagery 11-4-2022**

West EFRD

Ft Rice Boat Ramps

East EFRD

Beaver Creek Boat Ramps

Control Point 2 Irrigation Pump and Pipe Pad – Not a Boat Ramp