**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **STANDING ROCK SIOUX TRIBE,**<br><br>  **Plaintiff,**<br><br>  v.<br><br>**U.S. ARMY CORPS OF ENGINEERS,** *et al.*,<br><br>  **Defendants,**<br><br>**STATES OF NORTH DAKOTA,** *et al.*,<br><br>  **Defendant-Intervenors,**<br><br>  **and**<br><br>**DAKOTA ACCESS, LLC,**<br><br>  **Defendant-Intervenor.** |

Civil Action No. 24-2905 (JEB)

## <u>MEMORANDUM OPINION</u>

Once more unto the breach, dear friends.  Four years ago, in its last major ruling in this nearly decade-long dispute between the Standing Rock Sioux Tribe and the U.S. Army Corps of Engineers, the Court denied the Tribe's request for a permanent injunction to halt operation of the Dakota Access Pipeline, a 1,200-mile oil conduit operated by Dakota Access, LLC. Although Plaintiff had previously scored a "hard-earned victory" by convincing this Court and the D.C. Circuit that Dakota Access's easement to cross federal land should be vacated, it eventually "ran out of luck" when it could not show that it would suffer irreparable harm if the pipeline were allowed to operate pending a remand to the agency.  See <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock X</u>), 540 F. Supp. 3d 45, 49–50 (D.D.C.

1

2021).  So, for the last four years, black gold has continued to flow from the Bakken oil fields of North Dakota to southern Illinois, traversing federal land without a Corps-issued easement, while the Corps — unwilling to enforce its property rights — has stayed its hand.

The ostensible justification for this state of suspended animation is that the Government has been preparing a Court-ordered environmental-impact statement, which, depending on its conclusions, could allow the Corps to grant Dakota Access a new easement for the pipeline. While that process has dragged on, the Corps has continued to chart a "course . . . of inaction," choosing neither to "affirmatively authorize[]" the pipeline's operation nor to "exercis[e] its enforcement powers" to shut it down.  Standing Rock X, 540 F. Supp. 3d at 50.  That outcome has generated "understandable frustration" for the Tribe.  Id.  In closing the previous case, however, the Court noted that Plaintiff could always "file a separate action" to challenge the EIS once it was completed, Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, No. 16-1534, Minute Order of June 22, 2021 (D.D.C.), which would soon bring the dispute back to the Court's docket.

But not, perhaps, quite this soon.  Although the Corps has not yet finished the EIS required by the previous Order or issued a fresh easement, the Tribe is already knocking on the courthouse doors.  Alleging violations of a host of federal statutes, it now seeks to use the Administrative Procedure Act to either halt the operation of the pipeline or force the Corps to require Dakota Access to obtain an easement to operate.  Dakota Access and a coalition of states led by North Dakota have intervened as Defendants, and they along with the Corps have filed Motions to Dismiss this latest Complaint.  Although the precise nature of the relief Plaintiff seeks remains unclear, the Court can discern enough to grant those Motions and dismiss this prematurely filed suit.

# I.    Background

A.    <u>Prior Suit</u>

The Court will recount the factual and procedural history leading to the present dispute in abbreviated fashion, referring "readers hungry for more to its prior writings." <u>Standing Rock X</u>, 540 F. Supp. 3d at 50; <u>see, e.g.</u>, <u>id.</u> at 51–55; <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock III</u>), 255 F. Supp. 3d 101, 114–16 (D.D.C. 2017); <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock VII</u>), 471 F. Supp. 3d 71, 75 (D.D.C. 2020), <u>aff'd in part and rev'd in part</u>, <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock IX</u>), 985 F.3d 1032 (D.C. Cir. 2021).

The Dakota Access Pipeline — which transports more than half a million gallons of crude oil from North Dakota to Illinois every day — must occasionally cross federally regulated waters. <u>Standing Rock III</u>, 255 F. Supp. 3d at 114. One such junction is at Lake Oahe, an artificial reservoir on the Missouri River that spans North and South Dakota and borders several American Indian reservations, including Plaintiff's. <u>Id.</u> As the Court has previously emphasized, the reservoir "holds special significance" for these tribes, <u>id.</u>, who rely on it for "drinking, agriculture, industry, and sacred religious and medicinal practices." <u>Standing Rock IX</u>, 985 F.3d at 1040.

They accordingly have launched numerous legal challenges to enjoin the Corps from permitting Dakota Access to construct or operate the segment of the pipeline running underneath the lake. Early attempts brought under the National Historic Preservation Act and the Religious Freedom Restoration Act, however, were unsuccessful in obtaining that relief. <u>See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock II</u>), 239 F. Supp. 3d 77, 100 (D.D.C. 2017); <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock I</u>), 205 F. Supp. 3d 4, 37 (D.D.C. 2016). The Corps thus eventually granted the required easement, and

3

the pipeline became fully operational on June 1, 2017.  <u>Standing Rock III</u>, 255 F. Supp. 3d at 120.

"Undeterred" by their early defeats, the tribes soon "switched focus" and sought relief "under the National Environmental Policy Act, arguing that the Corps was required to prepare an Environmental Impact Statement" before granting the permit to cross federal land.  <u>Standing Rock VII</u>, 471 F. Supp. 3d at 77 (cleaned up).  That salvo met with better success.  Over the course of three years, the Court twice remanded the issue to the Corps, eventually holding that the agency was required to complete an EIS before granting an easement.  <u>See</u> <u>Standing Rock III</u>, 255 F. Supp. 3d at 112; <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock VI</u>), 440 F. Supp. 3d 1, 8 (D.D.C. 2020).  While the case was back with the Corps, the Court also vacated the existing easement — which had the "legal effect" of "render[ing] the pipeline an 'encroachment' on federal land" — and ordered Dakota Access to empty the pipeline of oil within 30 days.  <u>Standing Rock X</u>, 540 F. Supp. 3d at 52; <u>see</u> <u>Standing Rock VII</u>, 471 F. Supp. 3d at 75.

The long-sought shutdown, however, never came to pass.  A motions panel of the D.C. Circuit stayed that aspect of the Order while Defendants appealed, holding that this Court had not made the necessary findings to permanently enjoin operation of the pipeline.  <u>See</u> <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u> (<u>Standing Rock VIII</u>), 2020 WL 4548123, at *1 (D.C. Cir. Aug. 5, 2020).  But the panel rejected Defendants' bid to stay the rest of the Order, thus maintaining the legal status of the pipeline as an encroachment on federal property and requiring the Corps to begin preparing the EIS while the case was on appeal.  <u>Id.</u>

The merits panel followed suit several months later.  It "affirmed this Court's top-line conclusions" that the easement must be vacated while the Corps completed an EIS, but it

4

"reversed this Court's order shutting down the pipeline." <u>Standing Rock X</u>, 540 F. Supp. 3d at 53; <u>see</u> <u>Standing Rock IX</u>, 985 F.3d at 1039, 1053–54. Noting the unique posture of the case — the only one it had encountered "in which the sole issue before the court was whether an easement already in use (rather than a construction or operating permit) must be vacated on NEPA grounds" — the panel nonetheless held that this Court "could not order the pipeline to be shut down without . . . making the findings necessary for injunctive relief" under the traditional four-factor test. <u>Standing Rock IX</u>, 985 F.3d at 1054. The panel also prodded the Corps to "decide promptly" how it would enforce its property rights in light of the vacated easement. <u>Id.</u>

Meanwhile, briefing on the permanent injunction continued apace in this Court after the motions panel had issued its stay. <u>See</u> <u>Standing Rock X</u>, 540 F. Supp. 3d at 54. The Corps had been studiously noncommittal throughout about how it would respond to the pipeline's encroachment, even as it resisted injunctive relief that would halt operations. <u>Id.</u> at 53–54. Instead, it informed the Court in a status conference that it was in a "continuous process of evaluating the status of the encroachment and what steps are best to take." <u>Id.</u> at 54 (quotation marks omitted). This Court eventually denied the tribes' request for injunctive relief, holding that, in light of the vanishingly low likelihood of an oil spill, they had not shown that they would suffer irreparable harm were the pipeline permitted to operate. <u>Id.</u> at 57–64. It acknowledged, however, the regrettable recalcitrance of the Corps, which had opted throughout to ignore repeated instructions from this Court and our Circuit to decide "in the first instance" how it would "enforce its property rights *vis-à-vis* the pipeline's encroach[ment] on federal land." <u>Id.</u> at 64 (quotation marks omitted). Although that choice was a "political decision outside this Court's area of inquiry," the Court concluded, it was one that the Corps would have to "own[]." <u>Id.</u> at 65.

B.    <u>Current Suit</u>

That was where things stood approximately four years ago, and remarkably little has changed since.  According to Plaintiff, Dakota Access continues to operate its pipeline "without the required easement to cross federal land" and "absent a lawful environmental impact analysis," among other alleged deficiencies.  <u>See</u> ECF No. 1 (Compl.), ¶ 2.  Defendants do not dispute this.  <u>See</u> ECF No. 31 (U.S. MTD) at 9–10; <u>see also</u> <u>Sparrow v. United Airlines</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (on motion to dismiss, court takes facts as pled in complaint to be true).  They assert, however, that the Corps has been diligently working on the EIS and, as required by law, provided a draft to Plaintiff and other tribes for comment before publishing notice in the Federal Register in September 2023.  <u>See</u> U.S. MTD at 9; <u>see also</u> ECF No. 31-1 (Draft EIS); 10 C.F.R. §§ 51.73–.74 (draft EIS must be made available to various federal agencies and interested parties for public comment).  Plaintiff, for its part, acknowledges that Dakota Access has sought a new easement.  <u>See</u> Compl., ¶ 41.  No party has provided a timeline for either publishing the final EIS or granting the new easement.

Plaintiff filed this suit in October of last year, naming the Corps and various federal officials as Defendants.  Its Complaint alleges five counts, all of which cite 5 U.S.C. § 706(1) — the provision of the APA permitting a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed."  As best the Court can tell, the "action" that the Tribe alleges has been unlawfully withheld or unreasonably delayed appears to be the Corps' requiring Dakota Access to obtain an easement before operating its pipeline on federal land, in violation of the requirements of the Mineral Leasing Act (Count I), NEPA (Count II), the Government Acquisition and Streamlining Act of 1994 (Count III), the Clean Water Act (Count IV), and the NHPA (Count V).  <u>See</u> Compl., ¶¶ 95–152.

North Dakota quickly sought leave to intervene as a Defendant, which the Court granted. See ECF No. 10 (N.D. Mot. to Intervene); Minute Order of Dec. 3, 2024 (granting intervention). The Flickertail State was joined shortly thereafter by a coalition of thirteen others, led by Iowa, see ECF No. 19 (States' Mot. to Intervene); Minute Order of Dec. 17, 2024 (granting intervention), and by Dakota Access itself, see ECF No. 23 (Dakota Access Mot. to Intervene); Minute Order of Dec. 19, 2024 (granting intervention). The Defendant-Intervenor States and Dakota Access have filed separate Motions to Dismiss alongside the Government's. See ECF Nos. 32 (Dakota Access MTD), 33-1 (States MTD). Those Motions are now ripe.

## II.    Legal Standard

In connection with Plaintiff's APA claim, the Motions to Dismiss invoke Federal Rule of Civil Procedure 12(b)(6). That Rule provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations marks and citation omitted). In weighing a motion to dismiss, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997). The court "must treat the complaint's factual allegations as true and must grant [the] plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citations omitted). It need not accept as true, however, "a legal conclusion couched as a factual allegation" or an inference

unsupported by the facts set forth in the complaint.  <u>Trudeau v. FTC</u>, 456 F.3d 178, 193 (D.C. Cir. 2006) (cleaned up).

## III.    Analysis

The Court starts by demarcating the boundaries of the legal dispute, which have not been laid with particular care.  Despite its repeated citations to 5 U.S.C. § 706(1), for instance, Plaintiff peppers its Complaint with language from § 706(2)(A) — which applies only to final agency action, rather than to action unlawfully withheld or delayed.  <u>See, e.g.</u>, Compl., ¶¶ 104 (allowing Dakota Access to operate pipeline "without an easement is arbitrary, capricious, an abuse of discretion and contrary to law"), 110 (same), 117 (same), 129 (similar), 151 (similar). The Tribe also asks the Court at several points to <u>bar</u> Defendants from awarding to Dakota Access the very easement it elsewhere seeks to compel them to <u>require</u> that company to obtain. <u>Compare, e.g.</u>, <u>id.</u>, ¶¶ 117 (asserting that Dakota Access is "ineligible for an easement"), <u>and</u> 148 (asserting that "no federal permits or assistance" should "issue" to Dakota Access's parent company), <u>with</u> ECF No. 46 (Opp.) at 3 (arguing the Corps "must . . . require the pipeline operator to 'obtain an easement'").  And it alleges violations of an alphabet soup of other statutes in connection with these APA claims, without making clear in the Complaint whether these statutes are cited as independent causes of action.  <u>See</u> Compl., ¶¶ 95–152.

Such confusing and contradictory allegations notwithstanding, Plaintiff in its Opposition now maintains that it seeks review only under § 706(1), asserting that "[f]ederal defendants have a mandatory duty to require Energy Transfer LP [the parent company] to obtain an easement." Opp. at 2.  This late-breaking attempt at clarity still leaves much unanswered.  <u>Compare, e.g.</u>, <u>id.</u> (claiming that Complaint does not "seek the permanent shutdown or denial of an easement for the operation," except for Count V), <u>with</u> <u>id.</u> at 9 ("Plaintiff asks the Court for relief from the operation of a hazardous liquid pipeline across a flood control project without an easement."),

and Compl. at 31 (asking for permanent injunction stopping operations). The Court will nonetheless follow the lead of all parties and accept the Tribe's concession that its § 706(1) failure-to-act claim is the sole one for decision.

So narrowed, this dispute can be quickly dispatched. Plaintiff's Complaint and Opposition raise three possibilities for the relief such a suit could seek: (1) shutting down the pipeline; (2) forcing the Corps to eject Dakota Access from its land; or (3) mandating that Defendants "require" an easement. The *sine qua non* of a § 706(1) suit, however, is to "identify a legally required, discrete act that the [agency] has failed to perform." Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 227 (D.C. Cir. 2009). The Tribe clearly has not met this bar. Even if it had, moreover, all of the above options reduce to a renewed request for the type of injunctive relief the Court already denied in Standing Rock X, and they are thus precluded by that case. The Court will address each of these issues in turn.

A.    Nondiscretionary Duty

Like a writ of mandamus — its forebear — 5 U.S.C. § 706(1) may be used only to enforce statutory directives amounting to "specific, unequivocal command[s]." ICC v. New York, N.H. & H.R. Co., 287 U.S. 178, 204 (1932). Its function is therefore limited to compelling "ministerial" acts "about which [an official has] no discretion whatever." Norton v. S. Utah Wilderness All., 542 U.S. 55, 63, 64 (2004) (quotation marks omitted). While § 706(1) does not pose a jurisdictional bar, see Asim v. Blinken, 2024 WL 3338778, at *3 (D.D.C. July 8, 2024), the Tribe's suit against Defendants states a claim for relief "only [if it] asserts that [the Corps] failed to take a discrete agency action that it is required to take." Norton, 542 U.S. at 64.

Unfortunately for Plaintiff, none of the available options for relief is the type of "ministerial" act for which § 706(1) is available. As for shutting off the flow of oil or ejecting

the pipeline — a request the Tribe asserts is relevant only to Count V, <u>see</u> Opp. at 2 — Plaintiff relies entirely on a section of the NHPA barring federal agencies from granting a "permit, license, or other assistance" to applicants who have "intentionally significantly adversely affected a historic property." 54 U.S.C. § 306113; <u>see</u> Compl., ¶ 133. But that provision on its own terms applies only to <u>granting</u> permits or other types of "assistance." It says nothing about shutting down projects operating <u>without</u> such permits. At best, then, it would become relevant to this suit only once the Corps actually granted an easement to Dakota Access — something the Complaint acknowledges has not yet occurred. <u>See</u> Compl., ¶ 41. The NHPA, moreover, allows federal agencies to carve out exceptions to this prohibition if they determine "that circumstances justify granting the assistance despite the adverse effect created . . . by the applicant." 54 U.S.C. § 306113. That grant of discretionary exception-making is the polar opposite of the "unequivocal command" required to compel agency action under § 706(1).

Apart from the NHPA, Plaintiff identifies no other sources of law compelling the Corps to shut down the pipeline. In the prior lawsuit, Defendants pointed out to the Court that no legal authority requires them "to take any particular action to cure an encroachment within a specified time period, nor is there any requirement to ultimately cure the encroachment at all." <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, No. 16-1534, ECF No. 562 (Status Report) at 4. Over four years later, the Tribe has not improved on this understanding. The best it does is cite a Corps regulation stating that unauthorized structures on Corps-administered land "are subject to summary removal." 36 C.F.R. § 327.20; <u>see</u> Opp. at 11. No one disputes, however, that the pipeline is currently an unauthorized structure that the Corps <u>may</u>, at any moment, choose to remove. <u>See</u> U.S. MTD at 12–13; Dakota Access MTD at 15–16; States MTD at 2. The question is whether Defendants are legally <u>obligated</u> to do so. As to that issue, the Tribe

comes up empty.  "Merely because the statute indicates situations with respect to which the agency may take enforcement actions does not mean that the agency must act in all such situations."  NTCH, Inc. v. FCC, 841 F.3d 497, 503 (D.C. Cir. 2016).

That leaves option three: Plaintiff's repeated contention — based on Count I — that the Corps must "require" Dakota Access (or its parent company) "to obtain an easement."  Opp. at 2; see also id. at 3 (Corps must "require the pipeline operator to obtain an easement") (quotation marks omitted), 8 ("easement requirement" is "mandatory").  As the Intervenor States observe, however, "[T]his Court has already held" that the company must seek a new easement, "and no parties are disputing the point."  ECF No. 47 (States Reply) at 1 (citations omitted).  If Plaintiff means simply to re-argue that holding, then by its own admission the point is now moot: Dakota Access has "appli[ed] for" that easement, and it is "currently under consideration" by the Corps. See Compl., ¶ 41; see Conservation Force, Inc v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (case is moot if "a party has already obtained all the relief that [it has] sought") (quotation marks omitted).

Perhaps recognizing that barrier, the Tribe at times appears to argue a related point — namely, that the Corps is required to issue an easement for a pipeline to traverse Lake Oahe. See, e.g., Opp. at 4 (the "discreet [sic] mandatory dut[y]" is "issuance of an easement for the operation of the pipeline") (emphasis added), 5 (rejecting that the Corps "possesses the discretion to allow a pipeline to operate without an easement"), 9 (claiming that Plaintiff seeks "relief from the operation of a hazardous liquid pipeline across a flood control project without an easement," not to "shut down" or "remov[e]" the pipeline) (emphasis added).   The Court can only assume that Plaintiff presses this claim in order to expedite its opportunity to challenge such easement once approved.  Any relief, however, that would force Defendants to grant an easement now

would run headlong into the Court's Order requiring that the Corps first complete the EIS.  See Standing Rock VI, 440 F. Supp. 3d at 26.

Besides, Plaintiff also identifies no legal authority for its position.  The MLA (on which it pins its hopes, see Opp. at 5–9) provides that "[r]ights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes for the transportation of oil."  30 U.S.C. § 185(a) (emphasis added); see Compl., ¶ 97.  "May" is a quintessentially discretionary term.  See Jama v. ICE, 543 U.S. 335, 346 (2005).  As our Circuit thus long ago observed, "[T]he [MLA] reposes discretion as to the issuance of rights-of-way in the Secretary of the Interior" or other agency head.  Chapman v. El Paso Nat. Gas Co., 204 F.2d 46, 53 (D.C. Cir. 1953).  The Tribe rejoins that the use of "may" indicates simply that multiple agency heads have authority to grant easements, see Opp. at 6, but the Court is not persuaded.  Under that reading, "may" does no independent work; the statute could just as easily have said that rights-of-way "shall" "be granted by the Secretary of the Interior or appropriate agency head."  That is not what is written.  Cf. Duncan v. Walker, 533 U.S. 167, 174 (2001) (it is court's job "to give effect, if possible, to every clause and word of a statute").  The use of "may" instead appears designed to leave to the appropriate agency head's discretion whether to grant an easement in the first instance.  See Kingdomware Technologies, Inc. v. United States, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").  That interpretation is only underscored by the statute's use of "shall" to specify various other requirements, such as that the "[t]he Secretary or agency head shall impose requirements for the operation of the pipeline and related facilities in a manner that will protect" public and worker safety.  See 30 U.S.C. § 185(g); Anglers Conservation Network v.

12

Pritzker, 809 F.3d 664, 671 (D.C. Cir. 2016) ("[W]hen a statutory provision uses both 'shall' and 'may,' it is a fair inference that the writers intended the ordinary distinction" between the two.).

Because most of the subsequent counts are "tier[ed] off" Count I, see Opp. at 12, 13, they topple with it. Counts II and IV appear to ask for the same relief, adding only that the "required" easement must comply with NEPA and the CWA. See Compl., ¶¶ 107–10, 123–26; Opp. at 10–11. They therefore also fail to state a claim under § 706(1) for all the reasons previously explained. Count III, meanwhile, alleges that Dakota Access is "ineligible for an easement for the indefinite future" because of Energy Transfer's debarment proceedings, see Compl., ¶ 116, but also claiming that the Corps must "require a lawful easement to be in place" under § 706(1). Id., ¶ 118. (The Tribe leaves to the reader's imagination who should seek this required easement, if not Dakota Access.) However construed, that count likewise identifies no discrete, mandatory action that the Corps is required to take. The same goes for Count V, insofar as it seeks to compel similar agency action. See Compl., ¶ 152 (identifying only Corps' "failure to act in compliance with mandatory provisions of the NHPA").

To the extent that any of Plaintiff's allegations seek to bar Dakota Access or its parent company from obtaining a potential new easement, see, e.g., id., ¶¶ 114 ("The debarment renders Energy Transfer LP ineligible for the requested easement . . . ."), 148 ("[D]efendants have a mandatory duty under NHPA section 110(k) to ensure that no federal permits or assistance will issue to Energy Transfer LP . . . ."), or otherwise raise issues with the yet-to-be completed EIS or yet-to-be-issued permit, see, e.g., id., ¶¶ 124–26 (alleging that Defendants have not produced a proper Facility Response Plan under the CWA), they are neither actionable under § 706(1) nor fit for consideration at this time. See Fourth Branch Assocs. (Mechanicville) v. FERC, 253 F.3d 741, 746 (D.C. Cir. 2001) ("A party may only petition for judicial review of a final agency

action."). If the Tribe wishes to address such issues, it must wait until the Corps has issued the allegedly unlawful permit — an action this Court in the meantime has no power to compel.

    B.    <u>Issue Preclusion</u>

    The issues with Plaintiff's case do not end there. Even were it to clear § 706(1)'s bar, the Tribe would still be precluded from seeking injunctive relief because <u>Standing Rock X</u> already considered and denied such request. <u>See</u> U.S. MTD at 17–22; ECF No. 48 (U.S. Reply) at 12–14. The doctrine of issue preclusion is meant to conserve judicial resources by "prevent[ing] a party from relitigating an issue that has already been decided." <u>Jackson v. Off. of the Mayor of D.C.</u>, 911 F.3d 1167, 1171 (D.C. Cir. 2018). Under the doctrine, "an issue of fact or law that was actually litigated and necessarily decided is conclusive in a subsequent action." <u>McAlister v. Potter</u>, 843 F. Supp. 2d 117, 120 (D.D.C. 2012) (citing <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)). It requires that "(1) 'the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case;' (2) 'the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case;' and (3) 'preclusion in the second case must not work a basic unfairness to the party bound by the first determination.'" <u>Montgomery v. Internal Revenue Serv.</u>, 40 F.4th 702, 709 (D.C. Cir. 2022) (quoting <u>Martin v. Dep't of Just.</u>, 488 F.3d 446, 454 (D.C. Cir. 2007)).

    To be sure, Plaintiff here does not ask the Court to re-examine <u>Standing Rock X</u>, and, as previously indicated, it at points <u>disclaims</u> asking for shutting down or ejecting the pipeline. <u>See</u> Opp. at 2, 9. That would appear to limit its request only to "requir[ing]" Dakota Access "to obtain an easement." Opp. at 2. As explained, however, this Court has already held as much, and no party disputes that such relief has already been provided. The Tribe does not explain, moreover, how its various allegations — all of which boil down to attacking "the ongoing

operation of [the pipeline] without" an easement, see, e.g., Compl., ¶¶ 105, 111 — can be
resolved without an order shutting down pipeline operations. Indeed, despite its protestations to
the contrary, the Tribe does explicitly ask for stopping the operation of the pipeline, see Compl.
at p. 31; Opp. at 2, and it opposes preclusion primarily because of "new and different facts" that
it argues would support a fresh injunction — not because it disclaims any such request in the first
place. See Opp. at 25–27. The Court is thus at loss to see how Plaintiff's suit is anything other
than an attempted re-do of Standing Rock X.

       In that phase of the case, this Court refused to issue a permanent injunction shutting down
the pipeline because the plaintiffs had not made the requisite showing of irreparable harm. See
540 F. Supp. 3d at 64. The Court rested that conclusion on its finding that the likelihood of an
oil spill was exceedingly low: data in the record reflected "but a single, 1.7-barrel leak between
2010 and 2020 on any crude-oil pipeline installed using horizontal directional drilling
technology, the very method in place" at the Lake Oahe crossing. Id. at 57. Even if a leak did
occur, moreover, the possibility that any oil would reach Lake Oahe — 90 feet of "low-
permeability deposits, sediments, and clay" above the pipeline — was rarer still. Id. at 58. In
light of those remote possibilities, and considering the tribes' inability to point to any legal
reason to shut down the pipeline, the Court concluded that it could not offer such relief. Id. at
64–66.

       Plaintiff offers nothing to disturb those prior determinations. It insists that the current
case presents "disparate legal claims," Opp. at 25, but as those claims also seek an injunction
shutting down (or digging up) the pipeline, they cannot circumvent the preclusive effect of the
prior case. See Yamaha Corp. v. United States, 961 F.2d 245, 257–58 (D.C. Cir. 1992) ("If a
new legal theory or factual assertion put forward in the second action is related to the subject-

matter and relevant to the issues that were litigated and adjudicated previously, so that it <u>could</u> have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.") (quotation marks omitted).  The Tribe also points to "new and different facts" that purportedly change the injunction calculus, such as the "progress" that the Corps has made in "conducting a new NEPA evaluation," the "inadequacies of the facility response plans and spill remediation measures *vis-à-vis* the operational water levels of Lake Oahe," and "previously undisclosed evidence that the initial drilling of the pipeline may have resulted in a substantial release of some 1.4 million gallons of drilling mud in the ecosystem." Opp. at 25–26.  Plaintiff recites — but does not explain the legal import of — these observations. For example, it nowhere explains how they change the irreparable-harm considerations or would otherwise make preclusion here "basic[ally] unfair[]." <u>Montgomery</u>, 40 F.4th at 709.  Indeed, its submissions do not call into question the basis for the Court's prior decision: the low likelihood that the pipeline's ongoing operation would cause irreparable harm to Plaintiff and other similarly situated communities.

The Court thus concludes that, even if it could succeed on the merits of its APA claim, the Tribe would be precluded from seeking any injunctive relief here.  No matter its frustration with Defendants' sluggish pace, it is not yet entitled to a second bite at the apple.

## IV.    Conclusion

For the foregoing reasons, the Court will grant the Defendants and Intervenor-Defendants' Motions to Dismiss.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  <u>March 28, 2025</u>